## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE (WILMINGTON)

In re:                                                                  :
MORTGAGE LENDERS NETWORK, USA, INC. : no. 1:07-CV-00268
                                                                         :
        Debtor                                      :
                                                                         :
---

MITCHELL HEFFERNAN                                        :
        Appellant                                  :
                                                                         :
  vs.                                                              :
                                                                         :
STATE OF CONNECTICUT                                    :
        Appellee                                  :
---

### **APPENDIX**

The Appendix is filed on behalf of Appellant Mitchell Heffernan this 12th day of October 2007 by:

> JAMES E. DRNEC, ESQUIRE (DE Bar #3789)
> Balick & Balick, LLC
> 711 King Street
> Wilmington, DE 19801
> (302) 658-4265
>
> and
>
> ROBERT SCANDONE, ESQUIRE
> 1800 John F. Kennedy Blvd., Suite 200
> Philadelphia, PA 19103
> (215) 563-6571
> Admitted Pro Hac Vice
>
> and
>
> JUDITH P. RODDEN, ESQUIRE
> POZZUOLO & PERKISS, P.C.
> 2033 Walnut Street
> Philadelphia, PA 19103
> (215) 977-8200
> Admitted Pro Hac Vice
>
> Attorneys for Appellant Mitchell Heffernan

## TABLE OF CONTENTS - APPENDIX

### Heffernan vs. the State Of Connecticut

I.      Motion to Enjoin The State of Connecticut From Criminal Prosecution      Page 1
        Pursuant to 11 U.S.C. § 105, with attachments including Proposed Form
        of Order, Notice of Motion, Memorandum of Law and Affidavit, filed
        March 27, 2007 (Docket No. 367)

II.     Mitchell Heffernan's Motion for expedited Hearing Pursuant To Local      Page 18
        Rule 9006-1 (E) with attachments including Proposed form of Order
        filed March 28, 2007 (Docket No. 376)

III.    Motion to Enjoin the State of Connecticut from Criminal Prosecution      Page 21
        Pursuant to 11 U.S.C. § 105 with attachments including Memorandum
        of Law, Notice of Motion, Proposed form of Order and
        Affidavit of Mitchell Heffernan, filed March 28, 2007 (Docket No. 377)

IV.     Order Granting Motion for Expedited hearing Pursuant to Local  Rules     Page 38
        9006-1 (E), dated March 29, 2007 (Docket No. 386)

V.      Mitchell Heffernan's Motion to Reconsider the Court's Order dated        Page 39
        March 29, 2007, filed, March 29, 2007(Docket No. 387)

VI.     Supplemental Memorandum of Law in Support of Mitchell Heffernan's        Page 43
        Motion to Enjoin the State from commencing Criminal Prosecution
        Pursuant to 11 U.S.C. 105 including Exhibits A-G, filed April 9, 2007
        (Docket No. 430)

VII.    Stipulation regarding Affidavit of Mitchell Heffernan, filed April 10,   Page 113
        2007 (Docket No. 443)

VIII.   Minutes of Hearing held on April 10, 2007 and Court Sign-In             Page 116
        Sheet (Docket No. 444)

IX.     Transcript of Hearing held on April 10, 2007, before the Honorable      Page 118
        Judge Peter J. Walsh

X.      Order Denying Injunction Motion, dated April 18, 2007                   Page 166
        (Docket No. 484)

XI.     Motion to Strike of Residential Funding Company, LLC                    Page 167
        with Respect to (A) Motion to Enjoin the State of Connecticut
        from Criminal Prosecution pursuant to 11 U.S.C. § 105; (B) Memorandum of
        Law in support of Motion; and (C) Affidavit of Mitchell Heffernan in Support
        of Motion filed, April 3, 2007 (Docket No. 396)

XII.    Objection of State of Connecticut to Motion of Mitchell Heffernan to     Page 173
        Enjoin the State of Connecticut from Commencing Criminal Prosecution
        Pursuant to 11 U.S.C. § 105 including attachment and Affidavit, filed
        April 5. 2007 (Docket No. 421)

**UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF
DELAWARE**

| | | |
|---|---|---|
| **In Re:** | : | **CHAPTER 11** |
| **MORTGAGE LENDERS NETWORK** | : | |
| **USA, INC.** | : | **CASE NO.: 07-10146(PJW)** |
| Debtor | : | |

## MOTION TO ENJOIN THE STATE OF CONNECTICUT FROM CRIMINAL PROSECUTION PURSUANT TO 11 U.S.C. § 105

Mitchell Heffernan, director and former chief executive officer and president of Mortgage Lenders Network USA, Inc. ("Debtor"), hereby moves to enjoin the State of Connecticut from commencing criminal prosecution against him personally in order to collect unsecured debts of the Debtor for employee commissions. In support of this motion, Mitchell Heffernan alleges as follows:

1.      On February 5, 2007, Mortgage Lenders Network USA, Inc. ("Debtor") filed a voluntarily petition for relief under Chapter 11 of the United States Code, 11 U.S.C. §1101 et seq.

2.      Mitchell Heffernan is a director and former chief executive officer and president of the Debtor.

3.      During the approximate 45 day period prior to the filing of the bankruptcy petition, the Debtor's largest secured creditor, Residential Funding Company, LLC ("RFC") (vice president Thomas Kelly), RFC's restructuring consultant, Navigant Capital Advisors, LLC ("Navigant") (managing partner Edward Casas), and Debtor's restructuring consultant Scouler Andrews (principal Daniel Scouler) took over the cash management of the Debtor. All financial transactions and payments to creditors were required to be approved by RFC and Navigant.

4.    Mitchell Heffernan had no control over payments to any of Debtor's creditors, including, but not limited to, employee commissions from mid December 2006 through the date the bankruptcy petition was filed, February 5, 2007.

5.    In addition, Mr. Heffernan was directed by: (a) Debtor's bankruptcy counsel, James Stang, Esquire, (b) Thomas Kelly at RFC, (c) Edward Casas at Navigant, and (d) Daniel Scoular at Scoular Andrews, not to pay any commissions to employees because (1) the commissions were disputed and (2) the Bankruptcy Court would require the commission payments to be repaid to the Debtor as preferential payments.

6.    Connecticut General Statute §31-71(b) and (g) provides that: "Any employer or **any officer or agent of an employer** or any other person authorized by an employer to pay wages who violates any provision…" of the statute may be fined or imprisoned for failure to pay wages to employees.  Connecticut General Statute §31-72 provides that the Connecticut Labor Commissioner may commence a civil action to collect employee wage claims.

7.    Since last week Gary Pechie of the Connecticut Department of Labor has granted on-camera interviews and press interviews to the Hartford Courant and other local media confirming that the Connecticut Department of Labor requested an arrest warrant for Mr. Heffernan personally arising out of the disputed commissions the Debtor did not pay at the direction of RFC and Navigant.

8.    The Connecticut State Attorney in Middletown, Connecticut presently has on his desk an arrest warrant submitted by the Department of Labor for Mr. Heffernan for Debtor's failure to pay employee commissions.

9.      Counsel for Mr. Heffernan, Robert Scandone, Esquire, has been in contact with both the State Attorney's Office in Middletown, Connecticut and the State Attorney General's Office in Hartford, Connecticut.

10.     The Department of Labor and State's Attorney General's Office are trying to use this criminal statute to collect prepetition commissions.

11.     The arrest of Mr. Heffernan for following the directions of bankruptcy counsel, RFC, Navigant and Scoular, and the procedures of the bankruptcy court cannot and should not be permitted.  Bankruptcy Courts have enjoined criminal prosecution against directors and officers of corporate debtors where the proceeding is intertwined with the bankruptcy case.  See, e.g., In re Jerzak, 47 B.R. 771 (W.D. Wis. 1985), In re Bicro Corporation, 105 B.R. 255 (M.D. Pa.1988), In re Dettler Farms, 58 B.R. 404 (D. S.Dak. 1986) and In re Caldwell, 5 B.R. 740 (W.D. Va. 1980).

12.     Counsel for Mr. Heffernan has informed Daniel Scouler and the Debtor's bankruptcy counsel James Stang, Esquire, of their intent to file this motion, and counsel for Mr. Heffernan believe that they will join in with this request.

WHEREFORE, Mitchell Heffernan respectfully requests this Honorable Court to enjoin the State of Connecticut from commencing criminal prosecution against Mitchell Heffernan during these bankruptcy proceedings.

Respectfully submitted,

BY: _____/S/_____

    ROBERT SCANDONE, ESQUIRE
    1800 John F. Kennedy Blvd, Suite 200
    Philadelphia, PA 19103
    (215) 563-6571
    ATTY I.D. No. 15181

and

POZZUOLO & PERKISS, P.C.

BY: _____/S/_____

    GARY M. PERKISS, ESQUIRE
    2033 Walnut Street
    Philadelphia, PA 19103
    (215) 977-8200
    ATTY I.D. No. 30324
    Attorneys for Mitchell Heffernan

# UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | : | CHAPTER 11 |
| MORTGAGE LENDERS NETWORK | : | |
| USA, INC. | : | CASE NO.: 07-10146 (PJW) |
| Debtor | : | |
| | : | |
| | : | |

## ORDER

AND NOW, this _____ day of _____, 2007, Mitchell Heffernan, director

and former chief executive officer and president of Debtor Mortgage Lenders Network USA,

Inc., having filed a Motion for Expedited Hearing Pursuant to Local Rule 9006-1(e) in support

of his Motion to Enjoin the State of Connecticut from Criminal Prosecution Pursuant to 11

U.S.C. §105,

IT IS SO **ORDERED** that an expedited hearing is scheduled on this motion on the 10th

day of April, 2007 at _____ __.M. in Court Room _____, and the State of Connecticut is

enjoined from proceeding on an arrest warrant against Mitchell Heffernan pending the hearing.


BY THE COURT:


_____
**HONORABLE PETER WALSH, J.**
**UNITED STATES BANKRUPCTY JUDGE**



**UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In Re: | : | CHAPTER 11 |
| MORTGAGE LENDERS NETWORK | : | |
| USA, INC. | : | CASE NO.: 07-10146 (PJW) |
| Debtor | : | |
| | : | **OBJECTIONS DUE BY:** |
| | : | **HEARING DATE:** |

## NOTICE OF MOTION

TO:    Glenn Woods, Esquire
State Attorney General Office
55 Elm Street
Hartford, CT 06106
**Via facsimile #860-808-5388**

James E. O'Neill, Esquire
Laura Davis Jones, Esquire
Curtis A. Hehn, Esquire
Pachulski, Stang, Ziehl, Young, Jones
and Weintraub, LLP
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705
**Via Emil: chehn@pszyj.com;
Jo'neill@pszyj.com;
ljones@pszyj.com**

John Cashan, Esquire
GA 9 State Attorney's Office
1 Court Street
Middleton, CT 06457
**Via facsimile #860-343-6311**

U.S. Trustee
United States Trustee
844 King Street, Room 2207
Lockbox #35
Wilmington, DE 19899-0035
**Via facsimile #302-573-6497**

David W. Carickhoff, Jr., Esquire
Jason W. Staib, Esquire
Blank Rome, LLP
Chase Manhattan Centre
Wilmington, DE 19801
Attorneys for The Official
Committee of Unsecured Creditors
Of Mortgage Lenders Network USA,
Inc.
**Via Email:
carickhoff@blankrome.com
staib@blankrome.com**

Mitcehll Heffernan, Director and Officer of Debtor, has filed a Motion to Enjoin the State of Connecticut from Criminal Prosecution Pursuant to 11 U.S.C. §105 which seeks the following relief:

Mitchell Heffernan respectfully requests this Honorable Court to enjoin the Connecticut Department of Labor from arresting and criminally prosecuting Mitchell Heffernan during the pendency of this bankruptcy case.

You are required to file a response to the attached motion on or before

_____.

At the same time, you must also serve a copy of the response upon movant's attorneys:

Robert Scandone, Esquire                    Gary M. Perkiss, Esquire
1800 John F. Kennedy Boulevard              Pozzuolo & Perkiss, P.C.
Suite 200                                   2033 Walnut Street
Philadelphia, PA 19103                      Philadelphia, PA 19103

HEARING ON THE MOTION WILL BE HELD ON _____.

IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF DEMANDED BY THE MOTION WITHOUT FURTHER NOTICE OR HEARING.

                                   Respectfully submitted,

DATE: March 27, 2007              BY: _____/S/_____
                                   ROBERT SCANDONE, ESQUIRE
                                   1800 John F. Kennedy Blvd, Suite 200
                                   Philadelphia, PA 19103
                                   (215) 563-6571
                                   ATTY I.D. No. 15181
                                        and
                                   POZZUOLO & PERKISS, P.C.

DATE: March 27, 2007              BY: _____/S/_____
                                   GARY M. PERKISS, ESQUIRE
                                   2033 Walnut Street
                                   Philadelphia, PA 19103
                                   (215) 977-8200
                                   ATTY I.D. No. 30324
                                   Attorneys for Mitchell Heffernan

## UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | : | CHAPTER 11 |
| MORTGAGE LENDERS NETWORK | : | |
| USA, INC. | : | CASE NO.: 07-10146 (PJW) |
| Debtor | : | |
| | : | **OBJECTIONS DUE BY:** |
| | : | **HEARING DATE:** |

### CERTIFICATE OF SERVICE

I, Gary M. Perkiss, Esquire, certify that I am not less than 18 years of age, and that service of this notice of motion and a copy of the motion was made on March 27, 2007 via email upon:

Glenn Woods, Esquire
State Attorney General Office
55 Elm Street
Hartford, CT 06106
**Via facsimile #860-808-5388**

James E. O'Neill, Esquire
Laura Davis Jones, Esquire
Curtis A. Hehn, Esquire
Pachulski, Stang, Ziehl, Young, Jones
and Weintraub, LLP
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705
**Via Emil: chehn@pszyj.com;**
**Jo'neill@pszyj.com;**
**ljones@pszyj.com**

John Cashan, Esquire
GA 9 State Attorney's Office
1 Court Street
Middleton, CT 06457
**Via facsimile #860-343-6311**

U.S. Trustee
United States Trustee
844 King Street, Room 2207
Lockbox #35
Wilmington, DE 19899-0035
**Via facsimile #302-573-6497**

David W. Carickhoff, Jr., Esquire
Jason W. Staib, Esquire
Blank Rome, LLP
Chase Manhattan Centre
Wilmington, DE 19801
Attorneys for The Official
Committee of Unsecured Creditors
Of Mortgage Lenders Network USA,
Inc.
**Via Email:**
**carickhoff@blankrome.com**
**staib@blankrome.com**

Under penalty of perjury, I declare that the foregoing is true and correct.

POZZUOLO & PERKISS, P.C.

Date: March 27, 2007                          BY: _____/S/_____
                                                  GARY M. PERKISS, ESQUIRE
                                                  Attorney for Mitchell Heffernan

UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF
DELAWARE

| | | |
|---|---|---|
| In Re: | : | **CHAPTER 11** |
| **MORTGAGE LENDERS NETWORK** | : | |
| **USA, INC.** | : | **CASE NO.: 07-10146(PJW)** |
| Debtor | : | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO ENJOIN THE STATE OF CONNECTICUT FROM COMMENCING CRIMINAL PROSECUTION PURSUANT TO 11 U.S.C. § 105

This memorandum of law is submitted in support of the Motion of Mitchell Heffernan, director and former chief executive officer and president of Mortgage Lenders Network USA, Inc. ("Debtor") to Enjoin the State of Connecticut from commencing criminal prosecution against Mitchell Heffernan.

## I.    BACKGROUND

On February 5, 2007, Mortgage Lenders Network USA, Inc. ("Debtor") filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 1101 et seq.

During the approximate 45 day period prior to the filing of the bankruptcy petition, the Debtor's largest secured creditor Residential Funding Company, LLC ("RFC") took over the cash management of the Debtor. RFC retained a restructuring consultant, Navigant Capital Advisors, LLC ("Navigant"), to assist RFC in the management of the Debtor's operations, cash management and the bankruptcy reorganization process. RFC required the Debtor to retain a restructuring consultant, Scouler Andrews, to also assist the Debtor in the management of the Debtor's operations, cash management and the bankruptcy reorganization process. All financial transactions

and payments to creditors of the Debtor were required to be approved by RFC and Navigant.

From the takeover by RFC in mid December 2006, Mitchell Heffernan had no control over payments to any of Debtor's creditors, including, but not limited to, payment of employee commissions. In addition, Mitchell Heffernan was directed by: (a) Debtor's bankruptcy counsel, James Stang, Esquire, (b) Tom Kelly, vice president of RFC, (c) Ed Cassas, managing partner of Navigant, and (d) Daniel Scoular, principal at Scoular Andrews, not to pay any commissions to employees because (1) the commissions were disputed and (2) the Bankruptcy Court would require the commission payments to be repaid to the Debtor as preferential payments.

Even though Mitchell Heffernan had absolutely no control over payment of any creditors or employee commissions since mid December 2006, the Connecticut State Attorney has threatened to arrest Mitchell Heffernan for failure to pay wages pursuant to Connecticut General Statute § 31-71(b) and (g).

## II.    ARGUMENT.

11 U.S.C. § 105(a) provides that "the Court may issue an order, process or judgment that is necessary or appropriate to carry out the provisions of this title."

Bankruptcy Courts throughout this country have enjoined criminal prosecution, pursuant to the Bankruptcy Court's equitable powers of 11 U.S.C. § 105(a) when the criminal process is being used as a means of extracting a preference not accorded other creditors similarly situated. See, e.g., In re Jerzak, 47 B.R. 771 (W.D. Wis. 1985), In re Bicro Corporation, 105 B.R. 255 (M.D. Pa. 1988), In re Dettler Farms, 58 B.R. 404 (D. S.Dak. 1986) and In re Caldwell, 5 B.R. 740 (W.D. Va. 1980).

In In re Bicro Corporation, supra, a corporate debtor sought an injunction prohibiting the criminal prosecution of the debtor, its officers, and/or employees on a criminal complaint. The court concluded that "a creditor...may be permanently enjoined from any further participation in a criminal prosecution of a debtor when a creditor is seeking to utilize the criminal process as a means of exacting a preference not accorded to other creditors similarly situated." Id. at 257.

In In re Jerzak, supra, the Bankruptcy Court for the Western District of Wisconsin enjoined the Wisconsin Department of Industry, Labor and Human Relations ("DILHR") from proceeding with civil and criminal actions against Chapter 11 debtors for unpaid wages due an employee. The civil claim was commenced prior to the filing of the bankruptcy case. Subsequent to the filing of the bankruptcy case the County District Attorney commenced a criminal complaint for the unpaid wages. The Bankruptcy Court held that: "The conclusion is inescapable that the ... criminal proceeding is, but for the caption, a civil action to collect a debt." Id., 47 B.R. at 774.

Connecticut General Statutes §§ 31-71(b),(g) and 31-72 provide both civil and criminal remedies for the same act- failure to pay wages. This is identical to the Jerzak case. The instant threatened criminal action against Mitchell Heffernan is a civil action dressed in "criminal" clothes- a civil action to collect wages.

The Bankruptcy Court in the Western District of Pennsylvania addressed the same issue in In Re Shenango Group, Inc., 186 B.R. 623 (W.D. Pa. 1995). The Bankruptcy Court dismissed a lawsuit filed personally against the Chief Executive Officer and Chairman of the Board of Directors of the Debtor corporation under the Pennsylvania Wage Payment and Collection Law. The claim against the Chief Executive Officer and

Chairman of the Board of Directors was for unpaid fringe benefits that the Debtor had not

paid. In dismissing the claim, the Bankruptcy Court held that the Bankruptcy Code

preempts the Pennsylvania Wage Payment and Collection Law, stating:

> "Once a bankruptcy petition is filed, the debtor in a Chapter 11 is barred from paying prepetition claims by any method other than plan payments or order of court. Furthermore, the debts that arose prior to filing are discharged upon confirmation of the plan. 11 U.S.C. §1141(d). The amounts to be received pursuant to the plan are new obligations between the claimants and the debtor. Upon confirmation of the plan, the claimants are bound by its provisions. 11 U.S.C. §1141(a)."

> "If the WPCL is construed to mandate full payment by the [individual officers] of Plaintiffs' claims, they would be forced to pay monies that a debtor is not permitted to pay prior to the confirmation of its plan. Upon confirmation, a debtor's obligation is only the amount provided for in the plan. To require the [individual officers] to assume responsibility for amounts that [the Debtor] is not obligated to pay is, in effect, requiring them to make a contribution to the corporation on the basis of the position they held as officers of the debtor-in-possession."

> \*    \*    \*    \*

> "Interpreting the WPCL as Plaintiffs have suggested creates an unwarranted obstacle to attaining the objectives sought by the bankruptcy code....It would undermine the distribution scheme set forth in the bankruptcy code as it would require the debtor-in-possession's officers to make payments that the bankruptcy code prevents the debtor from making. It would create two payments for these claimants; one from the estate, the other from officers of the estate." Id. at 627-628.

Mitchell Heffernan respectfully submits that the threatened criminal prosecution

is nothing more than an unlawful attempt by the State of Connecticut to circumvent the

distribution scheme set forth in the bankruptcy code by seeking payments from Mr.

Heffernan personally. This is exactly what Bankruptcy Courts have prevented by

implementing the equitable powers of 11 U.S.C§ 105(a) to enjoin criminal prosecution

against officers and directors of debtor corporations. Since the takeover of the Debtor by RFC in mid December 2006, Mr. Heffernan control of the Debtor's funds was in the hands of RFC and Navigant.

The threatened action by the Connecticut State Attorney on behalf of the Commissioner of the Connecticut Department of Labor is identical to the actions of the Wisconsin DILHR in the Jerzak case and the Pennsylvania WPCL in the Shenango Group, Inc. case. The Connecticut State Attorney has threatened a criminal action to collect a civil debt, which is governed by the Bankruptcy Code. If the State of Connecticut is allowed to arrest an individual who has done nothing illegal and through his corporation has sought bankruptcy protection, no corporate officer would be safe from all states attempting to circumvent the Bankruptcy Court. This would make bankruptcy a nullity. Therefore, the Connecticut State Attorney must be enjoined from proceeding with the threatened criminal action against Mr. Heffernan.

## III.    **CONCLUSION.**

Based on the foregoing it is respectfully submitted that the State of Connecticut

be enjoined from commencing criminal prosecution against Mitchell Heffernan.

Respectfully submitted,

BY: _____/S/_____

ROBERT SCANDONE, ESQUIRE
1800 John F. Kennedy Blvd, Suite 200
Philadelphia, PA 19103
(215) 563-6571
ATTY I.D. No. 15181
            and
POZZUOLO & PERKISS, P.C.

BY: _____/S/_____

GARY M. PERKISS, ESQUIRE
2033 Walnut Street
Philadelphia, PA 19103
(215) 977-8200
ATTY I.D. No. 30324
Attorneys for Mitchell Heffernan

## UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | : | CHAPTER 11 |
| MORTGAGE LENDERS NETWORK USA, INC. | : | CASE NO.: 07-10146 (PJW) |
| Debtor | : | |
| | : | **OBJECTIONS DUE BY:** |
| | : | **HEARING DATE:** |

### AFFIDAVIT OF MITCHELL HEFFERNAN

MITCHELL HEFFERNAN, being duly sworn according to law, depose and say as follows:

1.    On February 5, 2007, Mortgage Lenders Network USA, Inc. ("Debtor") filed a voluntarily petition for relief under Chapter 11 of the United States Code, 11 U.S.C. §1101 et seq.

2.    I am a director and former chief executive officer and president of the Debtor.

3.    During the approximate 45 day period prior to the filing of the bankruptcy petition, the Debtor's largest secured creditor, Residential Funding Company, LLC ("RFC") (vice president Thomas Kelly), RFC's restructuring consultant, Navigant Capital Advisors, LLC ("Navigant") (managing partner Edward Casas), and Debtor's restructuring consultant Scouler Andrews (principal Daniel Scouler) took over the cash management of the Debtor. All financial transactions and payments to creditors were required to be approved by RFC and Navigant.

4.    I had no control over payments to any of Debtor's creditors, including, but not limited to, employee commissions from mid December 2006 through the date the bankruptcy petition was filed, February 5, 2007.

5.      In addition, I was directed by: (a) Debtor's bankruptcy counsel, James
Stang, Esquire, (b) Thomas Kelly at RFC, (c) Edward Casas at Navigant, and (d) Daniel
Scoular at Scoular Andrews, not to pay any commissions to employees because (1) the
commissions were disputed and (2) the Bankruptcy Court would require the commission
payments to be repaid to the Debtor as preferential payments.

Under penalty of perjury, the above statements, to the best of my knowledge and
belief, are true, correct and complete.


Date: __3-27-07__                         BY: _____
                                              MITCHELL HEFFERNAN

UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF
DELAWARE

| | | |
|---|---|---|
| In Re: | : | **CHAPTER 11** |
| **MORTGAGE LENDERS NETWORK** | : | |
| **USA, INC.** | : | **CASE NO.: 07-10146(PJW)** |
| Debtor | : | |

<u>**MITCHELL HEFFERNAN'S MOTION FOR EXPEDITED HEARING**</u>
<u>**PURSUANT TO LOCAL RULE 9006-1(E)**</u>

Mitchell Heffernan, director and former chief executive officer and president of

Mortgage Lenders Network USA, Inc. ("Debtor"), hereby moves this Honorable Court

for an expedited hearing pursuant to Local Rule 9006-1(e).  In support of this motion,

Mitchell Heffernan alleges as follows:

1.     Mitchell Heffernan filed a Motion to Enjoin the State of Connecticut from

Criminal Prosecution Pursuant to 11 U.S.C. § 105 on March 27, 2007.  A true and correct

copy of the Motion to Enjoin the State of Connecticut from Criminal Prosecution

Pursuant to 11 U.S.C. § 105 is attached hereto, made a part hereof and marked <u>Exhibit</u>

<u>"A."</u>

2.     In an attempt to circumvent the Bankruptcy Code and this Bankruptcy

Court's jurisdiction, the State of Connecticut has threatened immediate criminal

prosecution against Mitchell Heffernan to collect on a civil debt owed by the Debtor,

Mortgage Lenders Network USA, Inc., namely commissions owed by the Debtor

3.     Mitchell Heffernan requests this expedited hearing so that the State of

Connecticut not issue an arrest warrant based on a civil complaint filed by the

Connecticut Department of Labor.  Mitchell Heffernan requests an expedited hearing be

scheduled on April 10, 2007 provided the State of Connecticut is enjoined from

commencing criminal prosecution pending the hearing.  If, however, the Bankruptcy

Court does not enjoin the State of Connecticut pending the hearing, Mitchell Heffernan

requests an immediate hearing.

WHEREFORE, Mitchell Heffernan respectfully requests this Honorable Court to

schedule an expedited hearing.

Respectfully submitted,

BY: _____/S/_____

ROBERT SCANDONE, ESQUIRE
1800 John F. Kennedy Blvd, Suite 200
Philadelphia, PA 19103
(215) 563-6571
ATTY I.D. No. 15181

and

POZZUOLO & PERKISS, P.C.

BY: _____/S/_____

GARY M. PERKISS, ESQUIRE
2033 Walnut Street
Philadelphia, PA 19103
(215) 977-8200
ATTY I.D. No. 30324
Attorneys for Mitchell Heffernan

## UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | : | CHAPTER 11 |
| MORTGAGE LENDERS NETWORK | : | |
| USA, INC. | : | CASE NO.: 07-10146 (PJW) |
| Debtor | : | |
| | : | |
| | : | |

### ORDER

AND NOW, this _____ day of _____, 2007, Mitchell Heffernan, director and former chief executive officer and president of Debtor Mortgage Lenders Network USA, Inc., having filed a Motion to Enjoin the State of Connecticut from Criminal Prosecution Pursuant to 11 U.S.C. §105,

IT IS SO **ORDERED** that the State of Connecticut is preliminarily enjoined from commencing criminal prosecution against Mitchell Heffernan pending an emergency hearing on the motion which is scheduled for _____.

BY THE COURT:

_____
**HONORABLE PETER WALSH, J.**
**UNITED STATES BANKRUPCTY JUDGE**

## UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | : | **CHAPTER 11** |
| **MORTGAGE LENDERS NETWORK** | : | |
| **USA, INC.** | : | **CASE NO.: 07-10146(PJW)** |
| Debtor | : | |

## MOTION TO ENJOIN THE STATE OF CONNECTICUT FROM CRIMINAL PROSECUTION PURSUANT TO 11 U.S.C. § 105

Mitchell Heffernan, director and former chief executive officer and president of Mortgage Lenders Network USA, Inc. ("Debtor"), hereby moves to enjoin the State of Connecticut from commencing criminal prosecution against him personally in order to collect unsecured debts of the Debtor for employee commissions. In support of this motion, Mitchell Heffernan alleges as follows:

1.    On February 5, 2007, Mortgage Lenders Network USA, Inc. ("Debtor") filed a voluntarily petition for relief under Chapter 11 of the United States Code, 11 U.S.C. §1101 et seq.

2.    Mitchell Heffernan is a director and former chief executive officer and president of the Debtor.

3.    During the approximate 45 day period prior to the filing of the bankruptcy petition, the Debtor's largest secured creditor, Residential Funding Company, LLC ("RFC") (vice president Thomas Kelly), RFC's restructuring consultant, Navigant Capital Advisors, LLC ("Navigant") (managing partner Edward Casas), and Debtor's restructuring consultant Scouler Andrews (principal Daniel Scouler) took over the cash management of the Debtor. All financial transactions and payments to creditors were required to be approved by RFC and Navigant.

4.      Mitchell Heffernan had no control over payments to any of Debtor's creditors, including, but not limited to, employee commissions from mid December 2006 through the date the bankruptcy petition was filed, February 5, 2007.

5.      In addition, Mr. Heffernan was directed by: (a) Debtor's bankruptcy counsel, James Stang, Esquire, (b) Thomas Kelly at RFC, (c) Edward Casas at Navigant, and (d) Daniel Scoular at Scoular Andrews, not to pay any commissions to employees because (1) the commissions were disputed and (2) the Bankruptcy Court would require the commission payments to be repaid to the Debtor as preferential payments.

6.      Connecticut General Statute §31-71(b) and (g) provides that: "Any employer or **any officer or agent of an employer** or any other person authorized by an employer to pay wages who violates any provision…" of the statute may be fined or imprisoned for failure to pay wages to employees.  Connecticut General Statute §31-72 provides that the Connecticut Labor Commissioner may commence a civil action to collect employee wage claims.

7.      Since last week Gary Pechie of the Connecticut Department of Labor has granted on-camera interviews and press interviews to the Hartford Courant and other local media confirming that the Connecticut Department of Labor requested an arrest warrant for Mr. Heffernan personally arising out of the disputed commissions the Debtor did not pay at the direction of RFC and Navigant.

8.      The Connecticut State Attorney in Middletown, Connecticut presently has on his desk an arrest warrant submitted by the Department of Labor for Mr. Heffernan for Debtor's failure to pay employee commissions.

9.    Counsel for Mr. Heffernan, Robert Scandone, Esquire, has been in contact with both the State Attorney's Office in Middletown, Connecticut and the State Attorney General's Office in Hartford, Connecticut.

10.    The Department of Labor and State's Attorney General's Office are trying to use this criminal statute to collect prepetition commissions.

11.    The arrest of Mr. Heffernan for following the directions of bankruptcy counsel, RFC, Navigant and Scoular, and the procedures of the bankruptcy court cannot and should not be permitted.  Bankruptcy Courts have enjoined criminal prosecution against directors and officers of corporate debtors where the proceeding is intertwined with the bankruptcy case.  See, e.g., In re Jerzak, 47 B.R. 771 (W.D. Wis. 1985), In re Bicro Corporation, 105 B.R. 255 (M.D. Pa.1988), In re Dettler Farms, 58 B.R. 404 (D. S.Dak. 1986) and In re Caldwell, 5 B.R. 740 (W.D. Va. 1980).

12.    Counsel for Mr. Heffernan has informed Daniel Scouler and the Debtor's bankruptcy counsel James Stang, Esquire, of their intent to file this motion, and counsel for Mr. Heffernan believe that they will join in with this request.

WHEREFORE, Mitchell Heffernan respectfully requests this Honorable Court to enjoin the State of Connecticut from commencing criminal prosecution against Mitchell Heffernan during these bankruptcy proceedings.

Respectfully submitted,

BY: _____/S/_____

    ROBERT SCANDONE, ESQUIRE
    1800 John F. Kennedy Blvd, Suite 200
    Philadelphia, PA 19103
    (215) 563-6571
    ATTY I.D. No. 15181

and

POZZUOLO & PERKISS, P.C.

BY: _____/S/_____

    GARY M. PERKISS, ESQUIRE
    2033 Walnut Street
    Philadelphia, PA 19103
    (215) 977-8200
    ATTY I.D. No. 30324
    Attorneys for Mitchell Heffernan

## UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | : | **CHAPTER 11** |
| **MORTGAGE LENDERS NETWORK** | : | |
| **USA, INC.** | : | **CASE NO.: 07-10146(PJW)** |
| Debtor | : | |

### MEMORANDUM OF LAW IN SUPPORT OF MOTION TO ENJOIN THE STATE OF CONNECTICUT FROM COMMENCING CRIMINAL PROSECUTION PURSUANT TO 11 U.S.C. § 105

This memorandum of law is submitted in support of the Motion of Mitchell Heffernan, director and former chief executive officer and president of Mortgage Lenders Network USA, Inc. ("Debtor") to Enjoin the State of Connecticut from commencing criminal prosecution against Mitchell Heffernan.

### I.     BACKGROUND

On February 5, 2007, Mortgage Lenders Network USA, Inc. ("Debtor") filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 1101 et seq.

During the approximate 45 day period prior to the filing of the bankruptcy petition, the Debtor's largest secured creditor Residential Funding Company, LLC ("RFC") took over the cash management of the Debtor.  RFC retained a restructuring consultant, Navigant Capital Advisors, LLC ("Navigant"), to assist RFC in the management of the Debtor's operations, cash management and the bankruptcy reorganization process.  RFC required the Debtor to retain a restructuring consultant, Scouler Andrews, to also assist the Debtor in the management of the Debtor's operations, cash management and the bankruptcy reorganization process.  All financial transactions

and payments to creditors of the Debtor were required to be approved by RFC and Navigant.

From the takeover by RFC in mid December 2006, Mitchell Heffernan had no control over payments to any of Debtor's creditors, including, but not limited to, payment of employee commissions. In addition, Mitchell Heffernan was directed by: (a) Debtor's bankruptcy counsel, James Stang, Esquire, (b) Tom Kelly, vice president of RFC, (c) Ed Cassas, managing partner of Navigant, and (d) Daniel Scoular, principal at Scoular Andrews, not to pay any commissions to employees because (1) the commissions were disputed and (2) the Bankruptcy Court would require the commission payments to be repaid to the Debtor as preferential payments.

Even though Mitchell Heffernan had absolutely no control over payment of any creditors or employee commissions since mid December 2006, the Connecticut State Attorney has threatened to arrest Mitchell Heffernan for failure to pay wages pursuant to Connecticut General Statute § 31-71(b) and (g).

## II.    ARGUMENT.

11 U.S.C. § 105(a) provides that "the Court may issue an order, process or judgment that is necessary or appropriate to carry out the provisions of this title."

Bankruptcy Courts throughout this country have enjoined criminal prosecution, pursuant to the Bankruptcy Court's equitable powers of 11 U.S.C. § 105(a) when the criminal process is being used as a means of extracting a preference not accorded other creditors similarly situated. See, e.g., In re Jerzak, 47 B.R. 771 (W.D. Wis. 1985), In re Bicro Corporation, 105 B.R. 255 (M.D. Pa. 1988), In re Dettler Farms, 58 B.R. 404 (D. S.Dak. 1986) and In re Caldwell, 5 B.R. 740 (W.D. Va. 1980).

In In re <u>Bicro Corporation</u>, <u>supra</u>, a corporate debtor sought an injunction prohibiting the criminal prosecution of the debtor, its officers, and/or employees on a criminal complaint. The court concluded that "a creditor...may be permanently enjoined from any further participation in a criminal prosecution of a debtor when a creditor is seeking to utilize the criminal process as a means of exacting a preference not accorded to other creditors similarly situated." <u>Id</u>. at 257.

In <u>In re Jerzak</u>, <u>supra</u>, the Bankruptcy Court for the Western District of Wisconsin enjoined the Wisconsin Department of Industry, Labor and Human Relations ("DILHR") from proceeding with civil and criminal actions against Chapter 11 debtors for unpaid wages due an employee. The civil claim was commenced prior to the filing of the bankruptcy case. Subsequent to the filing of the bankruptcy case the County District Attorney commenced a criminal complaint for the unpaid wages. The Bankruptcy Court held that: "The conclusion is inescapable that the ... criminal proceeding is, but for the caption, a civil action to collect a debt." <u>Id</u>., 47 B.R. at 774.

Connecticut General Statutes §§ 31-71(b),(g) and 31-72 provide both civil and criminal remedies for the same act- failure to pay wages. This is identical to the <u>Jerzak</u> case. The instant threatened criminal action against Mitchell Heffernan is a civil action dressed in "criminal" clothes- a civil action to collect wages.

The Bankruptcy Court in the Western District of Pennsylvania addressed the same issue in In Re <u>Shenango Group, Inc.</u>, 186 B.R. 623 (W.D. Pa. 1995). The Bankruptcy Court dismissed a lawsuit filed personally against the Chief Executive Officer and Chairman of the Board of Directors of the Debtor corporation under the Pennsylvania Wage Payment and Collection Law. The claim against the Chief Executive Officer and

Chairman of the Board of Directors was for unpaid fringe benefits that the Debtor had not

paid.   In dismissing the claim, the Bankruptcy Court held that the Bankruptcy Code

preempts the Pennsylvania Wage Payment and Collection Law, stating:

> "Once a bankruptcy petition is filed, the debtor in a Chapter 11 is
> barred from paying prepetition claims by any method other than
> plan payments or order of court.  Furthermore, the debts that arose
> prior to filing are discharged upon confirmation of the plan.  11
> U.S.C. §1141(d). The amounts to be received pursuant to the plan
> are new obligations between the claimants and the debtor.  Upon
> confirmation of the plan, the claimants are bound by its provisions.
> 11 U.S.C. §1141(a)."

> "If the WPCL is construed to mandate full payment by the
> [individual officers] of Plaintiffs' claims, they would be forced to
> pay monies that a debtor is not permitted to pay prior to the
> confirmation of its plan.  Upon confirmation, a debtor's obligation
> is only the amount provided for in the plan.   To require the
> [individual officers] to assume responsibility for amounts that [the
> Debtor] is not obligated to pay is, in effect, requiring them to make
> a contribution to the corporation on the basis of the position they
> held as officers of the debtor-in-possession."

                    *        *        *        *

> "Interpreting the WPCL as Plaintiffs have suggested creates an
> unwarranted obstacle to attaining the objectives sought by the
> bankruptcy code....It would undermine the distribution scheme set
> forth in the bankruptcy code as it would require the debtor-in-
> possession's officers to make payments that the bankruptcy code
> prevents the debtor from making.  It would create two payments
> for these claimants; one from the estate, the other from officers of
> the estate." Id. at 627-628.

        Mitchell Heffernan respectfully submits that the threatened criminal prosecution

is nothing more than an unlawful attempt by the State of Connecticut to circumvent the

distribution scheme set forth in the bankruptcy code by seeking payments from Mr.

Heffernan personally.   This is exactly what Bankruptcy Courts have prevented by

implementing the equitable powers of 11 U.S.C§ 105(a) to enjoin criminal prosecution

against officers and directors of debtor corporations.  Since the takeover of the Debtor by RFC in mid December 2006, Mr. Heffernan control of the Debtor's funds was in the hands of RFC and Navigant.

The threatened action by the Connecticut State Attorney on behalf of the Commissioner of the Connecticut Department of Labor is identical to the actions of the Wisconsin DILHR in the Jerzak case and the Pennsylvania WPCL in the Shenango Group, Inc. case.  The Connecticut State Attorney has threatened a criminal action to collect a civil debt, which is governed by the Bankruptcy Code.  If the State of Connecticut is allowed to arrest an individual who has done nothing illegal and through his corporation has sought bankruptcy protection, no corporate officer would be safe from all states attempting to circumvent the Bankruptcy Court.  This would make bankruptcy a nullity.  Therefore, the Connecticut State Attorney must be enjoined from proceeding with the threatened criminal action against Mr. Heffernan.

III.    **CONCLUSION.**

Based on the foregoing it is respectfully submitted that the State of Connecticut

be enjoined from commencing criminal prosecution against Mitchell Heffernan.

Respectfully submitted,

BY: _____/S/_____
ROBERT SCANDONE, ESQUIRE
1800 John F. Kennedy Blvd, Suite 200
Philadelphia, PA 19103
(215) 563-6571
ATTY I.D. No. 15181
            and
POZZUOLO & PERKISS, P.C.

BY: _____/S/_____
GARY M. PERKISS, ESQUIRE
2033 Walnut Street
Philadelphia, PA 19103
(215) 977-8200
ATTY I.D. No. 30324
Attorneys for Mitchell Heffernan

**UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In Re: | : | CHAPTER 11 |
| MORTGAGE LENDERS NETWORK | : | |
| USA, INC. | : | CASE NO.: 07-10146 (PJW) |
| Debtor | : | |
| | : | **OBJECTIONS DUE BY:** |
| | : | **HEARING DATE:** |

## NOTICE OF MOTION

TO:   Glenn Woods, Esquire
State Attorney General Office
55 Elm Street
Hartford, CT 06106
**Via facsimile #860-808-5388**

James E. O'Neill, Esquire
Laura Davis Jones, Esquire
Curtis A. Hehn, Esquire
Pachulski, Stang, Ziehl, Young, Jones
and Weintraub, LLP
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705
**Via Emil: chehn@pszyj.com;
Jo'neill@pszyj.com;
ljones@pszyj.com**

John Cashan, Esquire
GA 9 State Attorney's Office
1 Court Street
Middleton, CT 06457
**Via facsimile #860-343-6311**

U.S. Trustee
United States Trustee
844 King Street, Room 2207
Lockbox #35
Wilmington, DE 19899-0035
**Via facsimile #302-573-6497**

David W. Carickhoff, Jr., Esquire
Jason W. Staib, Esquire
Blank Rome, LLP
Chase Manhattan Centre
Wilmington, DE 19801
Attorneys for The Official
Committee of Unsecured Creditors
Of Mortgage Lenders Network USA,
Inc.
**Via Email:
carickhoff@blankrome.com
staib@blankrome.com**

Mitcehll Heffernan, Director and Officer of Debtor, has filed a Motion to Enjoin

the State of Connecticut from Criminal Prosecution Pursuant to 11 U.S.C. §105 which

seeks the following relief:

Mitchell Heffernan respectfully requests this Honorable Court to enjoin the Connecticut Department of Labor from arresting and criminally prosecuting Mitchell Heffernan during the pendency of this bankruptcy case.

You are required to file a response to the attached motion on or before

_____.

At the same time, you must also serve a copy of the response upon movant's attorneys:

Robert Scandone, Esquire
1800 John F. Kennedy Boulevard
Suite 200
Philadelphia, PA 19103

Gary M. Perkiss, Esquire
Pozzuolo & Perkiss, P.C.
2033 Walnut Street
Philadelphia, PA 19103

HEARING ON THE MOTION WILL BE HELD ON _____.

IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF DEMANDED BY THE MOTION WITHOUT FURTHER NOTICE OR HEARING.

Respectfully submitted,

DATE: March 27, 2007

BY: _____/S/_____
ROBERT SCANDONE, ESQUIRE
1800 John F. Kennedy Blvd, Suite 200
Philadelphia, PA 19103
(215) 563-6571
ATTY I.D. No. 15181
and
POZZUOLO & PERKISS, P.C.

DATE: March 27, 2007

BY: _____/S/_____
GARY M. PERKISS, ESQUIRE
2033 Walnut Street
Philadelphia, PA 19103
(215) 977-8200
ATTY I.D. No. 30324
Attorneys for Mitchell Heffernan

## UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | : | CHAPTER 11 |
| MORTGAGE LENDERS NETWORK | : | |
| USA, INC. | : | CASE NO.: 07-10146 (PJW) |
|        Debtor | : | |
| | : | **OBJECTIONS DUE BY:** |
| | : | **HEARING DATE:** |

## CERTIFICATE OF SERVICE

I, Gary M. Perkiss, Esquire, certify that I am not less than 18 years of age, and that service of this notice of motion and a copy of the motion was made on March 27, 2007 via email upon:

Glenn Woods, Esquire
State Attorney General Office
55 Elm Street
Hartford, CT 06106
**Via facsimile #860-808-5388**

James E. O'Neill, Esquire
Laura Davis Jones, Esquire
Curtis A. Hehn, Esquire
Pachulski, Stang, Ziehl, Young, Jones
and Weintraub, LLP
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705
**Via Emil: chehn@pszyj.com;**
**Jo'neill@pszyj.com;**
**ljones@pszyj.com**

John Cashan, Esquire
GA 9 State Attorney's Office
1 Court Street
Middleton, CT 06457
**Via facsimile #860-343-6311**

U.S. Trustee
United States Trustee
844 King Street, Room 2207
Lockbox #35
Wilmington, DE 19899-0035
**Via facsimile #302-573-6497**

David W. Carickhoff, Jr., Esquire
Jason W. Staib, Esquire
Blank Rome, LLP
Chase Manhattan Centre
Wilmington, DE 19801
Attorneys for The Official
Committee of Unsecured Creditors
Of Mortgage Lenders Network USA,
Inc.
**Via Email:**
**carickhoff@blankrome.com**
**staib@blankrome.com**

Under penalty of perjury, I declare that the foregoing is true and correct.

POZZUOLO & PERKISS, P.C.

Date: March 27, 2007

BY: _____/S/_____
GARY M. PERKISS, ESQUIRE
Attorney for Mitchell Heffernan

UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | : | CHAPTER 11 |
| MORTGAGE LENDERS NETWORK | : | |
| USA, INC. | : | CASE NO.: 07-10146 (PJW) |
| Debtor | : | |
| | : | |
| | : | |

## ORDER

AND NOW, this _____ day of _____, 2007, Mitchell Heffernan, director and former chief executive officer and president of Debtor Mortgage Lenders Network USA, Inc., having filed a Motion to Enjoin the State of Connecticut from Criminal Prosecution Pursuant to 11 U.S.C. §105,

IT IS SO **ORDERED** that the State of Connecticut is preliminarily enjoined from commencing criminal prosecution against Mitchell Heffernan pending an emergency hearing on the motion which is scheduled for _____.

BY THE COURT:

_____
**HONORABLE PETER WALSH, J.**
**UNITED STATES BANKRUPCTY JUDGE**

## UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | : | CHAPTER 11 |
| MORTGAGE LENDERS NETWORK | : | |
| USA, INC. | : | CASE NO.: 07-10146 (PJW) |
| Debtor | : | |
| | : | **OBJECTIONS DUE BY:** |
| | : | **HEARING DATE:** |

### AFFIDAVIT OF MITCHELL HEFFERNAN

MITCHELL HEFFERNAN, being duly sworn according to law, depose and say as follows:

1.      On February 5, 2007, Mortgage Lenders Network USA, Inc. ("Debtor") filed a voluntarily petition for relief under Chapter 11 of the United States Code, 11 U.S.C. §1101 et seq.

2.      I am a director and former chief executive officer and president of the Debtor.

3.      During the approximate 45 day period prior to the filing of the bankruptcy petition, the Debtor's largest secured creditor, Residential Funding Company, LLC ("RFC") (vice president Thomas Kelly), RFC's restructuring consultant, Navigant Capital Advisors, LLC ("Navigant") (managing partner Edward Casas), and Debtor's restructuring consultant Scouler Andrews (principal Daniel Scouler) took over the cash management of the Debtor. All financial transactions and payments to creditors were required to be approved by RFC and Navigant.

4.      I had no control over payments to any of Debtor's creditors, including, but not limited to, employee commissions from mid December 2006 through the date the bankruptcy petition was filed, February 5, 2007.

5.    In addition, I was directed by: (a) Debtor's bankruptcy counsel, James Stang, Esquire, (b) Thomas Kelly at RFC, (c) Edward Casas at Navigant, and (d) Daniel Scoular at Scoular Andrews, not to pay any commissions to employees because (1) the commissions were disputed and (2) the Bankruptcy Court would require the commission payments to be repaid to the Debtor as preferential payments.

Under penalty of perjury, the above statements, to the best of my knowledge and belief, are true, correct and complete.


Date:  _3-27-07_                          BY: _____
                                             MITCHELL HEFFERNAN

**UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In Re: | : | CHAPTER 11 |
| MORTGAGE LENDERS NETWORK | : | |
| USA, INC. | : | CASE NO.: 07-10146 (PJW) |
|      Debtor | : | |
| | : | RE: Docket No. _376, 364_ |
| | : | |

## ORDER

AND NOW, this _29_ day of _March_ , 2007, Mitchell Heffernan, director

and former chief executive officer and president of Debtor Mortgage Lenders Network USA,

Inc., having filed a Motion for Expedited Hearing Pursuant to Local Rule 9006-1(c) in support

of his Motion to Enjoin the State of Connecticut from Criminal Prosecution Pursuant to 11

U.S.C. §105,

IT IS SO **ORDERED** that an expedited hearing is scheduled on this motion on the 10th

day of April, 2007 at _2:00_ _P_.M. in Court Room _2_, ~~and the State of Connecticut is~~ _PW_

~~enjoined from proceeding on an arrest warrant against Mitchell Heffernan pending the hearing.~~

_Objections due April 5, 2007 at 12:00_
_P.M._

BY THE COURT:

_[signature]_

**HONORABLE PETER WALSH, J.**
**UNITED STATES BANKRUPCTY JUDGE**

UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF
DELAWARE

| | | |
|---|---|---|
| In Re: | : | CHAPTER 11 |
| MORTGAGE LENDERS NETWORK | : | |
| USA, INC. | : | CASE NO.: 07-10146(PJW) |
| Debtor | : | |

### MITCHELL HEFFERNAN'S MOTION FOR RECONSIDERATION OF ORDER DATED MARCH 29, 2007

Mitchell Heffernan, director and former chief executive officer and president of Mortgage Lenders Network USA, Inc. ("Debtor"), hereby moves this Honorable Court to reconsider its order dated March 29, 2007. In support of this motion, Mitchell Heffernan alleges as follows:

1.      Petitioner filed a Motion to Enjoin the State of Connecticut from Criminal Prosecution Pursuant to 11 U.S.C. § 105 from executing an arrest warrant against him for failure to pay commissions that are in dispute in the Bankruptcy proceeding.

2.      In that Motion, Petitioner submitted a Memorandum of Law outlining the fact that Bankruptcy law must take precedence over State law.  Petitioner then filed a Motion for Expedited Hearing and agreed to the Bankruptcy Court's date of April 10, 2007 for the hearing, to comply with the Bankruptcy Court's calendar, only if the Bankruptcy Court granted a stay against the State of Connecticut pending the hearing.

3.      Petitioner then requested an immediate hearing if the Court was not agreeable to a stay pending the April 10, 2007 hearing.

4.      Mr. Heffernan's counsel was informed that the Bankruptcy Court will not stay the State of Connecticut from executing an arrest warrant without a hearing.

5.      A warrant for arrest under the Connecticut Department of Labor statute upon information and belief has never been used in a Bankruptcy Proceeding, and is now being used by the State of Connecticut to circumvent the normal bankruptcy procedures.

6.      This Court has already stayed a similar case involving "unusual circumstances" in the matter of In Re American Film Technologies, Inc., 175 B.R. 847 1994.

7.      All parties to this Bankruptcy Proceeding we believe will join in our Motion.

8.      We request this Honorable Court to reconsider its Order dated March 29, 2007 and either stay the State of Connecticut pending the hearing on April 10, 2007 or grant an immediate hearing as we are entitled.

WHEREFORE, Mitchell Heffernan respectfully requests this Honorable Court to reconsider its Order dated March 29, 2007 and either stay the State of Connecticut pending the hearing on April 10, 2007 or grant an immediate hearing.

Respectfully submitted,

BY: _____/S/_____
ROBERT SCANDONE, ESQUIRE
1800 John F. Kennedy Blvd, Suite 200
Philadelphia, PA 19103
(215) 563-6571
ATTY I.D. No. 15181

and

POZZUOLO & PERKISS, P.C.

BY: _____/S/_____

GARY M. PERKISS, ESQUIRE
2033 Walnut Street
Philadelphia, PA 19103
(215) 977-8200
ATTY I.D. No. 30324
Attorneys for Mitchell Heffernan

**UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In Re: | : | CHAPTER 11 |
| MORTGAGE LENDERS NETWORK | : | |
| USA, INC. | : | CASE NO.: 07-10146 (PJW) |
| Debtor | : | |
| | : | |
| | : | |

## ORDER

AND NOW, this ____ day of _____, 2007, Mitchell Heffernan, director

and former chief executive officer and president of Debtor Mortgage Lenders Network USA,

Inc., having filed a Motion for Reconsideration of the Court's Order dated March 29, 2007;

IT IS SO **ORDERED** that an expedited hearing is scheduled on this motion on the _____

day of April, 2007 at _____ __.M. in Court Room _____, and the State of Connecticut is

enjoined from proceeding on an arrest warrant against Mitchell Heffernan pending the hearing.


                              **BY THE COURT:**


                              _____
                              **HONORABLE PETER WALSH, J.**
                              **UNITED STATES BANKRUPCTY JUDGE**

# UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | : | CHAPTER 11 |
| MORTGAGE LENDERS NETWORK | : | |
| USA, INC. | : | CASE NO.: 07-10146(PJW) |
| Debtor | : | |

**Hearing Date: April 10, 2007 at 3:00pm**

## SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF MITCHELL HEFFERNAN'S MOTION TO ENJOIN THE STATE OF CONNECTICUT FROM COMMENCING CRIMINAL PROSECUTION PURSUANT TO 11 U.S.C. § 105

This Supplemental Memorandum of Law is submitted in further support of the Motion of Mitchell Heffernan, former Chief Executive Officer and President of Mortgage Lenders Network USA, Inc. ("Debtor") to Enjoin the State of Connecticut from commencing criminal prosecution against Mitchell Heffernan for debts owed by the Debtor.

## I.    BACKGROUND

### A.    The Debtor

On February 5, 2007, Mortgage Lenders Network USA, Inc. ("Debtor") filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 1101 et seq.  At all times relevant hereto, Mitchell Heffernan acted as Chief Executive Officer and President ("Officer") of the Debtor in accordance with the Debtor's By Laws and Delaware Business Corporation Law.

### B.    The Threatened Criminal Action

In its objections, the Connecticut State's Attorney admits that it has threatened to arrest Mitchell Heffernan for the Debtor's failure to pay wages pursuant to Connecticut General Statute § 31-71(b) and (g). These wages arise during the 45 day

43

period immediately prior to the bankruptcy filing.  In its objection to Mitchell Heffernan's Motion, the State's Attorney admits that the criminal statutes under which it will arrest Mitchell Heffernan address solely wages which certain individuals claim to have earned as employees of the Debtor, not from Mitchell Heffernan, and are strict liability statutes. These statutes require no mens rea or purposeful bad act or intent on the part of the defendant.  State of Connecticut v. Wilson, 83 Conn. App. 67; 848 A.2d 542 (2004).

### C.    Mitchell Heffernan Seeks Relief under the Bankruptcy Code

On March 27, 2007, Mitchell Heffernan had no other choice and was forced to file this Motion[1] with this Court in response to the bad faith media frenzy purposely and intentionally created by the Connecticut Department of Labor ("DOL"), the Connecticut State Attorney General ("Attorney General") and the Connecticut State's Attorney Office ("State's Attorney")[2].

---

[1] The State urges this Court not to consider this Motion because it was commenced by Motion instead of by Adversary Proceeding.  It is respectfully submitted that Mitchell Heffernan followed the procedures allowed under the Bankruptcy Code in asserting this Motion before this Honorable Court. *Collier on Bankruptcy- 15th Edition Rev.* states that a moving party may seek injunctive relief from a federal bankruptcy court instituted by motion instead of adversary proceeding because "in the interests of economy of administration of justice, will; address the merits and grant the relief where warranted". (See for example, In re Capital-York Constr. Corp., 43 Bankr. 52.,55 (S.D.N.Y. 1984).  See also, In re: Roy Magnus, 84 B.R. 976.978 (Bankr. E.D.Pa. 1988) treating a motion seeking injunctive relief as if an adversary complaint had been filed because such a pleading is one of form and not of substance); In re: Veseay, 43 B.R. 396,397 (Bankr. E.D.Pa,. 1984) (holding that a motion filed shall be treated as a complaint for asserting rights under the Bankruptcy Code).

[2] The State of Connecticut cites Perez v. Ledesma, 401 U.S. 82,85; 91 S.Ct. 674, 677 (1971) for the proposition that the State has the right to issue the arrest warrant against Mitchell Heffernan. Perez provides absolutely no support to the State.  In Perez, the United States Supreme Court remanded the case to the district court holding that:

> Only in cases of proven harassment or prosecution undertaken by state officials in bad faith without hope of obtaining a valid conviction and perhaps in other extraordinary circumstances where irreparable injury can be shown is federal injunctive relief against pending state prosecutions appropriate.

Id. at 677.

### D.    The State Causes a Media Frenzy

The DOL, the Attorney General and the State's Attorney willfully, wantonly, intentionally and in bad faith started a firestorm of news reports proclaiming the imminent arrest of Mitchell Heffernan, not because of any wrongdoing of Mitchell Heffernan, but because of certain unpaid wages of the Debtor which are part of this Debtor's bankruptcy case. The DOL, the Attorney General and the State's Attorney knowingly, intentionally, wantonly and in bad faith turned to the court of public opinion to circumvent this bankruptcy case under the control and custody of this Court and tried to file their claims in the news media to force Mitchell Heffernan to pay $2,500,000 to the State to reimburse these certain creditors. This was done even though the Attorney General, the State's Attorney and certain nameless Department of Labor officials were fully aware that their actions were in bad faith and violated and circumvented the very Congressional purpose of the Bankruptcy Code. Now that they are before the bar of this Court their defense is "we have not signed the arrest warrant"!!

---

As set forth in length in this Memorandum of Law, this is exactly the case here. The State of Connecticut is harassing Mitchell Heffernan in the court of public opinion without any federal or State of Connecticut precedent which allows the State's Attorney to arrest or convict Mitchell Heffernan for obligations owed by the Debtor. In fact, there is not one case the State's Attorney or State Attorney General can cite which supports an arrest or conviction of Mitchell Heffernan. This threatened criminal prosecution of Mitchell Heffernan is not for any wrongdoing by Mitchell Heffernan but is threatened only by virtue of his role as a former Officer of the Debtor in the State's hope of extorting and blackmailing Mitchell Heffernan for payment of certain monies owed by the Debtor, bypassing the Bankruptcy Code and the Debtor's Bankruptcy case. Now that they are before this Bankruptcy Court, their defense is "we have not signed the arrest warrant". This reasoning to this Court that the State's Attorney have not signed an arrest warrant is an absolute and unmitigated disgrace in light of the bad faith and public prosecution of Mitchell Heffernan to date. Therefore, it is respectfully submitted on behalf of Mitchell Heffernan that this threatened criminal prosecution is nothing more than the State's harassment and bad faith conduct in attempting to blackmail and extort monies from Mitchell Heffernan to satisfy certain debts of the Debtor outside of the Debtor's bankruptcy estate in circumvention of the Congressional mandate of federal bankruptcy law.

In fact, none of this frenzy was caused by Mitchell Heffernan. The State's Attorney's contempt for this Court, its equitable powers, the federal Constitution and Congressional mandate of the Bankruptcy Code and their bad faith, wanton, unconscionable actions are demonstrated by their Objections which only reinforces, supports and furthers the very words of the various Connecticut state officials. For example, Gary Pechie, a Connecticut Department of Labor official, published in *The Hartford Courant* on March 19, 2007, stated as follows:

1.      <u>March 19, 2007</u> – *The Hartford Courant*:

> Mitch Heffernan.......his old company – the now defunct Mortgage Lenders Network – could land him in plenty of trouble with the state for not paying wages earned by his former employees.

> The state department of Labor confirmed Monday that is had applied for an arrest warrant in Superior Court in Middletown that would charge Heffernan – the formed President of Middletown-based Mortgage Lenders – with 61 counts of failing to pay wages.

> The wages that the department alleges were unpaid total $3 million, mostly in sales commissions. The commission range from $5,000 to $300,000.

> Heffernan could face $300,000 in fines, jail time or both......

> Other Mortgage Lenders executives also could be named later because the state labor department's investigation is continuing, according to Gary Pechie, director of the states' Wage and Workplace Standards Division.
>
>     *         *         *         *
>
> Mortgage Lenders filed for bankruptcy protection Feb. 5, after a monthlong downward spiral.......

A true and correct copy of this article is attached hereto, made a part hereof and marked <u>Exhibit "A"</u> hereto.

4

These statements by Gary Pechie published in the *Hartford Courant* set off hourly, daily and weekly news reports by the DOL and the Attorney General including print articles, internet articles and televisions reports in Connecticut and throughout the United States. In each of these published or broadcast interviews, a DOL spokesperson or Attorney General is quoted as proclaiming that a request for the issuance of an arrest warrant has been directed to the State's Attorney because this criminal prosecution **is the only way to obtain wages from the Debtor.** Attorney General Richard Blumenthal stated March 29, 2007 on the 6:00p.m. evening news on WFSB-TV, Hartford, Connecticut

> **there's just no way a federal bankruptcy court in Delaware is going to enjoin or stop our criminal proceeding.**

See Exhibit "D" hereto).

Yet in almost each instance, the State clearly states the whole thing could be resolved if Mitchell Heffernan agreed to pay $2,500,000 for the certain wages owed by the Debtor. Some other examples of this bad faith media frenzy undertaken by the Connecticut officials, without any hope of obtaining a valid conviction, include the following:

1.    March 20, 2007 – *Eyewitness News Channel 3, WFSB-TV, Hartford, CT:*

Gary Pechie, a state Department of Labor official, was interviewed on the evening news concerning unpaid wages of the Debtor. Excerpts of this interview was published on WFSB.com, as follows:

> The [Labor] department claims that the company owed its former employees wages that could top $3,000,000.
>
> *            *            *            *

5



Prosecutors told Eyewitness News that because the company declared bankruptcy, criminal charges may be the only way to claim the money.

"The Judge could order restitution, but if not, it's a $2,000 to $5,000 fine and five years of imprisonment for each offense." Pechie. said. "And with 61 counts, you're talking a hefty fine and a year in jail".

A true and correct copy of this article from the website is attached hereto, made a part hereof and marked Exhibit "B" hereto.

2.     March 26, 2007 – *Reuters*  - Nancy Steffens, Connecticut Department of Labor spokeswoman, is quoted in a published article, as follows[3]:

"The company declared bankruptcy, which requires us to go through a criminal court to get former employees their money", Steffens said **"Our real purpose is to get people money owed to them.  If we can work out a settlement without criminal charges that's great"**. (emphasis added).

A true and correct copy of the article published on *Reuters.com* is attached hereto, made a part hereof and marked Exhibit "C'.

3.     March 29, 2007 – *Eyewitness News, Channel 3, WFSB-TV, Hartford, CT* - Connecticut Attorney General Richard Blumenthal was interviewed on camera and quoted at length on the 6:00p.m.Channel 3 Eyewitness News and stated, as follows:

We're determined to fight in upholding our rights as a sovereign state to use our criminal law to punish criminal wrongdoing, and there's just no way a federal bankruptcy court in Delaware is going to enjoin or stop our criminal proceeding.

A true and correct copy of a transcript of this television broadcast is attached hereto, made a part hereof and marked Exhibit "D".

---

[3] Pursuant to Federal Rule of Evidence 201 and  Benak v. Alliance Capital Management, L.P., 435 F.3d 396 (3rd Cir. 2006), this Court is permitted to take judicial notice of newspaper articles in the public domain.

4.    April 5, 2007 – *Dow Jones News* – Connecticut Attorney General Richard Blumenthal explained to the news media the purpose of the State's blackmail and extortion of Mitchell Heffernan in a published article"

> "There is a very powerful message that employers must be held accountable to pay for work," said Connecticut Attorney General Richard Blumenthal, explaining why the state may prosecute Heffernan "or others who may have allegedly broken our criminal laws."
>
> Connecticut can't force Mortgage Lenders to pay the employees now that it's in Chapter 11, the attorney general admitted. Unless companies provide otherwise -- and many do -- unpaid employees fall in with the rest of those waiting for a fractional recovery that may never arrive.
>
> Connecticut has no intention of asking the bankruptcy court to order the wages paid, Blumenthal said. All the state wants to do is arrest violators of its criminal laws. However, it's not unheard of for restitution to be part of a plea deal in such cases, he admitted.
>
> **"People are often persuaded by criminal prosecutions to do the right thing," Blumenthal said. "It's a matter of simple justice."**

A true and correct copy of the *Dow Jones News* article is attached hereto, made a part hereof and marked Exhibit "E".

Despite its bad faith harassment and public lynching of Mitchell Heffernan in the news media, the State's Attorney now has explained its bad faith, unconscionable, wanton, harassment and prosecution of Mitchell Heffernan to this Court and says that the arrest warrant of Mitchell Heffernan has not been signed and therefore argues that this Motion is not ripe[4]. However, it is undisputed that by his own voice State Attorney

---

[4] Despite the flames of this news media frenzy fanned by the State of Connecticut and State Attorney General Blumenthal and his continued threat of the arrest and criminal prosecution of Mitchell Heffernan. the State of Connecticut argues in their Objection to this Motion that this Motion is not ripe. The State is clearly wrong on the law. A case before a federal court must involve an actual case and controversy.

General Blumenthal, the top law maker in Connecticut, has told each and every citizen

of the state on public television that this very United States Bankruptcy Court is not

going to stop the criminal proceeding.  Attorney General Blumenthal ignores the clear

---

Surrick v. Killion, 449 F.3d 520, 527 (3rd Cir. 2006). There is a three part test to determine whether an action is ripe for pre-enforcement determination by the Court. Id. In Step-Saver Data Systems, Inc. v. Wyse Technology, 912 F.2d 643,647 (3rd Cir. 1990) the Third Circuit a Court must consider: (1) the parties must have adverse interests; (2) the facts must be such to allow for a legal judgment; and (3) the judgment rendered by the reviewing court must be useful to the parties.  Under the first prong of this test in The Presbytery of New Jersey of the Orthodox Presbyterian Church v. Florio, 40 F.3d 1454, 1468 (3rd Cir. 1994), the Third Circuit held that a case was ripe where even a threat of criminal prosecution existed. Under the second prong, the Court must determine whether a decision at the present time would be" more than an advisory opinion based upon a hypothetical set of facts" Id.  In Presbytery, relying upon Atlanta Gas Light Co. v. U.S. Dept. of Energy, 666 F.2d 1359 (11th Cir. 1982), the Third Circuit held the second prong of the ripeness standard was satisfied where (a) the parties claims would not change in future litigation, the current party was the appropriate party raising the issue; and (c) the party was subject to enforcement if the court permitted implementation. Id.   The third element is satisfied, if the judgment in the instant case would be useful to the parties at bar and other parties that may be affected. Id. At 1469. In Presbytery, the Third Circuit found the case was ripe because the threat of arrest for the minister existed if and when the minister stepped off the property of the church. Id.

In the case at bar in applying the Step Saver test it is clear that this case is ripe for a ruling by this Court on Mitchell Heffernan's Motion because:

(1) The first prong of the ripeness test is satisfied in the case at bar because the State of Connecticut, by its own Department of Labor and its Attorney General has  threatened to issue an arrest warrant for Mitchell Heffernan arising from certain unpaid debts of the Debtor.

(2) The second prong of the ripeness test is satisfied here because (a) Mitchell Heffernan's claims and defense would be the same in any future litigation; (b) Mitchell Heffernan is the correct party to bring this Motion because he is the party threatened with imminent criminal prosecution by the  State of Connecticut; (b) and if this Court does not enjoin the State of Connecticut from prosecuting Mitchell Heffernan for certain payments owed by the Debtor, Mitchell Heffernan would be subject to enforcement of this statute for debts owed by the Debtor;  and

(3) In the case at bar, any judgment by this Court would be useful to the parties and others affected because it would rule upon whether Connecticut law trumps bankruptcy law by enforcing its statute against an individual officer or director for certain debts of a debtor.

Accordingly, Mitchell Heffernan most respectfully submits that this Motion is ripe for consideration by this Court and, therefore, the State's argument must fail.

The State relies on NE Hub Partners, L.P. v. CNG Transmission Corp., 239 F.3d 333 (3rd Cir. 2001) to support its argument.  The State's reliance is misguided.  In Hub, the Third Circuit reversed and remanded the case to the District Court finding that the case was ripe for consideration to enjoin a state enforcement action.

and unequivocal fact that any criminal prosecution of Mitchell Heffernan for debts of the Debtor clearly and unequivocally interferes with the Debtor's bankruptcy case and interferes with the rights of all of the Debtor's other creditors. And now after all of this grandstanding, the State expects this Court to believe this process is not ripe because it has not signed the arrest warrant. The State's own conduct lead directly to the opposite conclusion.

### E.     Mitchell Heffernan Retains Counsel

Counsel for Mitchell Heffernan contacted the DOL and the State Attorney General's Office to attempt to understand the grounds for an imminent arrest warrant for Mitchell Heffernan based solely on a debt of the Debtor.  Counsel for Mitchell Heffernan discovered that the State's Attorneys' office was pursuing a criminal arrest for Mitchell Heffernan and the State Attorney General's Office was pursuing a civil complaint for the unpaid obligations of the Debtor. Mitchell Heffernan's counsel spoke to a representative of the State Attorney General's Office, Glen Woods and John Cashan from the State's Attorneys' Office, and was advised that if a negotiated financial settlement was reached with Mitchell Heffernan for payment of the Connecticut unpaid wages of the Debtor, the State's Attorney would certainly consider that in its determination of whether to approve an arrest warrant. The State Attorney General's Office then demanded that Mitchell Heffernan pay $2,500,000 even though when the Debtor files its schedules in its bankruptcy case, Mitchell Heffernan believes that these unpaid wages by the Debtor will be referenced as $1,700,000.

9

51

### F.    Mitchell Heffernan's Counsel Requests Legal Precedent

At all times relevant hereto, counsel for Mitchell Heffernan reminded the DOL,

the State Attorney General and the State's Attorney that the Debtor had filed for

bankruptcy protection under Chapter 11 of the Bankruptcy Code, that these very wages

are part of this bankruptcy case and requested legal precedence supporting the State's

authority to arrest and convict an Officer of a Debtor for the debts of the Debtor when

the only basis for the arrest is his position as an Officer of the Debtor.  To date, the

State has been unable to direct counsel or this Court to any legal authority whatsoever

or any other time they used this State of Connecticut statute to arrest or convict an

officer of a Bankrupt Debtor[5].

By way of illustration, counsel for Mitchell Heffernan, on March 26, 2007 and

March 27, 2007, sent letters to the State Attorney General's office requesting the legal

precedence the State was proceeding under which permitted the circumvention of the

Bankruptcy Code. If the State was unable to provide any legal precedence for its

position to arrest and convict an Officer, counsel for Mitchell Heffernan indicated he

would have no choice but to seek this Court's protection.[6]  The State again was unable

to point to any legal authority.  True and correct copies of counsel's letters are attached

hereto, made a part hereof and marked Exhibit "F".

---

[5] In its Objections, the State relies upon In Matter of Davis; Davis v. Sheldon d/b/a CNC, Ins. Co., 691 F.2d 176 (3rd Cir. 1982) in support of its position that it can ignore federal Bankruptcy law and arrest Mitchell Heffernan for the debts of the Debtor.  Davis is factually distinguishable. Davis concerned the prosecution of the debtor (husband and wife) for passing bad checks to pay debts which were dischargeable in bankruptcy.  This is not the case here. Here, the State's Attorney seeks to arrest Mitchell Heffernan for debts owed by the Debtor.

[6] The statute the State's Attorney seeks to enforce against Mitchell Heffernan has been in affect for at least forty (40) years.  In these forty years, there is not one instance where the State's Attorney has arrested the officer or former officer of a debtor for the debts of the Debtor.

### G.    There is No Legal Precedent for the State's Prosecution

Instead of providing legal authority to arrest and convict an Officer for the unpaid commissions of the Debtor in accord with the Bankruptcy Code, the State continued its news media frenzy through the statements of DOL spokeswoman Nancy Steffens which were published in *Reuters* article on March 26, 2007, which clearly and unequivocally demonstrates the State's intent to circumvent the Bankruptcy Code and blackmail and extort, in bad faith through publicly threatened criminal proceedings, Mitchell Heffernan to make payments to certain creditors of the Debtor:

> "The company declared bankruptcy, which requires us to go through a criminal court to get former employees their money", Steffens said "Our real purpose is to get people money owed to them. If we can work out a settlement without criminal charges that's great".

See Exhibit "B" hereto.

This threatened criminal prosecution is nothing more than bad faith and harassing extortion and blackmail of Mitchell Heffernan by the State to force him to personally pay certain creditors of the Debtor, which cannot be tolerated or condoned by this federal Bankruptcy Court.    Now, the State argues that Mitchell Heffernan's Motion before this Court is premature because a Connecticut judge has not signed the arrest warrant yet.  Simply put, the State is wrong.  It is the State who has started, in bad faith, the criminal proceeding and media frenzy and firestorm.  This threatened criminal proceedings and the resulting media frenzy and bottom-feeding by the press has forced Mitchell Heffernan and his family to hide from the media and has turned then into pariahs walking the dead man's walk to the death chamber.  If the State had not started the bad faith prosecution of its case in the news media, on television and in the

11

newspaper, Mitchell Heffernan would not now be seeking this Court's protection. The State started this criminal proceeding intentionally, willfully, wantonly, unconscionably, in bad faith and has continued it and can not now be allowed to tell this Court it is temporarily taking back these willful, wanton and unconscionable bad faith harassing actions or that this Motion is not ripe now because Mitchell Heffernan rightfully seeks protection from this Bankruptcy Court. It is too late! Such unconscionable bad faith conduct cannot be tolerated or condoned.

Therefore, on behalf of Mitchell Heffernan it is most respectfully submitted that this Motion is ripe for consideration by this Court today and not after the State completes the entire circumvention of the Founding Fathers and the Congressional intent of the Bankruptcy Code by arresting Mitchell Heffernan.

## II.    **ARGUMENT**

11 U.S.C. § 105(a) provides that "the Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title."

Bankruptcy Courts throughout this country have enjoined criminal prosecution, pursuant to the Bankruptcy Court's equitable powers of 11 U.S.C. § 105(a) when the criminal process is being used as a means of extracting a preference not accorded other creditors similarly situated. See, e.g., In re Jerzak, 47 B.R. 771 (W.D. Wis. 1985), In re Bicro Corporation, 105 B.R. 255 (M.D. Pa. 1988), In re Dettler Farms, 58 B.R. 404 (D. S.Dak. 1986) and In re Caldwell, 5 B.R. 740 (W.D. Va. 1980).

In the case at bar, Mitchell Heffernan most respectfully submits that this Honorable and Equitable Court  must extend the automatic stay provisions of 11 U.S.C. § 362, or alternatively enter a permanent injunction, enjoining the Connecticut State's Attorney from proceeding with the criminal prosecution of  Mitchell Heffernan for the following reasons: (a) there is such an identity between Mitchell Heffernan and the Debtor that any proceeding against Mitchell Heffernan is in effect a proceeding against the Debtor; (b) the State of Connecticut is using the criminal process as a means of extracting a preference  not accorded the creditors similarly situated; (c) pursuant to the Debtor's By Laws, Debtor must absolutely indemnify Mitchell Heffernan for any judgment, fines or penalties rendered against him in any Connecticut action, either criminal or civil, rendering any adverse finding against Mitchell Heffernan a finding or liability of the Debtor; (d) the Debtor will be irreparably harmed by any prosecution of Mitchell Heffernan for wage claims; (e) Mitchell Heffernan will be irreparably harmed by any criminal prosecution directed to him as a former Officer of the Debtor for a debt



of the Debtor; (f)   under the doctrine of collateral estoppel the Debtor would be estopped from disputing the wage claims of Connecticut employees; and (f) there is no authority under the Connecticut statute permitting the personal arrest of a corporate officer of a corporation seeking bankruptcy protection.

### A.      There is an Identity Between Mitchell Heffernan and the Debtor Rendering Any Judgment or Penalty Against Mitchell Heffernan a Judgment or Penalty Against Debtor

The automatic stay provisions set forth at 11 U.S.C. § 362 serves several functions including, but not limited to, (a) providing the debtor a breather from all adverse collection actions; (b) protects the Debtor from an "uncontrollable scramble for its assets in a number of uncoordinated proceedings in different courts"; (c) protects creditors by preventing a creditor from acting to obtain payments from the debtor to the detriment of the other creditors of the debtor; and (d) provides "the debtor and its executives with a reasonable respite from protracted litigation, during which they may have an opportunity to formulate a plan of reorganization for the debtor. A.H. Robins Co., Inc. v. Piccinin, 788 F.2d 994, 999 (4th Cir. 1986), cert. denied, 479 U.S. 876; 107 S.Ct. 251 (1986); McCartney v. Integra National Bank North, 106 F.3d 506 (3rd Cir. 1997).

The automatic stay provisions of 11 U.S.C. § 362 read together with this Court's equitable powers under 11 U.S.C. § 105 "empowers the bankruptcy court to enjoin parties other than the bankruptcy from commencing or continuing litigation". Robins at 1002 (citing In re Otero Mills, Inc., 25 Bankr. 1018, 1020 (D.N.M. 1982).   Protarga, Inc., v. Webb (In re: Protarga), 329 B.R. 451 (Bankr. DE 2005).

In <u>Robins,</u> the United States Appellate Court for the Fourth Circuit read the automatic stay provisions of Section 362 together with the equitable powers of the Bankruptcy Court under 11 U.S.C. § 105 to enjoin actions against non-debtors because of the potential impact any claim against the non-debtors would have on the bankruptcy case. <u>Id</u>. At 999. The Fourth Circuit held that unusual circumstances existed to extend the automatic stay to non-debtors where:

> there is such identity between the debtor and the third party
> defendant that the debtor may be said to be the real party
> defendant and that a judgment against the third party defendant
> will in effect be a judgment or finding against the debtor.

<u>Id.</u>

In the Adversary Proceeding styled <u>American Film Technologies, Inc. v. Taritero,</u> 175 B.R. 847, 850 (Bankr. DE. 1994) this Honorable Court, in reliance upon <u>Robins,</u> held there was an identity of parties where an action was commenced against individual non-debtor defendants, who were directors of the debtor, only because of their capacity as directors of the debtor. This Court held that any liability found against the non-debtor directors would be because of their capacity as agents of the debtor. <u>Id.</u> This Honorable Court enjoined the state court fraud action against these non-debtor directors finding that any liability found against the non-debtor directors would expose the debtor to vicarious liability under the doctrine of respondent superior. <u>Id.</u>

**B.     Debtor Must Absolutely Indemnify Mitchell Heffernan for any Adverse Action in Connecticut**

The <u>Robins</u> exception extending the automatic stay to a non-debtor third party is applicable in a proceeding against the third party non-debtor defendant where there is

an indemnity clause between the third party and the debtor making the debtor responsible for any monetary judgment which results. Id. At 999-1000. See also In RE W.R. Grace & Co., et al., Debtors; W.R. Grace & Co. et al., v. Chakarian, 2005 Bankr. LEXIS 579 Protarga, Inc., v. Webb (In re: Protarga), 329 B.R. at 479-480; accord American Film Technologies, 175 B.R. at 850. (Bankr. DE. 2004);

This Honorable Court, in reliance on Robins, extended the automatic stay to a non-debtor third party finding a close identity between the third party non-debtor and the debtor. In Re.W.R. Grace at 9. The Grace Court held that a judgment against the third party non-debtor would be a debt of the debtor because any adverse finding against the third party non-debtor would trigger an indemnification between these parties. This Court further reasoned a judgment against the third party non-debtor would essentially be a judgment against the debtor and will impair the debtor's ability to reorganize. Id. at 12.

Similarly, in In re Eagle-Picher Indus., Inc., 963 F.2d 855, 877 (6th Cir. 1992) the United States Court of Appeals for the Sixth Circuit held that the automatic stay extended to two non-debtor officers of the corporation where an absolute indemnity agreement existed because if the action against the officers was allowed to proceed it would essentially be a suit against the debtor.

### a.     The Indemnification Provisions

Debtor's By Laws provide such an absolute indemnification to Mitchell Heffernan from Debtor for any and all actions including criminal and civil proceedings. It is undisputed that Mitchell Heffernan is a director and former Chief Executive Officer and President of the Debtor. Article XI of the Debtor's By laws provide as follows:

Article XI – Indemnification and Insurance

Section 1 (a) Right to Indemnification. Each person who was or is made a party or is threatened to be made a party or is involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter "proceeding"), by reason of the fact that he or she, or a person of whom he or she is the legal representative, is or was a director or officer, of the Corporation.............shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the Delaware General Corporation Law, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than said law permitted the Corporation to provide prior to such amendment( against all expense, liability and loss (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by such person in connection therewith and such indemnification shall continue as to a person who has ceased to be a director, officer, employee or agent....

A true and correct copy of Debtor's By Laws are attached hereto, made a part hereof and marked Exhibit "G".

The Debtor's By Laws comply with the indemnification provisions of the Delaware Business Corporation Law which expressly permits indemnification of corporate officers in threatened criminal actions. Del. Code § 145. Section 145 provides in pertinent part:

(a) A corporation shall have power to indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the corporation) by reason of the fact that the person is or was a director, officer, employee or agent of the corporation......

Based on Article IX of the Debtor's By Laws and Section 145 of Delaware's Business Corporation Law, it is clear and unequivocal that the Debtor is required to

indemnify Mitchell Heffernan in defending the threatened Connecticut action, criminal or civil. Further, there is no doubt that any action by the State of Connecticut against Mitchell Heffernan is a way "to get people [of the State of Connecticut] money owed to them" by the Debtor. See Exhibit "C" hereto. There are absolutely no allegations by the State's Attorney that there was any wrongdoing on the part of Mitchell Heffernan other than the allegations that certain former employees of the Debtor claim they are owed money by the Debtor. Therefore, the indemnification provisions of the Debtor's By Laws apply to the threatened criminal action by the Connecticut State's Attorney.

In Protarga v. Webb, supra., this Court considered the claim of a former officer and director in a Pennsylvania state court action for unpaid wage claims against individual directors. Id at 479-480. There was an indemnity agreement between the corporation and the directors. This Bankruptcy Court found that because of this indemnification, any judgment rendered in the Pennsylvania state court was a judgment against the debtor which would significantly reduce the funds in the bankruptcy case available to pay the claims of other creditors. Id. This Court authorized the Debtor to file a motion for an injunction to enjoin the Pennsylvania state court action ruling:

> In my view, such a result produces a clear conflict between state law and the Bankruptcy Code. The relevant case law clearly supports the conclusion that in this matter the Bankruptcy Code trumps the state law.

Id. At 480-481.

However, for some reason, the Connecticut State's Attorney and its Attorney General feel they are above the United States Constitution, the Congressional intent of the Bankruptcy Code and federal laws by stating on television that:

18

there's just no way a federal bankruptcy court in Delaware is going to enjoin or stop our criminal proceeding.

See Exhibit "D" hereto.  He is wrong! Under the Supremacy Clause of the United

States Constitution, the federal Bankruptcy Code trumps the State of Connecticut law.

In accordance with Robins, Protarga, Grace, and American Film Technologies, the indemnification provisions of Debtor's By Laws support a finding that any adverse finding against Mitchell Heffernan in Connecticut, will be a liability against him as an agent of the Debtor and impair the Debtor's ability to reorganize.  Accordingly, these alleged claims versus Mitchell Heffernan are a liability/debt of the Debtor which requires this Court, in accordance with the aforementioned case law, to extend the automatic stay to enjoin the Connecticut action to protect the Debtor's bankruptcy case. The State of Connecticut cannot use this threatened criminal arrest as a means to extract a preference not accorded other creditors..

**C.    Debtor Will be Irreparably Harmed by Any Prosecution of Mitchell Heffernan for Unpaid Liability of the Debtor**

Pursuant to 11 U.S.C. § 105(a), this Honorable Court has the equitable powers to enter an injunction to permanently enjoin the Connecticut State's Attorney from proceeding with its threatened criminal action against Mitchell Heffernan.  In reviewing a request for an injunction, a Court must consider the following elements: (1) likelihood of success on the merits; (2) the irreparable harm to petitioner by the conduct; (3) the extent of irreparable harm to the potential enjoined party;  and (4) consideration of the public interest.   Opticians Ass'n of America v. Independent Opticians of America, 920 F.2d 187, 191-192 (3rd Cir. 1990).

19

(61)

**1.     Likelihood of Success on the Merits and Irreparable Harm to Mitchell Heffernan**

In the context of bankruptcy, this Court has recognized that the likelihood of Mitchell Heffernan's success on the merits depends upon the adverse affect of the Connecticut action on Debtor.    Robins at 999-1000. Protarga, 329 B.R. at 479-480; American Film Technologies, 175 B.R. at 850.

Connecticut seeks to pursue its threatened arrest for alleged unpaid wages owed by the Debtor based solely on the fact that Mitchell Heffernan is a former Officer of the Debtor.  The Connecticut State's Attorney articulates no other reason for its threatened criminal arrest.  This Court has recognized in a bankruptcy context, this element turns on whether the Debtor will be adversely affected if an automatic stay or injunction is not extended to Mitchell Heffernan in the Connecticut threatened action.   American Film Technologies at 849.

In the case at bar, there is no doubt that the Debtor will be adversely affected if an automatic stay or injunction is not extended to Mitchell Heffernan in the Connecticut action during the pendency of this case for the following reasons:

a.     Connecticut threatens arrest of Mitchell Heffernan based solely on his former capacity as the former CEO and President of the Debtor (Robins, American Film Technologies);

b.     There is an identity between Mitchell Heffernan and the Debtor which  effectively makes the Connecticut action against the Debtor (Robins);

c.     There is an indemnity between the Debtor and Mitchell Heffernan which requires the Debtor to be responsible for any liability arising out of the threatened Connecticut action (Robins, Grace, American Film Technologies ;

d.     This indemnification requires the Debtor to defend the Connecticut action because any liability against Mitchell Heffernan essentially is a liability of the Debtor; (Robins, Protarga, American Film Technologies);

e.     The Debtor must defend the Connecticut action as a party or be estopped from challenging the Connecticut wage issues in this case under the doctrine of collateral estoppel (American Film Technologies);

f.     Vicarious liability attaches to the Debtor for any actions of Mitchell Heffernan in his capacity as a former director and officer of the Debtor under the doctrine of respondeat superior and, therefore, Debtor is the correct party in any action by the State of Connecticut (American Film Technologies);

g.     Any other result would produce a clear conflict between the State of Connecticut and the Bankruptcy Code and will impair the Debtor's ability to reorganize and any judgment against Mitchell Heffernan is essentially a judgment against the Debtor (Robins);

h.     The relevant case law clearly supports the conclusion that in this matter, the federal Bankruptcy Code trumps the State Law (Protarga);

i.     Mitchell Heffernan will be publicly humiliated and forced to defend a criminal action based solely on the Debtor's inability to allegedly pay commissions which may or may not be due. This issue is challenged and must be litigated in this bankruptcy litigation;

j..     The very intent of bankruptcy law will be permanently damaged if an injunction is not entered because the alleged debt may receive a payment priority

ahead of other creditors (Robins, Protarga). This is clearly illustrated because the State

Attorney General has stated publicly on television:

> there's just no way a federal bankruptcy court in Delaware is
> going to enjoin or stop our criminal proceeding.

See Exhibit "D" hereto;

k.    The threatened Connecticut arrest is being used as a means to

extract a preference for the Connecticut employees not accorded the other creditors

similarly situated (Protarga);

l.    This conflict is even more obvious as demonstrated in the

statements of the Connecticut DOL spokeswoman, Nancy Steffens:

> "The company declared bankruptcy, which requires us to go
> through a criminal court to get former employees their money",
> Steffens said **"Our real purpose is to get people money owed
> to them. If we can work out a settlement without criminal
> charges that's great".** (emphasis added).

See Exhibit "C" hereto.

Therefore, there is a likelihood of success on the merits and Mitchell Heffernan

will be irreparably harmed if an injunction is not entered.

### 2.    No Irreparable Harm to the State

This threatened case is nothing more than the State's Attorney's bad faith,

strong arm tactics, blackmail and attempt to extort monies from the former Officer of

the Debtor through public humiliation, embarrassment and the threat of arrest. This is

contrary to the Congressional intent of the Bankruptcy Code. These strong arm tactics

are demonstrated by numerous statements and leaks to the press by officials of the State

of Connecticut, as follows:

1.     On March 20, 2007, on live television, Gary Pechie an official of the Connecticut Department of Labor told reporters that the only way to obtain the alleged commission owed to these employees because of the bankruptcy was to arrest Mitchell Heffernan and have a Connecticut State judge order restitution for these alleged commissions owed by the Debtor.  Excerpts of this March 20, 2007 story published with quotes from Pechie from the website of WFSB.com follows:

> The [Labor] department claims that the company owed its former employees wages that could top $3,000,000.
>
> *       *       *       *
>
> Prosecutors told Eyewitness News that because the company declared bankruptcy, criminal charges may be the only way to claim the money.
>
> "The Judge could order restitution, but if not, it's a $2,000 to $5,000 fine and five years of imprisonment for each offense." Pechie said.  "And with 61 counts, you're talking a hefty fine and a year in jail".

See Exhibit "B" hereto.

2.     On March 26, 2007, Nancy Steffens, the Connecticut Department of Labor spokeswoman, explained the Connecticut Department of Labor's position in an article published by *Reuters* on March 26, 2007:

> "The company declared bankruptcy, which requires us to go through a criminal court to get former employees their money", Steffens said **"Our real purpose is to get people money owed to them.  If we can work out a settlement without criminal charges that's great". (emphasis added).**

See Exhibit "A" hereto.

3.     On March 29, 2007, Connecticut Attorney General Richard Blumenthal stated on the 6:00p.m.Channel 3 Eyewitness News:

> We're determined to fight in upholding our rights as a sovereign state to use our criminal law to punish criminal wrongdoing, and there's just no way a federal bankruptcy court in Delaware is going to enjoin or stop our criminal proceeding.

A true and correct copy of a transcript of this television broadcast is attached hereto, made a part hereof and marked Exhibit "D".

In the very words of the Connecticut officials given to the news media including television and newspapers, there is no doubt the Connecticut State's State, on behalf of the Department of Labor, is attempting to impair and interfere with the Debtor's bankruptcy case in order to obtain priority payment for certain creditors. There is no irreparable harm to Connecticut!  There is just the opposite.  This irreparably harms the federal Constitution and the Congressional intent of the Bankruptcy Code on how each and every debtor in each and every bankruptcy case in the United States is treated. Therefore, Mitchell Heffernan most respectfully submits that an injunction will not irreparably harm the State of Connecticut.

Further, the "wages" the Connecticut State's Attorney is seeking to collect are all disputed by the Debtor.  Pursuant to the Bankruptcy Code, the employees with any type of wages claims are required to file proof of claims in the bankruptcy estate and receive payment as a creditor once a reorganization plan is approved. The Bankruptcy Code also provides these former employees with wage claims an opportunity to approve or object to the Debtor's plan of reorganization.  As stated in its objections, the State Attorney General has the opportunity to bring its threatened action against the Debtor in the Bankruptcy case for twice the amount of the unpaid wages, plus costs and reasonable attorneys' fees, if applicable.

### 3.    Public Interest

This Honorable Court has recognized that the public interest is served in a bankruptcy context by "the promoting of a successful reorganization". American Film Technologies at 849 (quoting Gathering Restaurant, Inc. v. First National Bank of Valparaiso (In re Gathering Restaurant, Inc.), 79 Bankr. 992, 999 (Bankr. N.D. Ind. 1986). This is a proceeding under Chapter 11 of the Bankruptcy Code with reorganization as the goal of the Debtor. Therefore, the public interest is served by its efforts to reorganize, not by any bad faith, harassing attempt to impair the ability to reorganize by an arrest warrant of a former Officer of debts owed by the Debtor.

In summary, in the case at bar, Mitchell Heffernan most respectfully submits that this Honorable Court must permanently enjoin the State's Attorney of Connecticut from proceeding with its threatened arrest of Mitchell Heffernan based on the factors enunciated by the Third Circuit in Opticians Ass'n.

### D.    The Doctrine of Collateral Estoppel Bars the Connecticut Action

The doctrine of collateral estoppel is invoked when the parties, the issues and the subject matter is the same. Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322; 99 S.Ct. 645 (1979). In a bankruptcy context involving an action against director or officer non-debtors, the Courts have issued preliminary injunctions under 11 U.S.C. § 105 enjoining the actions because the Debtor will be irreparably harmed by its ability to defend the same action if the same issue is implicated in the bankruptcy estate. American Film Technologies at 850-851; In re: Ionosphere Clubs, Inc., 111 Bankr. 324, 435 (Bankr. S.D.N.Y. 1990)(enjoining action against directors because any finding against the directors would extend to the debtor under the doctrine of collateral

estoppel); <u>Sudbury, Inc. v. H. Escott</u>, 140 Bankr. 461 (Bankr. N.D. Ohio (1992)(enjoining fraud action against former officers and directors until after reorganization because the doctrine of collateral estoppel would require the debtor to defend the fraud action as if the debtor was a party) .

In the case at bar, the doctrine of collateral estoppel prevents the Connecticut State's Attorney from proceeding on its threatened arrest of  Mitchell Heffernan by virtue of his capacity as a former Officer of the Debtor because:

1.      The parties in the threatened Connecticut action and Debtor's bankruptcy case are exactly the same.  The State's Attorney seeks to arrest Mitchell Heffernan solely by reason of his capacity as a former Officer of the Debtor. The indemnification provisions of the Debtor's By Laws require the Debtor to be liable for the outcome which in essence requires that the Debtor actually defend any action against Mitchell Heffernan (See <u>Robins</u> at 999-1000, <u>Protarga</u> at 480;  <u>Sudbury</u> at 463);

2.      The issues of the debts the State's Attorney seeks to litigate in the threatened Connecticut criminal action are the same debts of the Debtor's in the bankruptcy case – unpaid wages.  The State's Attorney seeks to arrest Mitchell Heffernan for unpaid wages the Debtor did not pay to former employees.   The threatened arrest  is solely by reason of Mitchell Heffernan's former capacity as the former Chief Executive Officer and President of the Debtor and not because of any misconduct or wrongdoing on his part.  The same unpaid wages are debts in the Debtor's bankruptcy case and the amounts owed, if any, are in dispute. Debtor would then be required to defend its rights in the Connecticut action or be estopped in this bankruptcy case by the findings in Connecticut thus impairing Debtor's ability to

challenge these wages. Therefore, a finding in Connecticut against Mitchell Heffernan would estop the Debtor from disputing these wages in the bankruptcy estate and violates the automatic stay provisions of 11 U.S.C. §362.

3.  The subject matter in this case and the threatened Connecticut action are exactly the same. The subject matter of the Connecticut action is solely an action for unpaid wages/commission that the Debtor did not pay Debtors's Connecticut employees. These alleged unpaid commissions are disputed by the Debtor in this case at bar. Therefore, the subject matter in this case and the Connecticut action are exactly the same.

Therefore, in accordance with <u>Parklane Hosiery</u>, <u>Protarga</u>, American <u>Film Technologies</u> and <u>Sudbury</u>, the doctrine of collateral estoppel bars the threatened Connecticut arrest from preceding. Accordingly, Mitchell Heffernan most respectfully submits that this Honorable Court must enter an injunction enjoining the State's Attorney of Connecticut from proceeding with the threatened arrest of  Mitchell Heffernan pursuant to this Court's equitable powers under 11 U.S.C. § 105(a).

**E.    The State Attorney General Has No Authority Under Connecticut Statutes or Federal Law to Seek the Arrest of a Corporate Officer of a Corporation Seeking Bankruptcy Protection**

Connecticut General Statutes §§ 31-71(b),(g) and 31-72 provide both civil and criminal remedies for the same act - failure to pay wages. This is identical to the <u>Jerzak</u> case. The instant threatened criminal arrest of Mitchell Heffernan in a civil action dressed in "criminal" clothes- a civil action to collect wages. This statute the State's Attorney seeks to enforce is arguably a quasi-civil statute because it impose strict

27

69

criminal liability on a defendant without any showing of mens rea, bad acts or intent. State of Connecticut v. Wilson, 83 Conn. App. 67; 848 A.2d 542 (2004). All that is required to arrest is a bold face allegation by the State's Attorney that wages are not paid. Id.

Additionally, the purpose of this statute is to allow the arrest of an employer who wrongfully and allegedly refuses to pay rightful earned wages; not to arrest an officer of a bankrupt debtor.

The State's own words uttered through its spokesperson Nancy Steffens clearly demonstrate that this threatened arrest is nothing more than the State's Attorney's attempt to circumvent the federal Constitution and the Bankruptcy Code to the detriment of Mitchell Heffernan. As demonstrated by Exhibit "C" hereto, the State's Attorney's Purpose for pursuing its threatened arrest of Mitchell Heffernan is clear:

> **"Our real purpose is to get people money owed to them. If we can work out a settlement without criminal charges that's great".** (emphasis added).

Further, there is no federal or state precedent, including Connecticut precedent, that permits the prosecution of an officer or director of a corporation that has filed for protection from its creditors under the Bankruptcy Code like the Debtor in this case. In fact, the case law in Connecticut which addressed this issue concerns the voluntary and willful failure to pay wages by an individual employer or corporate employer, as follows:

1.    Butler, Commission of Labor Ex REl. Marjorie Skidmore v. Hartford Technical Institute, Inc., et al., 243 Conn. 454; 704 A.2d 222 (Sup. Ct. Conn. 1997) –

No bankruptcy pending. Corporation and president were defendants. Employee claimed she was not paid overtime for which she was worked and was awarded double pay;

2.    State of Connecticut v. Merkinger, 27 Conn. App. 379; 655 A.2d 1167 (App. Ct. Conn. 1995) – employer not in bankruptcy;

3.    State of Connecticut v. Wilson, 83 Conn. App. 67; 848 A.2d 542 (App. Ct. Conn. 2004) – employer not in bankruptcy;

4.    State v. Lattanzio, 2001 Conn. Super. LEXIS 2830 – employer not in bankruptcy

Therefore, there is no Connecticut precedent authorizing the Connecticut State's Attorney to willfully ignore the federal Bankruptcy Code in seeking the arrest of Mitchell Heffernan based on this strict liability statute. Therefore, the Connecticut State Attorney must be enjoined from proceeding with the threatened criminal action against Mitchell Heffernan.

## III.    CONCLUSION.

Based on the foregoing it is respectfully submitted that this Honorable Court extend the automatic stay provisions to enjoin the State's Attorney of Connecticut from arresting and/or commencing criminal prosecution against Mitchell Heffernan, or in the alternative, to exercise its equitable powers and permanently enjoin the State's Attorney of Connecticut from arresting and/or commencing criminal prosecution against Mitchell Heffernan.

Respectfully submitted,

BY: _____/S/_____
ALBERT M. GRETO, ESQUIRE
1701 Shallcross Avenue, Suite C
P.O. Box 756
Wilmington, DE 19899
algreto@gretolaw.com

BY: _____/S/_____
ROBERT SCANDONE, ESQUIRE
1800 John F. Kennedy Blvd, Suite 200
Philadelphia, PA 19103
(215) 563-6571
Rscandone@yahoo.com

POZZUOLO & PERKISS, P.C.

BY: _____/S/_____
GARY M. PERKISS, ESQUIRE
JUDITH P. RODDEN, ESQUIRE
2033 Walnut Street
Philadelphia, PA 19103
(215) 977-8200
gary@pozzuolo.com
judy@pozzuolo.com

30

72

# EXHIBIT "A"

# courant.com

http://www.courant.com/hc-mortagewarrant-0319,0,266585.story?track=mostviewedlink

## Arrest Warrant Sought For Former Mortgage Co. Official

By KENNETH R. GOSSELIN
The Hartford Courant

March 19 2007, 5:49 PM EDT

Mitch Heffernan is involved in starting a new mortgage business, but his old company -- the now-defunct Mortgage Lenders Network -- could land him in plenty of trouble with the state for not paying wages earned by his former employees.

The state Department of Labor confirmed Monday that it has applied for an arrest warrant in Superior Court in Middletown that would charge Heffernan -- the former president of Middletown-based Mortgage Lenders -- with 61 counts of failing to pay wages.

The wages that the department alleges were unpaid total $3 million, mostly in sales commissions. The commissions range from $5,000 to $300,000.

Heffernan could face $300,000 in fines, jail time or both. He did not return calls seeking comment Monday.

Other Mortgage Lenders executives also could be named later because the state labor department's investigation is continuing, according to Gary Pechie, director of the state's Wage and Workplace Standards Division.

The Courant reported in January that Mortgage Lenders' sales representatives across the nation were angry that the company had failed to pay commissions. Some were preparing lawsuits.

On Monday, The Courant reported that Heffernan is part of a group of former Mortgage Lenders executives that is organizing a new mortgage company, also to be based in Middletown -- in some of the same office space occupied by the defunct company.

Mortgage Lenders filed for bankruptcy protection Feb. 5, after a monthlong downward spiral fueled by the collapse of its largest lending business. About 1,800 employees across the country, including about 950 in Connecticut, lost their jobs and saw their health benefits suddenly cut off.

Prosecutors and a judge in Middletown must still sign off on the warrant, and their thinking wasn't known Monday. The office of the chief state's attorney couldn't be reached for comment Monday.

Heffernan would be charged under the statutes of the The state Department of Labor, which authorizes the department to seek arrests for nonpayment of wages. Charges covering wages over $2,000 are a class-D felony. Such charges are not unusual, but Mortgage Lenders represents one of the larger cases.

Experts said officers in a company that has filed for bankruptcy aren't shielded from prosecution for failure to pay wages that have been earned.

"Officers have been arrested because it is a crime," said Joel Grafstein, a bankruptcy attorney at Grafstein



# EXHIBIT "B"



# WFSB.com

## President Of Bankrupt Company May Face Charges
### *Nearly 1,000 Workers Laid Off In Connecticut*

POSTED: 7:15 pm EDT March 20, 2007

**MIDDLETOWN, Conn. --** Arrest warrants are being reviewed for the president of a mortgage lending company that declared bankruptcy and laid off nearly 1,000 Connecticut employees.

Since the beginning of the year, Mortgage Lender's Network has laid off about 950 employees in Connecticut, declared bankruptcy and closed its doors.

### *EYEWITNESS NEWS* EXTRAS

- **Eyewitness News Seeks Mortgage Lender's Former Employees**

The state Department of Labor has now asked prosecutors to sign arrest warrants for the company's president, Mitch Heffeman.

The department claims that the company owes its former employees wages that could top $3 million.

"Incentive pay was such that the amounts owed to some people was $300,000, and for some people, that could be a whole year's pay," said Gary Pechie of the Connecticut Department of Labor.

Channel 3 Eyewitness News reporter Eric Parker reported that soon after the company told its employees to pack their belonging, the state began receiving complaints from workers who claimed to be owed unpaid wages.

The department said that it has received 141 complaints and that unpaid wages could top $3 million.

Prosecutors told Eyewitness News that because the company declared bankruptcy, criminal charges may be the only way to claim the money.

"The judge could order restitution, but if not, it's a $2,000 to $5,000 fine and five years of imprisonment for each offense," Pechie said. "And with 61 counts, you're talking a hefty fine and a year in jail."

Heffeman didn't return Eyewitness News' calls requesting comment.

**Click here to e-mail newstips to Eyewitness News, or dial toll-free: 866-289-0333.**
*Be sure to stay with WFSB.com and Channel 3 Eyewitness News for the latest news updates.* 

**Previous Stories:**

- January 31, 2007: Construction Continues At Troubled Co.'s Headquarters

*We Deliver! The Latest WFSB.com E-Mail Headlines In Your Lunchbox*
*Sign up for WFSB.com E-Mail Alerts for news, weather, sports and more directly in your inbox. Click here for more details.*

© 2007 by WFSB.com. All rights reserved.
This material may not be published, broadcast, rewritten or redistributed.

(76)

# EXHIBIT "C"



Print this article | Close this window

## Connecticut seeks arrest of Mortgage Lenders executive

Mon Mar 26, 2007 4:59PM EDT

By Jonathan Stempel

NEW YORK (Reuters) - Connecticut said on Monday it is seeking the arrest of former Mortgage Lenders Network USA Inc. President Mitchell Heffernan for failing to pay employees as the subprime lender sank into bankruptcy.

Any charges would be the first against a former top executive of a large U.S. subprime lender since delinquencies and defaults began rising in recent months.

The Connecticut Department of Labor applied for an arrest warrant charging Heffernan with failing to pay about $3 million to 61 employees of Middletown-based Mortgage Lenders, department spokeswoman Nancy Steffens said.

Most of the amounts owed relate to sales commissions, ranging from $5,000 to $300,000 per person, she said.

"The company declared bankruptcy, which requires us to go through a criminal court to get former employees their money," Steffens said. "Our real purpose is to get people money owed to them. If we can work out a settlement without criminal charges, that's great."

Calls and e-mails to Mortgage Lenders from Reuters were not immediately returned. Heffernan could also not immediately be reached. Mark Miele, an inspector in the office of state attorney Timothy Liston, who works in Middletown, declined to comment.

Mortgage Lenders had employed 1,800 people nationwide, including 950 in Connecticut, before filing for Chapter 11 protection from creditors on February 5.

The company had been the 15th-largest U.S. lender to people with poor credit histories. It expects to liquidate this year.

More than two dozen subprime lenders have quit the industry in the last year, and at least four large lenders have sought bankruptcy protection.

Another subprime lender, Irvine, California's New Century Financial Corp., faces an investigation by federal prosecutors in its home state over its accounting as well as trading in its stock.

New Century had been the largest independent subprime lender before shutting down its loan operations this month.

For more about the subprime mortgage crisis, see

© Reuters 2006. All rights reserved. Republication or redistribution of Reuters content, including by caching, framing or similar means, is expressly prohibited without the prior written consent of Reuters. Reuters and the Reuters sphere logo are registered trademarks and trademarks of the Reuters group of companies around the world.

Reuters journalists are subject to the Reuters Editorial Handbook which requires fair presentation and disclosure of relevant interests.

# EXHIBIT "D"

1

1

2                              - - -

3

4                  VIDEOTAPE TRANSCRIPTION

5                            of

6                     EXCERPT FROM

7             CHANNEL 3, 6:00 p.m. NEWS

8

9                   MARCH 29, 2007

10

11                         - - -

12

13    Transcribed by:  Lisa Del Casale,

14                      Registered Professional Reporter

15

16

17

18

19         DelCASALE, CASEY, MARTIN & MANCHELLO

20      Suite 402 - 1628 John F. Kennedy Boulevard

21           Philadelphia, Pennsylvania  19103

22           (215) 568-2111   (215) 568-2622 (fax)

23

24


                 DelCASALE, CASEY, MARTIN & MANCHELLO
                   (215)568-2111    (609)482-7207

2

1           (Segment begins.)

2           NEWS ANCHOR:  -- failed mortgage

3    company in Middletown, one week after the

4    State announced it wanted to arrest the

5    company's president -- (cuts off mid

6    sentence.)

7           NEWS REPORTER PARKER:  Three months

8    ago Mortgage Lenders Network sent 950

9    employees in Connecticut packing.  In that

10   time, the company declared bankruptcy in

11   the Federal Bankruptcy court in Delaware.

12          Last week the State Department of

13   Labor asked for arrest warrants for company

14   president, Mitch Heffernan, on 61 criminal

15   charges of failing to pay former workers.

16          Now, Heffernan's lawyer has asked

17   Bankruptcy Court to stop Connecticut from

18   pursuing those criminal charges.  Attorney

19   General Richard Blumenthal says the Federal

20   Court has no right to stop State criminal

21   proceedings.

22          ATTORNEY GENERAL BLUMENTHAL:  We're

23   determined to fight in upholding our rights

24   as a sovereign state to use our criminal

3

```
 1          law to punish criminal wrongdoing, and

 2          there's just no way that a Federal

 3          Bankruptcy Court in Delaware is going to

 4          enjoin or stop our criminal proceeding.

 5                    NEWS REPORTER PARKER:

 6          Eyewitness News has confirmed that

 7          prosecutors here at the Middlesex

 8          Courthouse are reviewing the applications

 9          for arrest warrants, but they say they'll

10          have no further comment beyond that.

11                    The next thing we'll hear about

12          those arrest warrants, and if they're

13          signed, is if Mitch Heffernan gets

14          arrested.

15                    ATTORNEY GENERAL BLUMENTHAL:  These

16          allegations are very serious and

17          significant and should be pursued.  There's

18          no way a Federal Bankruptcy court is going

19          to stop us as a state from protecting our

20          citizens.

21                    NEWS REPORTER PARKER:  Blumenthal

22          says his office won't wait for the warrants

23          to be signed; they'll start fighting

24          immediately.
```

DelCASALE, CASEY, MARTIN & MANCHELLO
(215)568-2211    (609)482-7207

4

```
1              Eric Parker, Channel 3, Eyewitness

2       News.

3              MALE NEWS ANCHOR:  And a footnote

4       to Eric's report, Heffernan's lawyers say

5       there is nothing -- "this," rather, "is

6       nothing more than an attempt to circumvent

7       bankruptcy law.  We'll find out at the

8       hearing whether they have the right to do

9       that, but I don't believe they do," end of

10      quote.

11             That hearing will take place on

12      April the 10th.

13                   (Segment ends.)

14

15

16

17

18

19

20

21

22

23

24
```

DelCASALE, CASEY, MARTIN & MANCHELLO
(215)568-2211    (609)482-7207

83

# EXHIBIT "E"



THIS STORY HAS BEEN FORMATTED FOR EASY PRINTING

# GMAC unit wants Mortgage Lenders ex-CEO comments stricken



By Peg Brickley, Dow Jones Newswires | April 5, 2007

WILMINGTON, Del. --A unit of GMAC Financial Services has moved to silence the former chief executive of Mortgage Lenders Network USA Inc., Mitchell Heffernan, who blames the unit and bankruptcy advisers for making decisions that could land him behind bars.

The GMAC unit, Residential Funding Co., is the largest secured creditor in Mortgage Lenders' Chapter 11 case.

In court documents in March, Residential Funding said it wants to erase "scandalous" statements Heffernan made while fighting criminal prosecution in Connecticut for failing to pay employees up to $2.5 million in wages owed when Mortgage Lenders Network went bankrupt Feb. 5.

Heffernan says he didn't make the decision not to pay employees. The call to withhold commission checks from at least 61 Connecticut employees was made by Residential Funding and restructuring advisers, Heffernan said in court documents filed in Delaware, where Mortgage Lenders is wrapping up its failed subprime mortgage lending business under the protection of a bankruptcy court.

Residential Funding wants Heffernan's claims about who stiffed employees and which name names, stricken from the court record.

Mortgage lenders, based in Middletown, Conn., is one of a parade of once-booming home lenders that collapsed as consumer defaults rose and backers like Residential Funding retreated.

All but 100 of Mortgage Lenders' 1,800 employees lost their jobs as a result of the bankruptcy. Many of the remaining 100, including top-tier executives, are sharing up to $500,000 in court-approved secret bankruptcy bonuses in addition to their pay for their final weeks on the job. Mortgage Lenders wants its loans sold and its doors shut by the end of April.

Residential Funding denies it was holding the purse strings during the 45 days before Mortgage Lenders filed for Chapter 11 bankruptcy.

One of the country's largest lenders to the distressed subprime sector, Residential Funding is part of the GMAC-ResCap group that in 2006 produced $161.6 billion in home loans, $30.6 billion of which went to consumers with bad credit.

Brett Weinberg, spokesman for GMAC-ResCap, declined to comment on the company's bid to strike Heffernan's comments from court records.

One of those Heffernan named, Daniel Scouler of Mortgage Lenders' financial adviser, also declined comment on the matter, except to say he isn't worried about the possibility of being targeted in a criminal investigation.

The move to hush Heffernan comes as Connecticut readies for a bankruptcy-court showdown in Wilmington, Del., Tuesday over its right to enforce criminal laws against those in charge of companies that don't pay wages.

Heffernan says Chapter 11 should shield him from arrest. Connecticut says it doesn't.

"There is a very powerful message that employers must be held accountable to pay for work," said Connecticut Attorney General Richard Blumenthal, explaining why the state may prosecute Heffernan "or others who may have allegedly broken our criminal laws."

Connecticut can't force Mortgage Lenders to pay the employees now that it's in Chapter 11, the attorney general admitted. Unless companies provide otherwise -- and many do -- unpaid employees fall in with the rest of those waiting for a fractional recovery that may never arrive.



MLAC unit wants Mortgage Lenders ex-CEO comments stricken - Bo...    http://www.boston.com/news/local/connecticut/articles/2007/04/05/g...

Connecticut has no intention of asking the bankruptcy court to order the wages paid, Blumenthal said. All the state wants to do is arrest violators of its criminal laws. However, it's not unheard of for restitution to be part of a plea deal in such cases, he admitted.

"People are often persuaded by criminal prosecutions to do the right thing," Blumenthal said. "It's a matter of simple justice."

Heffernan says Residential Funding and bankruptcy advisers decided who got paid and who didn't get paid in the six weeks before the bankruptcy filing.

Heffernan's attorneys did not return calls for comment.

Connecticut officials say the law at issue is meant to safeguard against "intentional and willful" harm to employees, and that its drafters were aware of the limits of bankruptcy-court authority.

The criminal investigation grew out of complaints filed with Connecticut's Department of Labor. Investigators found that the troubled company refused to pay commissions, and sought a warrant for Heffernan's arrest.

No warrant has yet been issued and a decision by prosecutors in the ongoing Mortgage Lenders' wage investigation is not expected for weeks, senior State's Attorney Maureen Platt, of Middletown, Conn., said Wednesday.

The warrant request says Mortgage Lenders stiffed Connecticut employees to the tune of $1.7 million. However, the real amount is probably closer to $2.5 million, said Gary Pechie, director of the Connecticut Department of Labor's Wage and Workplace Standards Division. ■

© Copyright 2007 The New York Times Company



# EXHIBIT "F"

# ROBERT SCANDONE
## ATTORNEY AT LAW

SUITE 200
1800 JOHN F. KENNEDY BOULEVARD
PHILADELPHIA, PA 19103

(215) 563-6571
FAX (215) 854-0083



March 26, 2007

*Via Facsimile 1-806-808-5388*
Glenn Woods, Esquire
State Attorney General Office
55 Elm Street
Hartford CT 06106

RE:    Mitch Heffernan

Dear Glenn:

I am awaiting your reply, however, I have reviewed your statute in various cases. I have not found in any one of those cases the situation as in my client. All those cases relate to an employer's failure to pay. None of them relate to an employer's direction to not pay because of the bankruptcy proceedings.

I would like you to review a case out of the Western District of Pennsylvania, Belculfine, et al v. Aloe, et al. 186 B.R. 623, 1995 Bankruptcy Lexis 1278. (See enclosed)

In that case it was whether the officers of a debtor in possession can be responsible under the wage payment and collection law of Pennsylvania for post petition payments the debtor/employer ceases to make upon the filing of the Bankruptcy Petition. I think this case is on point and your statute can not and does not apply to a case in bankruptcy. Additionally it states "to require post petition officers to make personal payments interferes with the bankruptcy code and its established distribution scheme."

In my review of this statute your Court's have held the only way that this Public Welfare Office properly does not require a mens rea and imposes strict liability is that the defendant benefits from labor's of the employees . . . As I indicated to you in this case there is no benefits in this case. The company lost twenty million dollars on the product that are basis for these commissions. That's why these commissions are in dispute in Bankruptcy Court.

The Bankruptcy Court may enjoin State Court proceedings, under 11 USC § 105A  See in RE: Jerzak, 47, B.R. 771 Western District.

March 26, 2007
Glenn Woods, Esquire
State Attorney General Office
Page 2


My client certainly wants to cooperate, and I am still awaiting word back from you for the
possible settlement figure, however, would you be so kind as to show me please a case involving
a bankrupt.

Very truly yours,

ROBERT SCANDONE

RS/th
Enclosure

# ROBERT SCANDONE

## ATTORNEY AT LAW

COPY

SUITE 200
1800 JOHN F. KENNEDY BOULEVARD
PHILADELPHIA, PA 19103
———
(215) 563-5571
FAX (215) 854-0083



March 27, 2007

*Via Facsimile 1-806-808-5388*

Glenn Woods, Esquire
State Attorney General Office
55 Elm Street
Hartford, CT 06106

RE:   Mitch Heffernan

Dear Glenn:

I did read the Third Circuit case before I sent the opinion from the Bankruptcy Court. However, since you supposedly had it in front of you, I went back and reviewed it again.

Now I know you can read because you are a Philly guy, however, if your move to Connecticut has caused you an inability to do what you did in Philadelphia, I will quote to you from the opinion as follows:

> "Under PA law, when a corporation fails to pay wages and benefits that it owes its employees, the corporation's top officers can be held personally liable for the non-payments. See e.g., <u>Carpenters Health and Welfare Fund v. Ambrose, Inc.</u>, 727 F.2d 279, 282-83 (3d Cir. 1983). The purpose of this rule is to give top corporate managers an incentive to use available corporate funds for the payment of wages and benefits rather than for some other purpose. <u>Carpenter</u>, 727 F.2d at 282-83. Holding the managers personally liable serves to give them an incentive not to divert funds away from the payments owed to employees. The issue raised by this case is what happens when the company files a Chapter 11 bankruptcy petition and the employees seek to recover from the corporate managers for unpaid vacation and retirement benefits that were allegedly earned in the pre-petition period, but that became due only in the post-petition period. The filing of a petition for bankruptcy under Chapter 11 of the Bankruptcy Code bars the payment of post-petition claims by the company. See 11

Glenn Woods, Esquire
State Attorney General Office
March 27, 2007
Page 2


"U.S.C. Sec. 362 (providing for automatic stay of creditors' efforts to seek
repayment). The question, then, is whether, in this context, where, by law,
the company's managers have no discretion to order payment of the
amounts owed to the employees, they can simultaneously be held liable
for not making the payments. We think not." (internal citations omitted).
Id. at 635.

That's this case. Do not force me to seek protection.

Very truly yours,

ROBERT SCANDONE

RS/ca

# EXHIBIT "G"

BY-LAWS

## ARTICLE I - OFFICES

Section 1.  The registered office of the corporation in the State of Delaware shall be at 11th Floor, Rodney Square North, 11th and Market Streets, Wilmington, New Castle County, DE 19801.

The registered agent in charge thereof shall be Corporation Guarantee and Trust Company.

Section 2.  The corporation may also have offices at such other places as the Board of Directors may from time to time appoint or the business of the corporation may require.

## ARTICLE II - SEAL

Section 1.  The corporate seal shall have inscribed thereon the name of the corporation, the year of its organization and the words "Corporate Seal, Delaware".

## ARTICLE III - STOCKHOLDERS' MEETINGS

Section 1.  Meetings of stockholders shall be held at the registered office of the corporation in this state or at such place, either within or without this state, as may be selected from time to time by the Board of Directors.

Section 2.  ANNUAL MEETINGS:  The annual meeting of the stockholders shall be held on the first Monday    of December in each year if not a legal holiday, and if a legal holiday, then on the next secular day following at 9:00   o'clock A.M., when they shall

elect a Board of Directors and transact such other business as may properly be brought before the meeting. If the annual meeting for election of directors is not held on the date designated therefor, the directors shall cause the meeting to be held as soon thereafter as convenient.

Section 3. ELECTION OF DIRECTORS: Elections of the directors of the corporation shall be by written ballot.

Section 4. SPECIAL MEETINGS: Special meetings of the stockholders may be called at any time by the President, or the Board of Directors, or stockholders entitled to cast at least one-fifth of the votes which all stockholders are entitled to cast at the particular meeting. At any time, upon written request of any person or persons who have duly called a special meeting, it shall be the duty of the Secretary to fix the date of the meeting, to be held not more than sixty days after receipt of the request, and to give due notice thereof. If the Secretary shall neglect or refuse to fix the date of the meeting and give notice thereof, the person or persons calling the meeting may do so.

Business transacted at all special meetings shall be confined to the objects stated in the call and matters germane thereto, unless all stockholders entitled to vote are present and consent.

Written notice of a special meeting of stockholders stating the time and place and object thereof, shall be given to each stockholder entitled to vote thereat at least       5      days before such meeting, unless a greater period of notice is required by statute in a particular case.

Section 5. QUORUM: A majority of the outstanding shares of the

corporation entitled to vote, represented in person or by proxy, shall constitute a quorum at a meeting of stockholders. If less than a majority of the outstanding shares entitled to vote is represented at a meeting, a majority of the shares so represented may adjourn the meeting from time to time without further notice. At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally noticed. The stockholders present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal of enough stockholders to leave less than a quorum.

Section 6. PROXIES: Each stockholder entitled to vote at a meeting of stockholders or to express consent or dissent to corporate action in writing without a meeting may authorize another person or persons to act for him by proxy, but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period.

A duly executed proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power. A proxy may be made irrevocable regardless of whether the interest with which it is coupled is an interest in the stock itself or an interest in the corporation generally. All proxies shall be filed with the Secretary of the meeting before being voted upon.

Section 7. NOTICE OF MEETINGS: Whenever stockholders are required or permitted to take any action at a meeting, a written notice of the meeting shall be given which shall state the place,

date and hour of the meeting, and, in the case of a special meeting, the purpose or purposes for which the meeting is called.

Unless otherwise provided by law, written notice of any meeting shall be given not less than ten nor more than sixty days before the date of the meeting to each stockholder entitled to vote at such meeting.

Section 8.  CONSENT IN LIEU OF MEETINGS:  Any action required to be taken at any annual or special meeting of stockholders of a corporation, or any action which may be taken at any annual or special meeting of such stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted. Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing.

Section 9.  LIST OF STOCKHOLDERS:  The officer who has charge of the stock ledger of the corporation shall prepare and make, at least ten days before every meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting, arranged in alphabetical order, and showing the address of each stockholder and the number of shares registered in the name of each stockholder.  No share of stock upon which any installment is due and unpaid shall be voted at any meeting.  The list shall be open to the examination of any stockholder, for any purpose germane to the meeting, during ordinary busi-

ness hours, for a period of at least ten days prior to the meeting, either at a place within the city where the meeting is to be held, which place shall be specified in the notice of the meeting, or, if not so specified, at the place where the meeting is to be held.  The list shall also be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any stockholder who is present.

## ARTICLE IV - DIRECTORS

Section 1.  The business and affairs of this corporation shall be managed by its Board of Directors,   1      in number.  The directors need not be residents of this state or stockholders in the corporation.  They shall be elected by the stockholders at the annual meeting of stockholders of the corporation, and each director shall be elected for the term of one year, and until his successor shall be elected and shall qualify or until his earlier resignation or removal.

Section 2.  REGULAR MEETINGS:  Regular meetings of the Board shall be held without notice

at the registered office of the corporation, or at such other time and place as shall be determined by the Board.

Section 3.  SPECIAL MEETINGS:  Special Meetings of the Board may be called by the President on      5      days notice to each director, either personally or by mail or by telegram; special meetings shall be called by the President or Secretary in like manner and on like notice on the written request of a majority of the directors in office.

Section 4.  QUORUM:  A majority of the total number of directors

shall constitute a quorum for the transaction of business.

Section 5.   CONSENT IN LIEU OF MEETING:   Any action required or permitted to be taken at any meeting of the Board of Directors, or of any committee thereof, may be taken without a meeting if all members of the Board or committee, as the case may be, consent thereto in writing, and the writing or writings are filed with the minutes of proceedings of the Board or committee.  The Board of Directors may hold its meetings, and have an office or offices, outside of this state.

Section 6.   CONFERENCE TELEPHONE:   One or more directors may participate in a meeting of the Board, of a committee of the Board or of the stockholders, by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other; participation in this manner shall constitute presence in person at such meeting.

Section 7.   COMPENSATION:   Directors as such, shall not receive any stated salary for their services, but by resolution of the Board, a fixed sum and expenses of attendance, if any, may be allowed for attendance at each regular or special meeting of the Board PROVIDED, that nothing herein contained shall be construed to preclude any director from serving the corporation in any other capacity and re- ceiving compensation therefor.

Section 8.   REMOVAL:   Any director or the entire Board of Directors may be removed, with or without cause, by the holders of a majority of the shares then entitled to vote at an election of directors, except that when cumulative voting is permitted, if less than the entire Board is to be removed, no director may be removed

without cause if the votes cast against his removal would be sufficient to elect him if then cumulatively voted at an election of the entire Board of Directors, or, if there be classes of directors, at an election of the class of directors of which he is a part.

## ARTICLE V - OFFICERS

Section 1.  The executive officers of the corporation shall be chosen by the directors and shall be a President, Secretary and Treasurer.  The Board of Directors may also choose a Chairman, one or more Vice Presidents and such other officers as it shall deem necessary.  Any number of offices may be held by the same person.

Section 2.  SALARIES:  Salaries of all officers and agents of the corporation shall be fixed by the Board of Directors.

Section 3.  TERM OF OFFICE:  The officers of the corporation shall hold office for one year and until their successors are chosen and have qualified.  Any officer or agent elected or appointed by the Board may be removed by the Board of Directors whenever in its judgment the best interest of the corporation will be served thereby.

Section 4.  PRESIDENT:  The President shall be the chief executive officer of the corporation; he shall preside at all meetings of the stockholders and directors; he shall have general and active management of the business of the corporation, shall see that all orders and resolutions of the Board are carried into effect, subject, however, to the right of the directors to delegate any specific powers, except such as may be by statute exclusively conferred on the President, to any other officer or officers of the corporation.  He shall execute bonds, mortgages and other contracts requiring a seal,

under the seal of the corporation. He shall be EX-OFFICIO a member of all committees, and shall have the general power and duties of supervision and management usually vested in the office of President of a corporation.

Section 5. SECRETARY: The Secretary shall attend all sessions of the Board and all meetings of the stockholders and act as clerk thereof, and record all the votes of the corporation and the minutes of all its transactions in a book to be kept for that purpose, and shall perform like duties for all committees of the Board of Directors when required. He shall give, or cause to be given, notice of all meetings of the stockholders and of the Board of Directors, and shall perform such other duties as may be prescribed by the Board of Directors or President, and under whose supervision he shall be. He shall keep in safe custody the corporate seal of the corporation, and when authorized by the Board, affix the same to any instrument requiring it.

Section 6. TREASURER: The Treasurer shall have custody of the corporate funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the corporation, and shall keep the moneys of the corporation in a separate account to the credit of the corporation. He shall disburse the funds of the corporation as may be ordered by the Board, taking proper vouchers for such disbursements, and shall render to the President and directors, at the regular meetings of the Board, or whenever they may require it, an account of all his transactions as Treasurer and of the financial condition of the corporation.

## ARTICLE VI - VACANCIES

Section 1.  Any vacancy occurring in any office of the corpo-
ration by death, resignation, removal or otherwise, shall be filled
by the Board of Directors.  Vacancies and newly created directorships
resulting from any increase in the authorized number of directors may
be filled by a majority of the directors then in office, although less
than a quorum, or by a sole remaining director.  If at any time, by
reason of death or resignation or other cause, the corporation should
have no directors in office, then any officer or any stockholder or an
executor, administrator, trustee or guardian of a stockholder, or
other fiduciary entrusted with like responsibility for the person or
estate of a stockholder, may call a special meeting of stockholders in
accordance with the provisions of these By-Laws.

Section 2.  RESIGNATIONS EFFECTIVE AT FUTURE DATE:  When one or
more directors shall resign from the Board, effective at a future
date, a majority of the directors then in office, including those who
have so resigned, shall have power to fill such vacancy or vacancies,
the vote thereon to take effect when such resignation or resignations
shall become effective.


## ARTICLE VII - CORPORATE RECORDS

Section 1.  Any stockholder of record, in person or by attorney
or other agent, shall, upon written demand under oath stating the
purpose thereof, have the right during the usual hours for business
to inspect for any proper purpose the corporation's stock ledger, a
list of its stockholders, and its other books and records, and to make
copies or extracts therefrom.  A proper purpose shall mean a purpose

reasonably related to such person's interest as a stockholder.  In
every instance where an attorney or other agent shall be the person
who seeks the right to inspection, the demand under oath shall be
accompanied by a power of attorney or such other writing which
authorizes the attorney or other agent to so act on behalf of the
stockholder.  The demand under oath shall be directed to the corpo-
ration at its registered office in this state or at its principal
place of business.


ARTICLE VIII - STOCK CERTIFICATES, DIVIDENDS, ETC.

Section 1.  The stock certificates of the corporation shall be
numbered and registered in the share ledger and transfer books of the
corporation as they are issued.  They shall bear the corporate seal
and shall be signed by the President and Secretary.

Section 2.  TRANSFERS:  Transfers of shares shall be made on the
books of the corporation upon surrender of the certificates therefor,
endorsed by the person named in the certificate or by attorney,
lawfully constituted in writing.  No transfer shall be made which is
inconsistent with law.

Section 3.  LOST CERTIFICATE:  The corporation may issue a new
certificate of stock in the place of any certificate theretofore
signed by it, alleged to have been lost, stolen or destroyed, and the
corporation may require the owner of the lost, stolen or destroyed
certificate, or his legal representative to give the corporation a
bond sufficient to indemnify it against any claim that may be made
against it on account of the alleged loss, theft or destruction of
any such certificate or the issuance of such new certificate.

Section 4.  RECORD DATE:  In order that the corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, or to express consent to corporate action in writing without a meeting, or entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion or exchange of stock or for the purpose of any other lawful action, the Board of Directors may fix, in advance, a record date, which shall not be more than sixty nor less than ten days before the date of such meeting, nor more than sixty days prior to any other action.

If no record date is fixed:

(a)  The record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held.

(b)  The record date for determining stockholders entitled to express consent to corporate action in writing without a meeting, when no prior action by the Board of Directors is necessary, shall be the day on which the first written consent is expressed.

(c)  The record date for determining stockholders for any other purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

(d)  A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board of Directors may fix a new record date for the adjourned meeting.

Section 5.  DIVIDENDS:  The Board of Directors may declare and pay dividends upon the outstanding shares of the corporation, from time to time and to such extent as they deem advisable, in the manner and upon the terms and conditions provided by statute and the Certificate of Incorporation.

Section 6.  RESERVES:  Before payment of any dividend there may be set aside out of the net profits of the corporation such sum or sums as the directors, from time to time, in their absolute discretion, think proper as a reserve fund to meet contingencies, or for equalizing dividends, or for repairing or maintaining any property of the corporation, or for such other purpose as the directors shall think conducive to the interests of the corporation, and the directors may abolish any such reserve in the manner in which it was created.


ARTICLE IX - MISCELLANEOUS PROVISIONS

Section 1.  CHECKS:  All checks or demands for money and notes of the corporation shall be signed by such officer or officers as the Board of Directors may from time to time designate.

Section 2.  FISCAL YEAR:  The fiscal year shall begin on the first day of October.

Section 3.  NOTICE:  Whenever written notice is required to be given to any person, it may be given to such person, either personally or by sending a copy thereof through the mail, or by telegram,

charges prepaid, to his address appearing on the books of the corporation, or supplied by him to the corporation for the purpose of notice. If the notice is sent by mail or by telegraph, it shall be deemed to have been given to the person entitled thereto when deposited in the United States mail or with a telegraph office for transmission to such person. Such notice shall specify the place, day and hour of the meeting and, in the case of a special meeting of stockholders, the general nature of the business to be transacted.

Section 4. WAIVER OF NOTICE: Whenever any written notice is required by statute, or by the Certificate or the By-Laws of this corporation a waiver thereof in writing, signed by the person or persons entitled to such notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice. Except in the case of a special meeting of stockholders, neither the business to be transacted at nor the purpose of the meeting need be specified in the waiver of notice of such meeting. Attendance of a person either in person or by proxy, at any meeting shall constitute a waiver of notice of such meeting, except where a person attends a meeting for the express purpose of objecting to the transaction of any business because the meeting was not lawfully called or convened.

Section 5. DISALLOWED COMPENSATION: Any payments made to an officer or employee of the corporation such as a salary, commission, bonus, interest, rent, travel or entertainment expense incurred by him, which shall be disallowed in whole or in part as a deductible expense by the Internal Revenue Service, shall be reimbursed by such officer or employee to the corporation to the full extent of such

disallowance. It shall be the duty of the directors, as a Board, to enforce payment of each such amount disallowed. In lieu of payment by the officer or employee, subject to the determination of the directors, proportionate amounts may be withheld from his future compensation payments until the amount owed to the corporation has been recovered.

Section 6. RESIGNATIONS: Any director or other officer may resign at any time, such resignation to be in writing and to take effect from the time of its receipt by the corporation, unless some time be fixed in the resignation and then from that date. The acceptance of a resignation shall not be required to make it effective.

## ARTICLE X - ANNUAL STATEMENT

Section 1. The President and the Board of Directors shall present at each annual meeting a full and complete statement of the business and affairs of the corporation for the preceding year. Such statement shall be prepared and presented in whatever manner the Board of Directors shall deem advisable and need not be verified by a Certified Public Accountant.

## ARTICLE XI - INDEMNIFICATION AND INSURANCE:

Section 1. (a) RIGHT TO INDEMNIFICATION. Each person who was or is made a party or is threatened to be made a party or is involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that he or she, or a person of whom he or she is the legal

representative, is or was a director or officer, of the Corporation or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans, whether the basis of such proceeding is alleged action in an official capacity as a director, officer, employee or agent or in any other capacity while serving as a director, officer, employee or agent, shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the Delaware General Corporation Law, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than said law permitted the Corporation to provide prior to such amendment), against all expense, liability and loss (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by such person in connection therewith and such indemnification shall continue as to a person who has ceased to be a director, officer, employee or agent and shall inure to the benefit of his or her heirs, executors and administrators; provided, however, that, except as provided in paragraph (b) hereof, the Corporation shall indemnify any such person seeking indemnification in connection with a proceeding (or part thereof) initiated by such person only if such proceeding (or part thereof) was authorized by the Board of Directors of the Corporation.  The right to indemnification conferred in this Section shall be a contract right and shall include the right to be paid by the Corporation the expenses incurred in defending any

such proceeding in advance of its final disposition: provided, however, that, if the Delaware General Corporation Law requires, the payment of such expenses incurred by a director or officer in his or her capacity as a director or officer (and not in any other capacity in which service was or is rendered by such person while a director or officer, including, without limitation, service to an employee benefit plan) in advance of the final disposition of a proceeding, shall be made only upon delivery to the corporation of an undertaking, by or on behalf of such director or officer, to repay all amounts so advanced if it shall ultimately be determined that such director or officer is not entitled to be indemnified under this Section or otherwise.  The Corporation may, by action of its Board of Directors, provide indemnification to employees and agents of the Corporation with the same scope and effect as the foregoing indemnification of directors and officers.

 (b) RIGHT OF CLAIMANT TO BRING SUIT:

 If a claim under paragraph (a) of this Section is not paid in full by the Corporation within thirty days after a written claim has been received by the Corporation, the claimant may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim and, if successful in whole or in part, the claimant shall be entitled to be paid also the expense of prosecuting such claim.  It shall be a defense to any such action (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition where the required undertaking, if any is required, has been tendered to the Corporation) that the claimant has not met the standards of conduct which make it

permissible under the Delaware General Corporation law for the Corporation to indemnify the claimant for the amount claimed, but the burden of proving such defense shall be on the Corporation. Neither the failure of the Corporation (including its Board of Directors, independent legal counsel, or its stockholders) to have made a determination prior to the commencement of such action that indemnification of the claimant is proper in the circumstances because he or she has met the applicable standard of conduct set forth in the Delaware General Corporation Law, nor an actual determination by the Corporation (including its Board of Directors, independent legal counsel, or its stockholders) that the claimant has not met such applicable standard or conduct, shall be a defense to the action or create a presumption that the claimant has not met the applicable standard or conduct.

(c) Notwithstanding any limitation to the contrary contained in sub-paragraphs (a) and (b) of this section, the corporation shall, to the fullest extent permitted by Section 145 of the General Corporation Law of the State of Delaware, as the same may be amended and supplemented, indemnify any and all persons whom it shall have power to indemnify under said section from and against any and all of the expenses, liabilities or other matters referred to in or covered by said section, and the indemnification provided for herein shall not be deemed exclusive of any other rights to which those indemnified may be entitled under any By-law, agreement, vote of stockholders or disinterested Directors or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office, and shall continue as to a person who has

ceased to be director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such a person.

    (d)  INSURANCE:

The Corporation may maintain insurance, at its expense, to protect itself and any director, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any such expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under the Delaware General Corporation Law.

## ARTICLE XII - AMENDMENTS

Section 1.  These By-Laws may be amended or repealed by the vote of stockholders entitled to cast at least a majority of the votes which all stockholders are entitled to cast thereon, at any regular or special meeting of the stockholders, duly convened after notice to the stockholders of that purpose.

## UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | : | CHAPTER 11 |
| MORTGAGE LENDERS NETWORK | : | |
| USA, INC. | : | CASE NO.: 07-10146 (PJW) |
| Debtor | : | |
| | : | |
| | : | |

## CERTIFICATE OF SERVICE

I, Gary M. Perkiss, attorney for Mitchell Heffeman, certify that I am not less than 18 years of age, and that service of Supplemental Memorandum of Law in Support of Mitchell Heffernan's Motion to Enjoin the State of Connecticut from Criminal Prosecution Pursuant to 11 U.S.C. §105 was made by means of the Court's electronic system, facsimile or email upon:

### Via Court's Electronic System

James E. O'Neill, Esquire
Laura Davis Jones, Esquire
Curtis A. Hehn, Esquire
Timothy P Cairns, Esquire
Pachulski, Stang, Ziehl, Young, Jones
and Weintraub, LLP
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705

Joan E. Pilver, Esquire
Robert W. Clark, Esquire
Assistant Attorney General
55 Elm Street, P.O. Box 120
Hartford, CT 06141
**(Via facsimile upon Robert W.
Clark, Esquire #860-808-5347)**

Diane Malfeld, Esquire
Chris Lenhart, Esquire
Dorsey & Whitney, LLP
50 South 6th Street, Suite 1500
Minneapolis, MN 55402
**(and Via Facsimile #612-340-2643)**

U.S. Trustee
United States Trustee
844 King Street, Room 2207
Lockbox #35
Wilmington, DE 19899-0035

David W. Carickhoff, Jr., Esquire
Jason W. Staib, Esquire
Blank Rome, LLP
Chase Manhattan Centre
Wilmington, DE 19801
Attorneys for The Official
Committee of Unsecured Creditors
of Mortgage Lenders Network USA,
Inc.

Mary F. Caloway, Esquire
Eric Lopez Schnbel, Esquire
Buchanan, Ingersoll & Rooney, PC
The Brandywine Building
1000 West Street, 14th Floor
Wilmington, DE, 19801
**(and Via Facsimile #302-552-4295)**

<u>**Via Facsimile**</u>

Glenn Woods, Esquire
State Attorney General Office
55 Elm Street
Hartford, CT 06106
**Via facsimile #860-808-5388**

John Cashan, Esquire
GA 9 State Attorney's Office
1 Court Street
Middleton, CT 06457
**Via facsimile #860-343-6311**

<u>**Via Email**</u>

Dan Scouler @ Scouler Andrews
**DScouler@scoulerandrews.com**

Under penalty of perjury, I declare that the foregoing is true and correct.

Respectfully submitted,

Dated: <u>April 9, 2007</u>

BY: _____/S/_____
ROBERT SCANDONE, ESQUIRE
1800 John F. Kennedy Blvd, Suite 200
Philadelphia, PA 19103
(215) 563-6571
ATTY I.D. No. 15181
and
POZZUOLO & PERKISS, P.C.

Dated: <u>April 9, 2007</u>

BY: _____/S/_____
GARY M. PERKISS, ESQUIRE
JUDITH P. RODDEN, ESQUIRE
2033 Walnut Street
Philadelphia, PA 19103
(215) 977-8200
ATTY I.D. No. 30324
Attorneys for Mitchell L. Heffernan

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| MORTGAGE LENDERS | ) |  |
| NETWORK USA, INC.,[1] | ) | Case No. 07-10146 (PJW) |
|  | ) |  |
| Debtor. | ) |  |

## STIPULATION RE AFFIDAVIT OF MITCHELL HEFFERNAN

1.      This stipulation is by and between Mitchell Heffernan by and through his

counsel Robert Scandone, Esq. and counsel for the Debtor, James I. Stang, Pachulski Stang Ziehl

Young Jones & Weintraub LLP, regarding paragraph 5 of Mr. Heffernan's Affidavit in Support

of Motion to Enjoin the State of Connecticut from Criminal Prosecution Pursuant to 11 U.S.C.

§ 105 (docket no.367), ("Heffernan Affidavit").

2.      Mr. Heffernan and PSZYJ&W hereby agree that paragraph 5 of the

Heffernan Affidavit should be supplemented to reflect that:

a.      Pachulski Stang Ziehl Young Jones & Weintraub LLP was

retained by the Debtor on January 26, 2007.

b.      Mr. Stang advised generally about the impact of the Debtor's

bankruptcy case on the Debtor's obligations to employees and to pay employee benefits,

---

[1] Debtor's EIN:  XX-XXX7394
   Debtor's Address:  Middlesex Corporate Center, 213 Court Street, 11th Floor, Middletown, CT  06457

including the benefits and risks associated with the payment and non-payment of prepetition

employee benefits.

        c.     Mr. Stang did not advise the Debtor to pay or not pay the

brokerage commissions and;

        3.     Any inconsistency between this stipulation and paragraph 5 of the

Heffernan affidavit should be resolved as set forth herein.

        IT IS SO STIPULATED.

Dated:   April 10, 2007

BY:  _____
        Robert Scandone, Esq.
        Counsel to Mitchell Heffernan

PACHULSKI STANG ZIEHL YOUNG JONES &
WEINTRAUB LLP

BY:_____
        James I. Stang, Esq.
        Counsel to Mortgage Lenders Network USA, Inc.
        Debtor and Debtor in Possession



including the benefits and risks associated with the payment and non-payment of prepetition

employee benefits.

          c.      Mr. Stang did not advise the Debtor to pay or not pay the

brokerage commissions and;

          3.      Any inconsistency between this stipulation and paragraph 5 of the

Heffernan affidavit should be resolved as set forth herein.

       IT IS SO STIPULATED.

Dated:   April 10, 2007

                   By:_____
                        Robert Scandone, Esq.
                        Counsel to Mitchell Heffernan

                   PACHULSKI STANG ZIEHL YOUNG JONES &
                   WEINTRAUB LLP

                 BY:_____
                        James I. Stang, Esq.
                        Counsel to Mortgage Lenders Network USA, Inc.
                        Debtor and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

# Minute Entry

### *Hearing Information:*

| | |
|---|---|
| **Debtor:** | Mortgage Lenders Network USA, Inc. |
| **Case Number:** | 07-10146-PJW          **Chapter:** 11 |
| **Date / Time / Room:** | TUESDAY, APRIL 10, 2007 03:00 PM   CRT#2, 6TH FL. |
| **Bankruptcy Judge:** | PETER J. WALSH |
| **Courtroom Clerk:** | LORA JOHNSON |
| **Reporter / ECR:** | NICKITA BARKSDALE |

### *Matter:*

OMNIBUS

**R / M #:**   440 / 0

### *Appearances:*

See attached sign-in sheet

### *Proceedings:*

Hearing held.
Agenda items:
#1 - CNO filed and order signed
#2 - Order signed  approving stipulation
#3 - Motion denied
#4 - Order signed
#5 - Continued

Page 1 of 1

(116)

# SIGN-IN SHEET

**CASE NAME:** Mortgage Lenders Network USA, Inc.

**CASE NO.:** 07-10146 (PJW)

**COURTROOM NO.:** 2

**DATE:** 4-10-07

| NAME | LAW FIRM OR COMPANY | CLIENT REPRESENTING |
|------|--------------------|--------------------|
| Robert Jeandue | Robert Sandows | MacClect offman |
| Robert Poole | Reed & Perlin, P | Michel Jeffrey M |
| PATRICK McLaughlin | Dorsey + Whitney LLP | Residential Funding |
| Christopher Schnabel | Buchanan | RFC |
| Laura Davis Jones | Pachulski Stang et al | Debtor |
| Sandra O'Neill | Pachulski Stang et al | Debtor |
| SANDRA SELZER | GREENBERG Traurig | Sovereign |
| Louis DeLucio | Greenberg Traurig | " |
| Al Gero | Gero Law Firm | Mitchell Heffernan |
| David Carickhoff | Blank Rome | Creditors' Committee |
| Robert W. Clark | State of Connecticut office of the Attorney General | State of Connecticut |
| Mark Kenny | U.S. Trustee | UST |
| | | |

## PLEASE PRINT OR YOUR APPEARANCE CANNOT BE CORRECTLY NOTED!

```
 1
 2                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
 3
 4    IN RE:                        .          Chapter 11
                                    .
 5    Mortgage Lenders Network,     .
      USA, Inc.,                    .
 6                                  .
               Debtor.             .          Bankruptcy #07-10146 (PJW)
 7    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
 8                              Wilmington, DE
                                April 10, 2007
 9                                 3:00 p.m.
10
11                          TRANSCRIPT OF HEARING
                    BEFORE THE HONORABLE PETER J. WALSH
12                    UNITED STATES BANKRUPTCY JUDGE
13    APPEARANCES:
14    For The Debtor:                    Laura Davis Jones, Esq.
                                         Pachulski Stang Ziehl Young
15                                       Jones & Weintraub, LLP
                                         919 N. Market St.-17th Fl.
16                                       Wilmington, DE 19899
17                                       James O'Neill, Esq.
                                         Pachulski Stang Ziehl Young
18                                       Jones & Weintraub, LLP
                                         919 N. Market St.-17th Fl.
19                                       Wilmington, DE 19899
20    For The Official Committee:        David Carickhoff, Esq.
      of Unsecured Creditors             Blank Rome, LLP
21                                       Chase Manhattan Centre
                                         1201 Market Street-Ste. 800
22                                       Wilmington, DE 19801
23    For Mitchell Heffernan:            Albert M. Greto, Esq.
                                         Albert M. Greto Law Offices
24                                       1201 Shallcross Ave.#C
                                         Wilmington, DE 19806
25
```



2

```
 1                                  Robert Scandone, Esq.
                                    Robert Scandone Law Offices
 2                                  1800 JFK Blvd.-Ste. 200
                                    Philadelphia, PA 19103
 3
                                    Judith P. Rodden, Esq.
 4                                  Pozzuolo & Perkiss, PC
                                    2033 Walnut Street
 5                                  Philadelphia, PA 19103

 6  For The State of Connecticut:   Robert W. Clark, Esq.
                                    State of Connecticut
 7                                  Office of attorney General
                                    55 Elm Street
 8                                  Hartford, CT 06106

 9  For Residential Funding:        Patrick J. McLaughlin, Esq.
                                    Dorsey & Whitney, LLP
10                                  Ste. 1500
                                    50 Sought Sixth Street
11                                  Minneapolis, MN 55402

12                                  Eric L. Schnabel, Esq.
                                    Buchanan Ingersoll & Rooney, PC
13                                  The Brandywine Bldg.
                                    1000 West street-Ste. 1410
14                                  Wilmington, DE 19801

15  For Sovereign Bank:             Sandra Selzer, Esq.
                                    Greenberg Traurig, LLP
16                                  The Nemours Bldg.
                                    1007 N. Orange St.-Ste. 1200
17                                  Wilmington, DE 19801

18                                  Louis DeLucia, Esq.
                                    Greenberg Traurig, LLP
19                                  200 Park Ave.
                                    Florham Pk., NJ 07932
20
    For United States Trustee:      Mark Kenney, Esq.
21                                  Office of the U.S. Trustee
                                    844 King Street-Ste. 2207
22                                  Wilmington, DE 19801

23  Audio Operator:                 Nickita Barksdale

24

25
```



3

```
 1    Transcribing Firm:              Writer's Cramp, Inc.
                                      6 Norton Rd.
 2                                    Monmouth Jct., NJ 08852
                                      732-329-0191
 3
      Proceedings recorded by electronic sound recording, transcript
 4    produced by transcription service.

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1    THE CLERK:   Please rise.

2    THE COURT:   Please be seated.

3    MS. JONES:   Good afternoon, Your Honor, Laura Davis

4  Jones, Pachulski Stang Ziehl Young Jones & Weintraub on behalf

5  of the Debtor.   Your Honor, if I may refer the Court to the

6  amended notice of agenda for today's hearing.   The first

7  matter, Your Honor, the Debtor's Motion to Pay Due Diligence

8  Fee, and I understand Your Honor has signed that order, and we

9  appreciate Your Honor doing that.

10    Your Honor, the second matter was the motion of Sovereign

11  Bank for relief from stay that we talked about quite a bit at

12  the last hearing.   And as we mentioned at the last hearing,

13  Your Honor, that matter had been resolved, subject to the

14  parties negotiating a stipulation.

15    Your Honor, the parties have been able to reflect their

16  agreements in a stipulation.   If I may, Your Honor, I'd like to

17  approach the bench and hand it in.

18    THE COURT:   Okay.

19    (Court reviews document)

20    THE COURT:   Okay, I'll sign it.

21    MS. DAVIS JONES:   Thank you, Your Honor.

22    THE COURT:   Okay.

23    MS. DAVIS JONES:   Your Honor, matters 3 and 5 on the

24  agenda are related.   Matter 4 I believe is a very short matter.

25  Your Honor, if we may go out of turn on that, I'm gonna yield



5

1  to Mr. O'Neill with respect to matter 4.

2          THE COURT:  Okay.

3          MR. O'NEILL:  Good afternoon, Your Honor.  On item

4  #4, this is the Debtor's Motion for an Order Approving Disposal

5  of Certain Books and Records and Files of the Debtor.  And Your

6  Honor, the -- this motion comes as the result of the employees

7  of the Debtor wanting to make sure that they take care of

8  appropriate document retention and destruction of documents

9  going forward in the case.

10     We filed the motion.  We established certain guidelines,

11 some suggested guidelines in the motion.  Since filing the

12 motion we received a few objections, which are noted on the

13 agenda.  One from the State of Connecticut, one from Iron

14 Mountain.  And we received input from the Committee.  And Your

15 Honor, we have worked on an agreed upon -- a revised Form of

16 Order which I can hand up and explain to Your Honor as we go

17 through.  I do have a clean copy and a blackline.

18          THE COURT:  Okay.

19          MR. O'NEILL:  Your Honor, both the Committee and

20 State of Connecticut requested that we set the seven-year mark

21 kind of as the dividing line.  We have requested in the motion

22 authority to dispose of some documents that were less than

23 seven years old.  But we are agreeable to retain documents

24 which we would normally retain in our business, and that we

25 would not seek through this motion to destroy internal records

1  or customer records that are less than seven years old, only

2  those that are more than --

3                THE COURT:  Okay.

4                MR. O'NEILL:  -- seven years old.  As we talked

5  further through the motion, the company also expressed concerns

6  with some documents which were just piling up at the company

7  headquarters.  These were documents which had been returned

8  when we were closing the various locations and just people sent

9  stuff back to headquarters, and other records that were at the

10  various locations.

11        These were in two groups.  There were 50 banker's boxes of

12  documents which we -- the company could identify were duplicate

13  copies of loan files that the company had elsewhere in its

14  records, either electronic or hard copies.  And then there were

15  also approximately 100 bags that were in shred bags.  The

16  Debtor has in its ordinary course put this -- put certain

17  documents to be discarded in shred bags, and then has a vendor

18  that comes in and actually shreds them due to the confidential

19  nature of a lot of the documents that the Debtor has.

20        So what we agreed upon in our conversations with the

21  Committee and State of Connecticut was that with respect to the

22  50 banker's boxes which the Debtor has represented are

23  duplicate loan records, those documents can be destroyed now

24  and the blackline order authorizes destruction of those

25  documents now.

1    With respect to the 100 bags that are shred bags, the

2  Debtor expects that these are documents which would ordinarily

3  be discarded in the ordinary course of its business.  The

4  Debtor's gonna do a sampling of the shred bags to make sure

5  that its expectation regarding the contents of the bags is

6  correct.  The Debtor will confirm in writing to the Committee

7  and to the State of Connecticut the results of the sampling,

8  either that it confirms what the Debtor believes is in the

9  bags, or otherwise.  And the Debtor will await confirmation

10  from the State of Connecticut and from the Committee prior to

11  any destruction of any of the shred bags.

12    There's also a protocol for going forward for documents

13  that are less than seven years old.  That is that if the Debtor

14  identifies that there are documents less than seven years old

15  that it would ordinarily destroy it will present a list of

16  those documents to the Committee and to the State of

17  Connecticut, and will only destroy those documents if it

18  receives confirmation in writing from the Creditors Committee

19  and the State of Connecticut that it is acceptable to them to

20  destroy the documents.

21    In addition, Your Honor, we received an objection from

22  Iron Mountain.  Iron Mountain is a storage facility for a lot

23  of the documents, and Iron Mountain's concern was that the

24  Debtor would seek to abandon records and just leave them at

25  Iron Mountain.  As part of our accommodation for Iron Mountain

8

1  we've revised the order to reflect that the Debtor has

2  authority to pay the post petition payments for preservation

3  and destruction of documents, including post petition charges

4  by Iron Mountain.  And we also agreed that we would not seek to

5  abandon records at Iron Mountain.  And we revised the order

6  accordingly.

7       THE COURT:  Okay.

8       MR. O'NEILL:  And Your Honor, if you don't have any

9  further questions regarding the Form of Order I would ask that

10  it be entered.

11       THE COURT:  Okay.  I'll sign it.

12       MR. O'NEILL:  Thank you very much, Your Honor.

13       THE COURT:  Okay.

14       MS. DAVIS JONES:  Your Honor, as I mentioned matters

15  3 and 5 are related.  What I'll do at this point is yield the

16  podium to Counsel for Mr. Heffernan to present their motion.

17       MR. CARICKHOFF:  Excuse me, Your Honor, David

18  Carickhoff from Blank Rome on behalf of the Committee.  Before

19  we proceed with items 3 and 5 on the agenda, the Committee

20  didn't file any objections to either Mr. Heffernan's motion or

21  to RFC's motion.  The only concern that the Committee has, #1,

22  at this juncture we don't think that procedurally it would be

23  appropriate to make any findings of fact in connection with the

24  allegations raised in Mr. Heffernan's motion.  And I believe

25  RFC's motion goes to that issue.  The Committee still has its



1  ongoing investigation with respect to any claims and causes of

2  action with respect to RFC, and we'd like to -- a) we don't

3  believe it's appropriate to make factual findings in connection

4  with whether or not RFC was in control of the Debtor prior to

5  the petition date, and we don't believe that the Court needs to

6  make any such determination in connection with any rulings on

7  these motions.  So that's -- those are our concerns, and we

8  just would ask that Your Honor be apprised of them.

9            THE COURT:  Okay.

10           MR. CARICKHOFF:  Thank you.

11       (Pause in proceedings)

12           THE COURT:  Yes.

13           MR. GRETO:  Good afternoon, Your Honor.  My name is

14  Al Greto and I'm here on behalf of Mr. Heffernan, an interested

15  party.  And I filed as of yesterday Motions Pro Hac Vice for my

16  colleagues in Pennsylvania, those being Gary Perkiss, Robert

17  Scandone and Judy Rodden.  Mr. Scandone and Ms. Rodden are here

18  in the Court to my right at the table.

19           THE COURT:  Okay.  I haven't signed the orders yet

20  but I've seen them and they can appear.

21           MR. GRETO:  Thank you, Sir.

22           MR. SCANDONE:  Your Honor, this is Bob Clark.  I met

23  him this morning.

24           MR. CLARK:  Your Honor, Assistant Attorney General

25  Robert Clark from the State of Connecticut.  I just wanted to

10

1   apprise the Court of my presence here today.  We also have Pro

2   Hac Motions with the Court.  Having seen that they weren't

3   entered yet and having reviewed the rules we discovered that it

4   wasn't clear that we needed to get pro --

5           THE COURT:  You can be heard.

6           MR. CLARK:  -- hack admission.  So we followed

7   appearance today with the certification pursuant to local

8   rules.

9           THE COURT:  Okay.

10          MR. CLARK:  Thank you.

11          MR. SCANDONE:  Your Honor, if I may, I apologize to

12  this Court because it's normally not a good way to start by

13  apologizing, Your Honor, but we filed a motion in this matter

14  to bring this matter before this Court.  There was no question,

15  Your Honor, after reviewing the rules that it more likely than

16  not should have been an adversarial proceeding.

17      I had both motions filed, Your Honor.  To be quite frank

18  with you, I'm not comfortable in Bankruptcy Court.  Gary

19  Perkiss, who was my co-counsel with at the time, and who still

20  is my co-counsel, Your Honor, and who has clerked in Bankruptcy

21  Court in Philadelphia, indicated that this would be the best

22  way to go rather than adversarial proceeding, and if in fact we

23  would have filed the motion, if Your Honor didn't want the

24  motion we could file the adversary proceeding.  If I had it to

25  do over again I'd have done both.  But I apologize.  It's

11

1  certainly not the way to start. But that's the way I am gonna

2  start by saying that we filed a motion, it's form over

3  substance, Your Honor. We have everybody here. I'm certain we

4  got everybody's attention. Whether that's good or bad, I'm not

5  sure. But Your Honor, I think that realistically speaking you

6  had an opportunity hopefully to see our original motion and our

7  memorandum and our supplement memorandum.

8      Realistically speaking, Your Honor, quite frankly I am

9  here, uncomfortably here, because didn't know what else to do.

10  Didn't know where else to go. As I've indicated to you in our

11  supplemental memorandum and as I've indicated to you before and

12  as I will indicate to you again, in both my letters as such,

13  the way this process started, Your Honor, it started on March

14  19th. And it started with a newspaper article that my client

15  sent to me. I didn't -- frankly, didn't think very much of it.

16  I figured, well, it's a newspaper article. Somebody's making a

17  threat, somebody's making a claim. Not a concern.

18      But Your Honor, the newspaper article didn't stop. It

19  continued. And it was a constant hassle on my client. My

20  client got back to me again. Two or three days later, Your

21  Honor, after continued newspaper articles and continued threats

22  on the fact that he was gonna be imminently arrested I started

23  making phone calls. Because my feeling, Your Honor, always is

24  you talk to somebody. You don't just immediately start yelling

25  at people.

1    So Your Honor, I started with the State Attorney's office,

2  because that's where I was informed that I would go.  I always

3  get local Counsel, Your Honor, when I go to a jurisdiction that

4  I shouldn't be at.  Or I haven't been at before.  And my local

5  Counsel in this case is an attorney by the name of Mark

6  Balabine.  And he indicated to me that it would be the State

7  Attorney's office in Middletown.  So I started there.  Because

8  that's what the DOL said, Department of Labor, and that's what,

9  Your Honor, what the newspaper article said.

10    After a phone conversation I was informed two hours later

11  that they knew nothing about it.  Another phone -- another

12  newspaper article came out and then a news reporter appeared.

13  There was a newscast on television.  Again, stating that my

14  client was gonna be imminently arrested.

15    I then, Your Honor, called the Attorney General's office

16  trying to find somebody -- somebody indicated to me not in

17  Middletown, would be in Hartford, or Rocky Hill.  So I called

18  Hartford.  I was directed to an attorney by the name of Glen

19  Woods, who was an Attorney General who indicated to me that he

20  in fact was in charge of DOL, Department of Labor.  He was

21  aware of it.  At that point I figured that I had somebody that

22  I could talk to.

23    After I started talking to Mr. Woods he indicated to me

24  that a person in Middletown who I should talk to is a person by

25  the name of John, I believe Christmas name is.  He's in my

13

1  memorandum.  He gave me a phone number, told me the guy was

2  standing there waiting for me.  I called the gentleman, he

3  indicated to me that in fact the State Attorney's office did

4  have arrest warrants sitting on somebody's desk, that they had

5  not made a determination of whether to arrest or not.

6      I says, well, you know, I'm talking to the Attorney

7  General, and his answer to me very simply was, well, if you

8  make restitution then of course that will be taken in

9  consideration of whether or not we're going to arrest you --

10 your client.  At that point, Your Honor, my position very

11 simply was, I hadn't done any research, I had not heard

12 anything about this.  I started to look at the Connecticut

13 statute and couldn't believe it.  Quite frankly, Your Honor, I

14 -- when I first talked to the Attorney General in Connecticut I

15 asked him whether this was still part of the United States.  I

16 thought maybe we were some place else because I thought

17 Debtor's prison left.  But this statute, Your Honor, has no

18 mens rea.  It's strict liability.  So we started to do research

19 on it, Your Honor, and every case that we found on this statute

20 indicated that an employer refused to pay.  So the employee had

21 the right to file against the employer.  That was in this case.

22 It was a bankruptcy.

23      When I was speaking to Mr. Woods, Mr. Woods started

24 negotiating.  Because my feeling, and I'll be honest with Your

25 Honor, my feeling was, hey, listen, if this could go away for a

```
1   small amount of money, my client doesn't get arrested, I'm okay
2   with that.  So I said, where are we going?  Mr. Woods started
3   at $2.5 million.  I said to him, how could it be $2.5 million?
4   I don't know very much about this but I know that the
5   bankruptcy only talks about 1.7.  Well, our guys -- DOL tells
6   us 2.5.
7        So I hang up the phone, talk to my client, client says,
8   what are you talking about?  I shouldn't have to pay that.
9   Next thing I do, Your Honor, is I do some research.  Have the
10  Bucklefine case.  I sent that case to Mr. Woods.  I said Glen,
11  please, the research that I have I don't see anything in your
12  statute that says that it handles a bankruptcy.  Look at this
13  case, please.  What does it say?  It says to me that you
14  shouldn't be doing this.  I said to him, Glen, if you're
15  correct, if our reinsurance company goes under then the CEO is
16  responsible for every seller, ever wage.  And that can't be
17  possible.  Well, we've done it, we've done this before.  I
18  said, well, give me a precedence, some place.  Your Honor, it
19  continued.
20       We got -- we heard from Dow, we heard from Ruters, we
21  heard from Bloomberg News.  It would be on every night.
22  Frankly, he came down from Philadelphia to see me, and honestly
23  Judge -- because where they were going I thought what was
24  happening was they were gonna come at 6 o'clock in the morning
25  like Tony Soprano and they were gonna handcuff him behind his
```

1   back with newspaper reporters sitting outside.  Nobody was

2   telling me we had nothing to worry about.  Everybody was

3   telling me we're gonna be arrested immediately, immediately.

4        My local Counsel attempted to get in touch with the State

5   Attorney.  Twice talked to the State Attorney.  Turned out the

6   person's desk it was on.  Couldn't get any insurance, Your

7   Honor, for two things.  Number one, that we wouldn't be

8   arrested right away, and number two, whether there was gonna be

9   an arrest or no arrest.  My local attorney indicated to me the

10  same thing, I don't know what else to tell you.  I can't get

11  them to respond one way or the other.

12       I got back to Mr. Woods.  Sent him another letter.  Said

13  to him, Glen, please show me some precedence.  Show me

14  something somewhere that indicates that you can do this.  I

15  regave -- I gave him again the Bucklefine case, gave him two

16  more cases and indicated to him that if I didn't get anything

17  from you I was gonna file a Motion for Protection in Bankruptcy

18  Court.  That's how I came here Judge, and that's why I am here.

19       I say to you the following things, Judge.  In reading the

20  response by the Government, as upset as I was, Judge, about

21  Debtor's prison, I'm more upset about the fact that we're not

22  right, according to them.  Because we haven't made the

23  determination yet.  Judge, if they would have said nothing like

24  they should do, you know, Judge, there's investigations that go

25  on every single day -- I'm involved in them.  I'm familiar with

1  criminal law.  Do it all the time, Judge.  There's

2  investigations that go on every day.  And you know what

3  happens, Judge?  When they talk to the FBI, when they talk to

4  the IRS, this is the statement that comes out of their mouth,

5  we have nothing to say, no comment.  Instead, Judge, every

6  opportunity they've had to speak they've said two things.

7  Number one, we've submitted arrest warrant to the State

8  Attorney's office for the imminent arrest of Mr. Heffernan on

9  61 counts.  And Judge, what they said is, although it doesn't

10  call for it we're looking for restitution.

11      We have in our supplement motion here, Judge, the actual

12  news articles.  We also, Your Honor, indicate to you very

13  simply every time they've talked about it they've talked about

14  a very simple fact, restitution let's it go away.  Judge,

15  that's not the way it's supposed to be.  Restitution is not the

16  answer.  Restitution, Judge, is nothing more than them taking

17  this criminal case and trying the get money from my client that

18  they shouldn't be able to do.

19      We continue to do research, Judge, and in the additional

20  research, Your Honor, we then find the vitals, and in the

21  vitals, Your Honor, there is immunity.  My client is immunized

22  by -- excuse me.  I'm sorry, immunized and has indemnity, under

23  the bylaws, Judge.

24      In additional research that we've done, Judge, we find the

25  problem then is you can't tell the difference between the

17

1  Debtor, and you can't tell the difference between Mr.

2  Heffernan because essentially, Judge, they're the same parties.

3  And the reason I say they're the same party, Judge, is if in

4  fact Mr. Heffernan had done something wrong, and that's the

5  point where I come back to with this criminal statute.  If Mr.

6  Heffernan had stole money, arrest him.  I don't have a problem.

7  If Mr. Heffernan, Judge, had given bad checks, arrest him.  No

8  problem.  Mr. Heffernan's only crime in this case, Judge, is he

9  is a director of MNL who went bankruptcy.  He hasn't said, I

10  don't want to pay.  He hasn't said, you don't deserve to get

11  paid.  What has happened, Judge, is that we find out and that

12  is that we believe, he is going through a bankruptcy

13  proceeding.  And in the bankruptcy proceeding, Judge, there are

14  certain things that have to be done, and there are certain

15  things that have to be paid, and not paid.  This is not

16  something that should be paid.  This is something that should

17  go through the bankruptcy process.

18      The problem realistically that we have here, Judge, is I

19  don't know where else to go.  I am here to you because of one

20  very simple fact.  Because I don't know how to stop them.

21  Found out something last night, Judge, that I thought was

22  important.  Talked to Mr. Clark today.  They don't think it's

23  that important.  What I found out last night, according to my

24  clients, is that we believe that 81% of all the employees in

25  Connecticut are gonna be fully paid.  153 of them, through this

18

1   bankruptcy. We also believe, Judge, that the ones that are not

2   gonna be fully paid, 10 of them, 10 of them have 80% of the

3   money that's owed to them in a complaint that they're talking

4   about. And have, Judge, gotten a tremendous amount of money

5   throughout the year.

6        So we are here, Judge, because we want you to help us, if

7   you can, to stop them from coming after Mr. Heffernan. What

8   we've got, Your Honor, is I can go through a whole process and

9   a hearing, I have Mr. Heffernan here. I have Mr. Heffernan,

10  Your Honor, who can go through what it was like to do this, to

11  be involved with this. I can have Mr. Heffernan testify, Your

12  Honor, to what he's done and how he started in Connecticut,

13  Judge. He went back to Connecticut to start this company

14  because it was his home state, and the only thing, Judge, that

15  he's done wrong is his company went bankrupt. His company's

16  not the only one, Judge. New Century went bankrupt, and that's

17  right in this Courthouse too.

18       Now, Judge, if they're correct, then everybody in New

19  Century, or the officer in New Century, or the director in New

20  Century who has a Connecticut employee has to be arrested also.

21  That's why, Judge, this makes no sense. There is no question

22  at all that what they're trying to do is not arrest this man

23  for a crime. They're trying to get money from this man. And

24  the only way they can get money, according to Attorney General

25  Blumenthal is to arrest him, and then justice will prevail.

1  Because from an arrest people understand at that point that

2  maybe they should pay.

3      Well, why should he pay?  He hasn't done anything wrong.

4  So, Judge, where we are very simply in this motion, as I

5  indicated to you and Mr. Heffernan here, he can testify.  And I

6  will be very happy to have him testify.  But Your Honor, in my

7  remarks to you, in my opening remarks to you very simply I'm

8  saying to you that I am here only because I didn't know what

9  else to do.  And I still don't know.

10     One more example to let you know that in my mind the State

11  of Connecticut doesn't have a clue of the difference between a

12  criminal case and a civil case.  I had a conversation this

13  morning, and I've indicated to Mr. Clark, with an individual by

14  the name of Joan -- what's her name, Bob, last name?

15         MR. CLARK:  Joan Pilver.

16         MR. SCANDONE:  Joan Pilver.  Ms. Pilver indicates to

17  me the following.  Mr. Scandone, I hear what you say, but if a

18  bank robber commits a bank robbery and he decides to pay the

19  money back, should that be taken into consideration of whether

20  or not he should be arrested?  Are you kidding me?  It's a

21  crime.  What you concern yourself about if somebody pays the

22  money back, Judge, is the sentencing aspect.  A crime is a

23  crime.  If this is a crime that's one thing.  But it's not a

24  crime.  They are attempting to take this out of Bankruptcy

25  Court, and they're attempting, Judge, to get the money from him

20

1   to pay back people, Judge, out of this bankruptcy, who are

2   going to get paid back in this bankruptcy.

3        If they're allowed to do it, Judge, then every state's

4   gonna be allowed to do it.  And they're gonna be allowed to do

5   it to everybody, including New Century.

6        THE COURT:  Let me indicate -- I want to put

7   something in the record regarding what I think is relevant

8   information.  And I'm looking at the schedule filed by the

9   Debtors on March 14.  This is docket #276.  And in the summary

10  on the first page it indicates that with respect to Creditors

11  holding unsecured priority claims the aggregate amount is

12  $10,177,734, and it indicates in a footnote it says, "Included

13  in the total of {quote}, 'Creditors holding unsecured priority

14  claims' are $3,804,189.84 claims which may be entitled to

15  priority treatment under the Bankruptcy Code."

16       What I think that is telling us is that of the 10 million

17  plus of priority claims approximately 3.8 million would be

18  priority under Code Section 502.  That is, claims for

19  compensation not exceeding in any individual case $10,000.

20       So it's my view that at least with respect to the claims

21  of up to $10,000 I would think there's a good possibility, I

22  won't even say probability, a good possibility that this case

23  will be administratively solvent, and will allow for the

24  payment of those wage earners whose claims do not exceed

25  $10,000.

1    And in an attempt to reconcile the information in schedule

2  E, that is Creditors holding priority claims, I attempted to

3  identify the people from Connecticut, and according to my

4  count, and this is a listing that runs 38 pages, and according

5  to my calculation, or my quick review of the document, 189 of

6  those Claimants are Connecticut residents.  And they represent

7  an aggregate of 1,701,000 of claims.

8    And what I want to emphasize is that although there's a

9  caveat in this schedule that says the Debtor is not necessarily

10  agreeing that any claim is not disputed, not contention, or not

11  unliquidated, it certainly appears with this 38-page listing,

12  and there must be about, oh, at least 20 Claimants per page, it

13  certainly appears that the records are readily available to

14  determine down to the penny who has claims against this Estate,

15  and likewise who has claims that perhaps the Attorney General

16  is attempting to protect.

17    But I just want to point out what I think is probably the

18  Debtor's admission that these Claimants exist.  Let me ask the

19  Debtor, has anybody -- is there any doubt about the fact that

20  there are very, very substantial prepetition commission

21  obligations to hundreds of former employees?

22    MS. DAVIS JONES:  Thank you, Your Honor.

23  Mr. Schuller is here, Your Honor, if we had to put him on the

24  stand and talk about the claims we could do that.  My

25  understanding though, Your Honor, is that there is recognition



22

1  in the schedules that there is a substantial amount owed to the

2  employees, and that we have tried to quantify that as much as

3  we can.  And I think Counsel's comment that he understands the

4  number of roughly 1.7 million pretty well coordinates with the

5  1.7 million that is in the schedules, Your Honor.

6         THE COURT:  Okay.  Well, is it fair to say that the

7  company acknowledges that there are substantial prepetition

8  commissions owed to former employees?

9         MS. DAVIS JONES:  Your Honor, if I can have the

10  Court's indulgence one moment, because Mr. Schuller prepared

11  that schedule with one of my colleagues.  I want to make sure

12  we're in the same place on that.

13         THE COURT:  Okay.

14     (Pause in proceedings)

15         MS. DAVIS JONES:  Thank you, Your Honor.  I

16  confirmed with Mr. Schuller.  Your Honor, we have -- the Debtor

17  acknowledges that there are some prepetition commissions that

18  have not been paid.  The fine point on it though that Mr.

19  Schuller mentioned is that, Your Honor, while those commissions

20  were allegedly earned on a mispriced product, and even though

21  that there was a direction to stop the selling of the product,

22  some of that selling continued.  And Your Honor, that's why you

23  see the commissions are listed as disputed in the schedules.

24     Having said that, Your Honor, and I don't know how much or

25  how little that will reduce the amount of commissions that were

23

1  payable, and that's something the company will still have to

2  work through.  Mr. Schuller does acknowledge, Your Honor, that

3  there are commissions owed to the employees.  Or that are on

4  the company's books and records, Your Honor.

5          THE COURT:  Okay.  Are you saying that there may be

6  some of those commission amounts that are subject to a defense

7  --

8          MS. DAVIS JONES:  Yes, Sir, you --

9          THE COURT:  -- but that means there are others that

10  are not subject to a defense?

11          MS. DAVIS JONES:  Your Honor, that's probably

12  correct.  As Your Honor may recall, in the beginning we had the

13  A++ loans, Your Honor, that we described to the --

14          THE COURT:  Right.

15          MS. DAVIS JONES:  -- Court that had the error in the

16  algorithm, Your Honor, and there were commissions allegedly

17  earned on those, and one of the things the company needs to

18  work through, and would work through in the claims objection

19  process, is whether those commissions were rightfully earned,

20  Your Honor.  Because there was a period of time when that

21  algorithm mistake was identified, that the sales were to stop.

22  According to Mr. Schuller there were sales allegedly that

23  continued, and so that has put some of those commissions in

24  dispute, Your Honor.

25          THE COURT:  Okay.  And if they're in dispute in this

*Writer's Cramp, Inc.*

*Certified Court Transcribers*

*732-329-0191*



24

1    case I assume they will be in dispute in any criminal

2    proceeding?

3             MS. DAVIS JONES:  I would expect, Your Honor, there

4    are defenses, Your Honor, and no matter where the matter pends.

5             THE COURT:  Okay.  Well, I wanted to point out the

6    magnitude of this problem, and obtain the admissions that I

7    have just received regarding the fact that it is a major

8    problem.  Okay, let me hear from the State of Connecticut.

9             MR. CLARK:  Good afternoon, Your Honor.  Excuse me,

10   Robert Clark from the Connecticut Attorney General's office on

11   behalf of the State of Connecticut, which is the subject of the

12   motion.

13       Your Honor, I'd like to just start by being very clear

14   about who has the authority to seek and issue an arrest warrant

15   in the State of Connecticut.

16            THE COURT:  I don't think that's disputed.

17            MR. CLARK:  The Attorney General has no authority.

18   The Department of Labor has no authority.

19            THE COURT:  You indicate in your brief --

20            MR. CLARK:  Okay.

21            THE COURT:  -- that you must obtain --

22            MR. CLARK:  Oh, there was a footnote on it.

23            THE COURT:  -- you have to obtain a Court Order --

24            MR. CLARK:  Right.

25            THE COURT:  -- and Counsel for Mr. Heffernan hasn't



25

1    challenged that proposition.

2             MR. CLARK:  So only the State's Attorney's office

3    can seek an arrest warrant from a Judge.

4             THE COURT:  Okay.

5             MR. CLARK:  And none of the submissions that

6    Mr. Scandone has submitted today suggest in any way that the

7    people who are capable of actually seeking an arrest warrant

8    are doing so solely for the purposes of collecting the unpaid

9    wages from Mr. Heffernan personally, and Mr. Heffernan doesn't

10   claim, and I don't think his lawyer claims, that in any

11   conversations that may have taken place with other State

12   officials and Mr. Scandone that anyone from the State of

13   Connecticut suggested that the Debtor in this case would pay

14   those wages.

15        So, you know, we've heard a lot today from Mr. Scandone.

16   I don't think any of it is appropriate evidence.  It's for the

17   most part hearsay.  And more importantly, not relevant, really,

18   in our view to the analysis under the 3rd Circuit case of _Davis_

19   and the Younger Abstention Doctrine.  Because in _Davis_ the 3rd

20   Circuit made very clear that the complaining witness, which in

21   this case was an official with the Department of Labor who

22   filled out an affidavit and asked the State's Attorney's office

23   to seek an arrest warrant.  That was the complaining party.

24   And in _Davis_ the complaining party's motives just aren't

25   relevant.  We don't require Prosecutors to undertake some sort

1  of review of the public spirit of the complaining witness's

2  motives.  So I just wanted to start with that.  Obviously Your

3  Honor's indicated that you're clear about how the criminal

4  process works in Connecticut.  But I wanted to start with that.

5      The facts as we know them, and that can actually be

6  established we think by competent evidence, and have been

7  through an affidavit submitted to this Court by the State's

8  Attorney, the very State's Attorney who's been assigned to the

9  matter, and who would make her own independent determination

10  about whether a) there was probably cause, and b) it made

11  sense, even if there were probably cause, to seek an arrest

12  warrant from a Judge.  Her affidavit suggests the following,

13  which is that on March 8th, 2007 an official from the

14  Department of Labor submitted an affidavit and an application

15  for an arrest warrant to the State's Attorney's office.  The

16  affidavit alleged violations of criminal wage statute that does

17  not provide specifically for restitution.  And the criminal

18  statute that was violated doesn't say until the wages are paid

19  you're subject to criminal liability.  It says if the wages

20  aren't paid in a timely manner as of a certain date you've

21  committed a crime.  And the statute says that not only can an

22  employer be guilty of a crime, it specifically directs criminal

23  liability to others who might have the authority to have made

24  the payments in a timely manner.  So that's what the criminal

25  statute at issue says.



1    As I said, it -- the criminal statute also gives the Court

2    the option of imposing fines and/or imprisonment.  May not

3    result in fines at all.  It could result just in imprisonment.

4    Could result in probation of some kind.

5    In proving the case in the criminal Court there will not

6    necessarily be a definitive finding about the actual full

7    amount of wages paid.  If you read the statute, what it does,

8    it sets out different penalties for different counts and

9    different offenses.  And what it says is, if there's a finding

10   that an employer or an authorized agent failed to pay in a

11   timely manner unpaid wages in excess of $5,000 these penalties

12   will apply.  You know, less than $5,000 these penalties will

13   apply.  So it's not -- there's no certainty that in a criminal

14   proceeding the actual amount of unpaid wages due would be

15   determined in a criminal case.

16   The application for the arrest warrant did not seek

17   criminal penalties against MLN or anyone else.  Only Mr.

18   Heffernan.  No arrest warrant has issued.  No Prosecutor has

19   signed the application or presented it to a Judge.  And

20   therefore no Judge has made his or her own independent probable

21   cause determination.

22   On March 27th after what Mr. Scandone alleges to have

23   taken place but has not been proven, were conversations between

24   him and people who have no authority to issue an arrest

25   warrant, other than he makes one allegation to the Court today



28

1  that a Mr. Cashman, who is in the State's Attorney's office and

2  is a Prosecutor in the State's Attorney's office, and has not

3  been assigned to this matter, and was never assigned to this

4  matter, Mr. Scandone claims that that person told him if you

5  pay restitution we won't bring the case.  That man has no

6  authority to bring a case, he hasn't been assigned to the

7  matter, and disputes that.  That's a disputed fact.  He's not

8  here today, but no one's proven that conversation took place.

9       In any event, on March 27th Mr. Heffernan filed his motion

10 seeking to enjoin not the Department of Labor individuals, not

11 specific State's Attorneys General, not specific State's

12 Attorney.  The entire State of Connecticut from commencing a

13 criminal prosecution against him.

14      He claims only that the State seeks -- alleges this in a

15 very conclusory fashion without any facts supporting it, that

16 the "State" {quote, unquote} seeks to bring the prosecution

17 against him to collect unsecured debts of the Debtor for

18 employee commissions.  I mean, that's not true.  What the State

19 is considering is whether or not to bring a criminal action

20 against Mr. Heffernan for failing to pay the wages which were

21 prepetition in a timely manner, on time.  Within a week, or two

22 weeks, or whatever the statute says about what timely means.

23      He presents no evidence and he makes allegation that the

24 State or any State actors receiving to use the criminal wage

25 statute to carve money from the bankruptcy Estate.



1    In his papers he seems to -- Mr. Scandone at least asserts

2    that again some State's Attorney not assigned to the matter

3    suggested that, I think it was a little bit different than what

4    it was put today, it was that that particular State's Attorney,

5    again who wasn't assigned to the matter, might take into

6    consideration whether or not restitution was paid when

7    considering whether or not to pursue an arrest warrant.  Well,

8    aside from the fact that I think that's a disputed fact, and

9    that that person had to authority to bring -- or to seek an

10   arrest warrant on the case because he wasn't assigned to it, I

11   don't think that that's in and of itself evidence of bad faith.

12   I think that Prosecutors have all kinds of discretion about

13   whether or not to bring a criminal case.  And it's not

14   surprising, I don't think, in particular in a crime like this

15   where there's -- it's essentially a financial crime, that a

16   Prosecutor might say to themselves, well, geez, the wages have

17   been paid.  Maybe I shouldn't bring it.  Maybe I should.  Maybe

18   I'll seek this penalty.  Maybe I won't.  That's not evidence of

19   bad faith.  And it hasn't been proven, in any event.

20   Really the crux of the only, you know, facts submitted in

21   affidavit form by Mr. Heffernan, which by the way the chief

22   Secured Lender in this case has since moved to strike as

23   patently false and scandalous, is that he had no control over

24   the Debtor's wage decisions during the pertinent prepetition

25   period.  And that the wages are disputed.  But those claims go



1    to the merits of any criminal prosecution that may eventually

2    be commenced, and can certainly be raised in those State

3    criminal proceedings.

4        The State has objected to the motion, as you know, Your

5    Honor, on five separate grounds.  I'm gonna address those

6    briefly if I could.  The first is, and Mr. Scandone raised this

7    in his opening remarks, that it should have been brought by

8    motion -- should have been brought by adversary proceeding and

9    not by motion.  We don't think in this case that that's

10   necessarily such a small technical issue.  If you have someone

11   bring a complaint you put them on notice.  In this case we've

12   had sort of allegations shifting and being supplemented right

13   up until the day before this hearing.  This hearing was

14   obviously scheduled on short notice -- yesterday afternoon we

15   got a whole new brief with a whole new set of allegations.

16       You bring an adversary proceeding, you sue specific

17   individuals.  You make specific allegations with respect to

18   each of them.  You seek specific relief with respect to each of

19   them and you put the Defendants on notice about what the claims

20   are.  And that just hasn't happened here, in part because it

21   was brought by motion.

22       I know Mr. Scandone has cited three different cases, which

23   he suggested might be -- might, you know, justify a Court in

24   certain circumstances -- treating it and considering it as a

25   motion.  We don't think those cases support what he says they

31

1  say.

2      Two of them were Pennsylvania cases where one was a

3  turnover proceeding.  One was to determine the validity of the

4  lien, they were not injunctive cases.  The last case was in the

5  Southern District of New York.  And if the Court made clear

6  that none of the parties had objected to the Court considering

7  it as a motion and so the Court proceeded to do so.

8      We also don't think the matter is ripe, Your Honor,

9  because no prosecutor -- the only one capable in Connecticut

10  of, you know, seeking an arrest warrant, has decided yet

11  whether are grounds to, or whether they will.  Hasn't signed

12  it, hasn't brought it to a Superior Court Judge.

13      I can represent to Your Honor today that that decision had

14  nothing to do with this motion or with this proceeding.  The

15  Prosecutor's Office is in the process of making their own -- as

16  they should -- independent determination as to whether there's

17  probable cause to arrest Mr. Heffernan on any of the counts

18  alleged in the affidavit and whether to present those to a

19  Judge.

20      When you look at -- and we've sort of -- I think we both

21  agree for the most part about what the factors are for

22  considering whether something is ripe for adjudication -- and I

23  won't go through all those step by step during this argument,

24  but we don't think the parties are in a sufficiently

25  adversarial position in light of the fact that there's no proof

*Writer's Cramp, Inc.*

*Certified Court Transcribers*

*732-329-0191*



1  that there will be or that there is an imminent threat of a

2  prosecution against him.

3      All that's happened so far is there was a complaining

4  witness who submitted an affidavit to a prosecutor.  No one

5  knows whether anything's going to happen after that.  People

6  will have to make -- at least two parties -- a prosecutor does

7  still have to make some sort of determination as to whether or

8  not to pursue an arrest.

9      We don't think the facts alleged are fully developed

10 enough for the Court to decide the matter conclusively.  And we

11 don't think the Movant has been aggrieved in the manner that

12 would justify the expenditure of judicial resources on a matter

13 that has caused as of yet no harm to anybody.

14      But the strongest, I think, argument for this Court not

15 granting the motion is the Younger Abstention Doctrine, which

16 as I mentioned at the outset, has in fact been adopted and

17 applied by the 3rd Circuit in a bankruptcy proceeding where it

18 was a Debtor, not a non-Debtor -- a Debtor who was seeking to

19 join criminal prosecution, which he alleged was really sort of

20 the same sheep in wolf clothes that Mr. Scandone has claimed

21 this is.

22      Which was to say that the Creditor allegedly was seeking

23 to utilize the criminal process to collect the debt.  In that

24 case, it was the Debtor and the 3rd Circuit still said no

25 because in Younger vs. Harris, the U.S. Supreme Court held that



33

1   it is a basic doctrine of equity jurisprudence that Courts of

2   Equity should not act and particularly should not act or

3   restrain a criminal prosecution when the Moving party has an

4   adequate remedy of law and will not suffer irreparable injury

5   at the non-equitable relief.

6       Now, this doctrine -- and I'll give you a cite, Your

7   Honor.  It's In Re: Klaussen -- with a K -- at 50 Bankruptcy

8   Reporter 776.  It's a Northern District of Indiana case.  And

9   it cites a Supreme Court case called Fenner vs. Boykin for the

10  proposition that the Younger Abstention Doctrine applies not

11  only to criminal proceedings that are pending, but also to

12  criminal proceedings that are threatened but not yet

13  instituted.

14      With respect to irreparable harm, the Younger Court

15  specifically held that the Moving party must show that great,

16  immediate, irreparable harm will occur without Federal Court

17  interference and that the threat to a Federally protected right

18  must be a threat that cannot be eliminated through a Defense in

19  the State Court proceedings.

20      Now, when you look at the cases that have applied this

21  test in the Bankruptcy Court context, typically it's a Debtor.

22  This case is a little bit unusual.  Typically, it's a Debtor,

23  in some cases a Debtor joined by an officer or director seeking

24  to enjoin a criminal prosecution.  And what the Courts have

25  done is try to identify in the first instance -- as they should



34

1    -- under <u>Younger</u> what is the Federally protected right?

2        In those cases it was fairly straightforward and they were

3    looking to see whether the criminal prosecution would interfere

4    with what otherwise might be a proper discharge under the

5    Bankruptcy Code.  More appropriately, I think, and more

6    commonly what they look at is whether a threatened criminal

7    prosecution or a pending criminal prosecution would result in

8    some preference to the Creditor -- the complaining witness in

9    those cases -- over other Creditors in the case.

10       We submit that that just -- there is no Federally

11   protected right at stake here.  We don't really understand what

12   the claim is but even if there were some Federally protected

13   right, it's clear that the Movant must show that there is a

14   great and immediate threat of irreparable harm to that right.

15   The <u>Davis</u> Court noted that among the considerations that can't

16   be taken into account when considering irreparable harm would

17   be the cost and anxiety of having to defend a case.

18       Again, and as far as bad faith goes, <u>Davis</u> again said that

19   motives of complaining witness are not an appropriate

20   consideration.  You have to show the prosecutor will bring the

21   action in bad faith.  And more recently, I think we've cited a

22   9th Circuit case -- <u>Grungs vs. Los Angeles</u> -- which is 202 F 3d

23   1074 -- that held that even the motivation of a prosecutor

24   wouldn't be relevant.

25       And we think that kind of a rule makes even more sense in

1  a case like this, where, even if the prosecutor wants an arrest

2  warrant, he or she has to present it to a Judge.  In other

3  words, you have to really demonstrate that the Judge was

4  somehow complicit in the conspiracy to bring a case in bad

5  faith.  You have that extra layer of protection.

6      Now, in his most recent submission to the Court, Mr.

7  Heffernan cites a number of cases from this circuit and others

8  where Courts indeed did enjoin actions against non-Debtors

9  because there was some concern that the action, by virtue of

10  the non-Debtors' indemnification rights vis a vis the Debtor,

11  might interfere with the administration of the bankruptcy case.

12  But all of those cases were just civil actions brought by

13  private parties and the basis of the Court's ruling in those

14  cases was that it would essentially interfere with the

15  automatic stay.

16     But of course, the automatic stay, under 362(b)(1) exempts

17  criminal proceedings.  So we're not sure -- you know, none of

18  them involved cases where there was an expressed exception to

19  the automatic stay.  And we don't think any of them are

20  applicable here.

21     Again, we just -- we see no evidence of irreparable harm

22  to the Estate, which is what we think should be shown the

23  criminal penalties if any -- if any, as I emphasize against --

24  would be against him, not the Debtor.  It's possible no

25  criminal fines at all would be imposed and no one's claiming



1  the State is threatening to prosecute him if the Debtor,

2  through his Estate, fails to pay the disputed wages.

3      And we -- I'm not clear how he sort of -- he summarily

4  asserts in his latest brief that if we're allowed to proceed

5  with a criminal -- if the State and the State's Attorney's

6  Office, which I'm not part of -- were allowed to proceed with a

7  criminal action, there could be res adjudicata implications for

8  it for the Debtor or collateral estoppel implications.

9      There could be -- that's a bit speculative, it's not

10  certain that there would be -- as I said, particularly with

11  respect to the amounts at issue, but that would obviously be

12  the case in an action brought directly against the Debtor -- a

13  criminal proceeding brought directly against the Debtor, which

14  is exempt from the automatic stay.  I mean, that happens all

15  the time.

16      So it's almost as if they're arguing that, well, yes, the

17  automatic stay permits criminal actions against the Debtor but

18  you know, not against a non-Debtor who may be able to go back

19  to the Debtor for indemnity rights.  It just -- that can't be

20  the law if the Claimants involved in the criminal proceeding or

21  the criminal proceeding against Mr. Heffernan results -- and

22  it's broad -- results in a guilty verdict and the Claimants

23  could make some sort of collateral estoppel argument in this

24  Court, which it's not clear they could -- it's not necessarily

25  extracting a preference over other Creditors.



commencing a criminal prosecution against the Movant and bankruptcy courts only have the authority to enjoin criminal proceedings by enjoining *individual litigants other than state courts.* *See Davis*, 691 F.2d at 178 n.5.

## BACKGROUND

4.     Under Connecticut law, any employer *or any officer or agent of an employer or any other person authorized by an employer to pay wages* who violates any provision of the Connecticut statutes governing the payment of wages may be fined not less than two thousand dollars nor more than five thousand dollars or imprisoned not more than five years for each offense if the total amount of all unpaid wages owed to an employee is more than two thousand dollars. Conn. Gen. Stat. § 31-71g(1) (attached). The remaining subsections of that statute provide for lesser penalties for each instance in which any of the persons described therein violate the wage statutes by failing to pay employees' wages owed in lesser amounts. *Id.*

5.     Connecticut law also authorizes the Labor Commissioner, on receipt of a complaint for nonpayment of wages, to investigate a complaint. Among other things, the Labor Commissioner is authorized to enter a place of business or employment, examine payroll and other records, interview employees, call hearings, administer oaths, take testimony, and issue subpoenas for the attendance of witnesses and the production of books and records. *See* Conn. Gen. Stat. § 31-76a (attached).

6.     Pursuant to Section 31-72 of the Connecticut General Statutes, whenever an employer fails to pay an employee's wages in accordance with state law, the Labor Commissioner may bring a civil action to recover twice the full amount of unpaid wages and the employer shall be required to pay the costs and such reasonable attorney's fees as may be

allowed by the court. Conn. Gen. Stat. § 31-72 (attached). In the event the Commissioner is successful, he is required to distribute recovered wages to the employee. *Id.* The Labor Commissioner has not exercised his authority to commence a civil action against the Movant or any other person or entity, including the Debtor, to recover the wages that are the subject of the arrest warrant application.

7.     The Labor Commissioner has *no authority* to impose any of the criminal penalties described in Conn. Gen. Stat. § 31-71g. The Labor Commissioner's sole authority with respect to the imposition of those criminal penalties is to investigate alleged crimes and to ask a prosecutor within the Connecticut State's Attorney's Office to seek an arrest warrant. In order to make such a request, a member of the Department of Labor must provide the State's Attorneys Office with an application containing a sworn affidavit attesting to facts that the affiant believes constitute probable cause that one of the persons or entities described in Section 31-71g has violated a provision of the wage statutes. *See* Conn. Gen. Stat. § 54-2a (attached).

8.     Once the State's Attorney's Office receives an application from the Department of Labor or some other investigating agency, such as the local or state police, one or more prosecutors review the application to make an independent determination of whether probable cause exists to arrest the suspect for committing a crime. *Id.*

9.     Generally speaking, and in particular under Section 31-76a, if a prosecutor determines that no probable cause exists, no arrest warrant may issue. *Id.* If, on the other hand, a prosecutor determines that probable cause does exist, he or she may apply to a superior court judge for an arrest warrant. *Id.* The judge, in turn, makes his or her own independent determination of whether there is probable cause to issue an arrest warrant. Specifically,

Connecticut law provides that a superior court judge may issue "bench warrants of arrest upon application by a prosecutorial official if the court or judge determines that the affidavit accompanying the application shows that there is probable cause to believe that an offense has been committed and that the person complained against committed it." Conn. Gen. Stat. § 54-2a(a)(1). If, and only if, a superior court judge issues a bench warrant for a person's arrest, the person named in the warrant may be arrested by a proper officer and brought before a court to face the charges against him or her. Conn. Gen. Stat. § 54-2a(d)-(e).

10.    On or about March 8, 2007, a Wage Enforcement Agent for the State of Connecticut Department of Labor provided the State's Attorneys Office in Middletown, Connecticut with an application for an arrest warrant for Mitchell Heffernan. (Affidavit of Senior Assistant State's Attorney Maureen Platt Temchin (the "Platt Aff.") at ¶ 8). That application included an affidavit from the agent attesting to facts that the agent believed demonstrated Mr. Heffernan had violated Connecticut's wage statutes. (*Id.* ¶ 8). Among other things, the agent swore that he had, pursuant to his authority under Conn. Gen. Stat. § 31-76a, conducted an investigation in response to numerous claims for unpaid wages that had been filed with the Department of Labor. (*Id.* ¶ 8).

11.    As a result of that investigation and audit, the agent requested that an arrest warrant issue for Mr. Heffernan, who he alleged had been the President and Chief Executive Officer of MLN during the relevant period, for failure to pay weekly, all monies due as required by section 31-71b of the Connecticut General Statutes.[3] (*Id.* ¶ 9). Specifically, the agent sought

---

[3] Section 31-71b requires employers, by themselves, their agents or representatives, to "pay weekly all moneys due each employee on a regular pay day, designated in advance by the employer, in cash, by negotiable checks or, upon an employee's written request, by credit to such employee's account in any bank which has agreed with the employer to accept such wage deposits." Conn. Gen. Stat. § 31-71b(a).



an arrest warrant for Mr. Heffernan for 61 separate counts of wage violations. The agent alleged

that the 61 separate wage violations amounted to approximately $2.5 million in unpaid wages,

with claims for unpaid wages ranging from $178.00 to $310,380.29. (*Id.* ¶ 9). The application

did not seek a warrant for the Debtor or, for that matter, any other individual or entity. (*Id.* ¶ 9).

12.    As of the date of this objection, the Connecticut State's Attorneys Office has not

signed the arrest warrant or sought the issuance of a warrant for Mr. Heffernan's arrest from a

superior court judge. (*Id.* ¶ 10).

13.    In his Motion, the Movant makes the bald and unsupported assertion that the State

of Connecticut – although it is not clear through which state actors or agents – seeks to

commence "a criminal prosecution against him personally in order to collect unsecured debts of

the Debtor for employee commissions." (Motion at p. 1; see also ¶ 10). Mr. Heffernan's

supporting affidavit, however, contains no facts whatsoever supporting that assertion. (See

March 27, 2007 Affidavit of Mitchell Heffernan). Moreover, while, under Connecticut law, the

Department of Labor does have the authority to bring a civil action against an employer to

recover twice the amount of the total wages owed, *see* Conn. Gen. Stat. § 31-72, the Department

of Labor has not, as of the date of this objection, brought any such action against the Movant or

the Debtor.

14.    In addition, because Connecticut law only authorizes prosecutors to seek an arrest

warrant from a superior court judge, and because the law in the Third Circuit makes clear that the

motives of a complaining witness, such as the Department of Labor, are not relevant factors in

determining whether a federal bankruptcy court should enjoin a state criminal prosecution, *see*

*Davis, infra*, in order to prevail on his Motion, the Movant must demonstrate, at the very least,

6

(178)

that the State's Attorneys Office is pursuing his prosecution in bad faith, and arguably, that a

superior court judge would be complicit in that conspiracy. The Movant has not made – and

cannot make – any such showing.

## ARGUMENT

### I. The Movant's Motion For An Injunction Should be Denied Because It Was Not Brought As an Adversary Proceeding As Required By The Federal Rules of Bankruptcy Procedure 7001(7).

15.     The Federal Rules of Bankruptcy Procedure 7001(7) provide that: "An adversary

proceeding is governed by the rules of this Part VII. The following are adversary proceedings:

… (7) a proceeding to obtain an injunction or other equitable relief, except when a chapter 9,

chapter 11, chapter 12 or chapter 13 provides for the relief." In this case, the Movant is seeking

equitable relief under §105 of the Bankruptcy Code.

16.     That being the case, the action must be commenced by the filing of an adversary

proceeding – not by motion. *In re Gledhill*, 76 F.3d 1070, 1079-80 (10th Cir. 1996) (a party

seeking equitable relief pursuant to section 105(a) must file an adversary proceeding); *accord,*

*United States v. Gilmore*, 226 B.R. 567 (D.E.D. Tex. 1998); *In re Worldcorp., Inc.*, 252 B.R. 890

(Bankr. D. Del. 2000). Because the Movant has not made his request by commencing an

adversary proceeding, his Motion should be denied on that ground alone.

### II. The Movant's Motion for An Injunction Should Be Denied Because The Matter Is Not Ripe For Determination.

17.     The Movant is seeking an injunction to enjoin the State of Connecticut from

"commencing" a criminal prosecution against him. Thus, the Movant is seeking relief prior to

the State's Attorneys Office being given the opportunity to decide whether or not to seek an

arrest warrant against him. Even if the State's Attorney were to decide to eventually seek an

arrest, an application must first be submitted to a judge of the superior court and approved by him or her before a warrant for the Movant's arrest can be issued.

18.    The "ripeness doctrine" derives in some circumstances from the requirement in Article III of the United States Constitution that federal courts are only empowered to decide cases and controversies and in others from prudential limitations. *NE Hub Partners, L.P. v. CNG Transmission Corp.,* 239 F.3d 333, 341 (3d Cir. 2001*).* "The function of the ripeness doctrine is to determine whether a party has brought an action prematurely, *Philadelphia Federation of Teachers, American Federation of Teachers, Local 3, AFL-CIO v. Ridge,* 150 F.3d 319, 323 (3d Cir. 1998*),* and counsels abstention until such time as a dispute is sufficiently concrete to satisfy the constitutional and prudential requirements of the doctrine." *Abbott Labs. v. Gardner,* 387 U.S. 136, 148-49, 87 S. Ct. 1507 (1967*), overruled on other grounds, Califano v. Sanders,* 430 U.S. 99, 105, 97 S. Ct. 980 (1977*).*

19.    Among the considerations in determining whether a proceeding is ripe for determination are: whether the parties are in a sufficiently adversarial posture so as to be able to present their positions vigorously; whether the facts of the case are sufficiently developed to provide the court with enough information on which to decide the matter conclusively; and whether a party is genuinely aggrieved so as to avoid expenditure of judicial resources on matters which have caused harm to no one. *See* Erwin Chemerinsky, *Federal Jurisdiction* § 2.3.1 (1989). Accordingly, the ripeness doctrine requires that the challenge grow out of a "real, substantial controversy between parties" involving a "dispute definite and concrete." *Babbitt v. United Farm Workers National Union,* 442 U.S. 289, 298, 99 S. Ct. 2301 (1979*)* (citation omitted).

20.     In the case now before this Court, the Movant has asked the Court to enjoin the State of Connecticut from commencing a criminal prosecution against him. At this point in time, however, the State's Attorneys Office has not yet sought an arrest warrant from a superior court judge. As a result, no superior court judge has made the separate and necessary determination as to whether there is probable cause to issue a bench warrant. As set forth above, the Department of Labor has no authority to commence a criminal prosecution against the Movant. Thus, the Court is not capable of enjoining any criminal prosecution because none of the parties capable of commencing a prosecution – a prosecutor and a superior court judge – have exercised their authority to do so at this time. In short, this matter is not ripe because there is no concrete dispute and no aggrieved party requiring consideration by this Court.

**III.    Even If The Court Determines That The Matter Is Ripe, It Should Deny The Motion Because Bankruptcy Courts Are Generally Barred From Enjoining State Criminal Proceedings.**

21.     The Movant is asking the Court to exercise its equitable power under Bankruptcy Code §105(a) by entering an injunction to enjoin the State of Connecticut from instituting criminal proceedings against the Movant, a former officer of the Debtor.

22.     The circumstances under which a bankruptcy court may enjoin criminal proceedings in a state court are narrowly circumscribed by the doctrine of *Younger v. Harris*. 401 U.S. 37, 91 S.Ct. 746 (1971). In *Younger*, the Supreme Court reaffirmed what it called the longstanding public policy against federal court interference with state court proceedings. *Id.* at 43. Thus, "the normal thing to do when federal courts are asked to enjoin pending proceedings in state courts is not to issue such injunctions." *Id.* at 45.

23.     The *Younger* principal was cited with approval in *Kelly v. Robinson*, 479 U.S. 36, 107 S.Ct. 353 (1986), where the Supreme Court held that criminal restitution obligations are not dischargeable in a Chapter 7 proceeding. *Kelly*, 479 U.S. at 47. The Supreme Court pointed out in *Kelly* that "the State's interest in administering their criminal justice systems free from federal interference is one of the most powerful of the considerations that should influence a court considering equitable types of relief." *Kelly*, 479 U.S. at 49, citing *Younger*, 401 U.S. at 44-45.

24.     While the court is granted limited injunctive powers under Bankruptcy Code §105(a) to override the bar on enjoining proceedings in a state court, 28 U.S.C. §2283, such a provision does not "qualify in any way the principles of equity, comity, and federalism that must restrain a federal court when asked to enjoin a state court proceeding." *Davis v. Sheldon (In the Matter of Davis)*, 691 F.2d 176, 178 (3d Cir. 1982), quoting, *Mitchum v. Foster*, 407 U.S. 225, 243 (1972).

25.     In *Davis*, a creditor of the debtors instituted a criminal complaint against one of the debtors for purchasing goods from the creditor and paying for the goods with a check that was later dishonored at the bank. The debtors thereafter sought to enjoin the pending criminal proceedings. The Court of Appeals affirmed the refusal of both the Bankruptcy Court and District Court to grant an injunction. Quoting from *Younger v. Harris*, the court stated, "it is a basic doctrine of equity jurisprudence that courts of equity should not act, and particularly should not act to restrain a criminal prosecution, when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief." 401 U.S. at 43-44.

26.     This principle is even more applicable in this case. Unlike in the *Davis* case, in which the court considered but then rejected *the debtors' claim* that the remedy at law was

inadequate because any possible restitution order arising from his criminal conviction would undercut his discharge and "fresh start", the Movant here, *is not a debtor in bankruptcy*. The Movant has asserted in his Motion that he should not be held criminally responsible for the failure of the company to pay wages because he was not operating the business during the forty-five (45) day period prior to the filing of the bankruptcy.[4] However, the Movant has stated no reason why such a defense could not be raised by him in a state court. *See Ticket Plus, Inc. v. Makoul (In re Ticket Plus, Inc.)*, 103 B.R. 574, 577 (Bankr. M.D. Pa. 1989) (defense to the criminal action may be raised in the state court and had no bearing on whether to issue an injunction).

27.    Moreover, the Movant has not alleged any facts demonstrating that he, or more importantly for purposes of the present action, the Debtor, will suffer any irreparable injury from the possible state prosecution. Nor could he. It is clear that the "cost, anxiety and inconvenience" of defending oneself in a good faith criminal prosecution does not constitute irreparable injury." *Davis* at 178, quoting *Younger v. Harris*, 401 U.S. at 46. Nor can he claim that the estate would be irreparably harmed. He is not operating the debtor and the debtor is in the process of liquidating, not reorganizing. Further, *Younger* makes it clear that "even irreparable injury is insufficient unless it is "both great and immediate." *Id.*

28.    While the Movant vaguely asserts that the complaining party, the Department of Labor and its counsel, the Office of Attorney General, are "trying to use this criminal statute to

---

[4] Since the Motion was filed, Residential Funding Company, LLC has moved to strike all statements in Mr. Heffernan's Motion, supporting affidavit and memorandum of law suggesting that RFC or its financial advisors "took over the cash management of the Debtor" or instructed Mr. Heffernan "not to pay any commissions to employees," claiming that all such allegations are "patently false." *See* RFC Motion to Strike at p. 1-2 (Docket No. 396). According to RFC, Mr. Heffernan's "attempt to deflect blame from himself by dragging RFC and [its financial advisor] through the mud constitutes scandalous material of the type properly the subject of a motion pursuant to Rule 12(f) of the Federal Rules of Civil Procedure." *Id.* at 2.

collect prepetition commissions," under *Davis*, the motives of the complaining party, in this case the Department of Labor, are not relevant to the analysis. As the court stated in *Davis*, "We cannot require a prosecutor to conduct a searching inquiry into the public spirit of the victim of a crime before proceeding with what appears to be an otherwise valid criminal prosecution. Under these circumstances, *the intentions of the complaining witnesses are not controlling in judging the good faith of a criminal prosecution.*" *Davis*, 691 F.2d at 179 (emphasis added).

29.     More recently, in *Gruntz v. County of Los Angeles (In re Gruntz)*, 202 F.3d 1074 (9th Cir. 2000), in an *en banc* decision, the Ninth Circuit Court of Appeals reconsidered its earlier holding to the contrary in *Hucke v. Oregon*, 992 F.2d 950 (9th Cir. 1993), and held that *even the motivation of the prosecutor is irrelevant*. (Emphasis added) ([T]here is "no rationale or justification for severing economic and noneconomic ramifications of the debtor's criminal conduct," citing 3 *Collier on Bankruptcy* 362-48 (15th ed. 1999)). Such a rule would appear to be even more reasonable in a case like this, where prosecutors only have the discretion *to seek, but not issue*, an arrest warrant. In other words, because, in Connecticut, a superior court judge must make an independent determination of probable cause before a warrant can issue, the prosecutor's motives, like those of a complaining witness, should not be controlling in judging the good faith of the commencement of a criminal prosecution. Rather, the Movant should have to demonstrate that a superior court judge, the only person capable of actually issuing an arrest warrant, also is complicit in whatever bad faith motives he claims may subject him to a criminal prosecution.

30.     Even if this Court were not to adopt such a rule, however, and, instead, conclude that a litigant can enjoin a state criminal prosecution solely by demonstrating that a prosecutor is

12

(184)

acting in bad faith (notwithstanding the fact that only a judge can issue an arrest warrant upon his or her own independent judgment about whether there is probable cause to make an arrest), it is the Movant's burden to prove bad faith and the bad faith exception permitting an injunction, as with the other exceptions, is to be narrowly construed. *See Perez v. Ledesma*, 401 U.S. 82, 85, 91 S.C. 674 (1971) ("Only in cases of proven harassment or prosecutions undertaken by state officials in bad faith without hope of obtaining a valid conviction and perhaps in other extraordinary circumstances where irreparable injury can be shown is federal injunctive relief against pending state prosecutions appropriate.").

31.    In his Motion, the Movant has produced no evidence whatsoever to support a claim that the Connecticut State's Attorneys Office is acting in bad faith. As is set forth *supra*, the State's Attorneys Office has not signed the arrest warrant application or presented it to a superior court judge. In these circumstances, it can hardly be said that the State's Attorneys Office has acted with such bad faith that this Court can or should exercise its limited powers under 11 U.S.C. §105 to enjoin the commencement of a state criminal prosecution.

32.    While the Movant cites *American Film Technologies, Inc. v. Taritero (In re American Film Technologies, Inc.)*, 175 B.R. 847 (Bankr. D. Del. 1994), in support of his Motion to enjoin the criminal proceedings, that case is inapposite. That case concerned the power of the court to enter injunctions to enjoin *civil* proceedings. The standards that are applicable in those types of proceedings are entirely different from the considerations that apply here.

33.    Movant also cites *Dettler Farms v. Clark Community Oil Co. (In re Dettler Farms)*, 58 B.R. 404 (Bankr. D. S. D. 1986); *Bicro Corp. v. Mackes Electric (In re Bico Corp.)*,

13

105 B.R. 255 (M.D. Pa. 1988), and *In re Caldwell*, 5 B. R. 740 (Bankr. W.D. Va. 1980), in

support of his request for an injunction against the State. Those cases are all distinguishable,

however, because they all involved attempts by creditors to recover money from a debtor to the

detriment of other creditors and/or to deprive *a debtor* of his statutory right to have pre-petition

debts discharged. In *Caldwell*, for instance, *a debtor* sought to enjoin a creditor from seeking a

criminal prosecution against him on the grounds that the creditor was using the criminal process

to extract money from the debtor *in violation of the automatic stay. Caldwell*, 5 B.R. at 742.

Similarly, in *Dettler Farms*, the court enjoined a creditor from participating in a criminal

prosecution against *a debtor* because the evidence showed that the creditor was seeking to utilize

the criminal process to collect an unsecured debt *from the debtor* to the disadvantage of other

similarly situated creditors. *Dettler Farms*, 58 B.R. at 407. The same circumstances led a court

to enjoin a creditor in *In re Bicro Corp.*, where the court found that an injunction was necessary

to prevent a creditor from participating in a criminal case that it found would permit the creditor

to extract a preference from the debtor, -not afforded other similarly situated creditors. *Id.* at

258.

      34.    Here, of course, and unlike in any of these cases, the Movant is not a debtor and,

as a result, there is no danger that the criminal prosecution will have a detrimental effect on the

estate or its creditors. Moreover, and unlike in the present case, the plaintiffs in those cases only

sought injunctions against the complaining parties, not against state prosecutors. In fact, in

*Caldwell*, the court took particular note of any effort to enjoin the criminal prosecution, itself:

"This order in no way seeks nor is intended to restrict or be construed as interfering with the

Prosecuting Attorney of the City of Salem or the General District Court of the City of Salem in

the enforcement of the criminal laws of the Commonwealth of Virginia. . . ." *Caldwell*, 5 B.R. at 742.

35.     While in *In re Jerzak*, 47 B.R. 771 (Bankr. W.D. Wis. 1985) the final case cited by the Movant, the court did enter an injunction to stop pending criminal proceedings, questioning the motives of the prosecutor, it also was in a case *concerning a debtor*, not a third party, as here, and a creditor, *seeking to be paid an otherwise dischargeable debt*.  Further, in granting the injunction, the court disagreed in part, with the reasoning of the Third Circuit Court of Appeals in *Davis v. Sheldon*, 691 F.2d at 178, which stated that a prosecutor's questionable motives could be raised as a defense in the state court.  *Jerzak*, 47 B.R. at 773 n.3.

36.     Both Congress, through its adoption of §§362(b)(1) and (4) creating exceptions to the automatic stay for criminal proceedings, and the federal courts, including the Third Circuit, have made it clear that the states' interests in administering their criminal statutes overrides a debtor's "fresh start", as important as that may be.  In this case, involving as it does a nondebtor, even that limitation is inapplicable.

## IV.    The Bankruptcy Court Should Deny The Motion Because The Bankruptcy Court Lacks Subject Matter Jurisdiction Over This Matter.

37.     The Movant is a non-debtor, seeking the entry of an injunction under Bankruptcy Code § 105 against another non-debtor.  The Court lacks subject matter jurisdiction because the Movant's effort to enjoin legal proceedings between nondebtors does not "arise in or under" title 11, within the meaning of 28 U.S.C. §1334.  In addition, although 28 U.S.C. §1334(b) confers on Bankruptcy Courts broad jurisdiction over actions between non-debtors if the action is "related to" the bankruptcy case, such jurisdiction is not limitless.  See *Internal Revenue Service v. Prescription Home Health Care, Inc.*, 316 F.3d 542, 547 (5th Cir. 2002).

15

(187)

38.    The test of whether a bankruptcy court has "related to" jurisdiction is whether "the outcome of [the] proceeding could conceivably have any effect on the estate being administered in bankruptcy." *In re Zinchiak*, 406 F.3d 214, 226 (3d Cir. 2005) (quoting *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)).

39.    In this case, the party seeking the injunction is a former officer of the Debtor who, according to the Movant, is minimally involved in its operations. Daniel Schuler was appointed by the Board of Directors to be the Debtor's Chief Restructuring Officer prior to the filing of the bankruptcy petition. The Debtor is not reorganizing but is in the last stages of liquidating. Moreover, any criminal penalties imposed upon the Movant will have no financial impact on the estate. Those penalties do not include restitution and the Movant, of course, is not even entitled to a discharge in the Debtor's bankruptcy. Finally, and notwithstanding the Movant's vague assertions to the contrary, no state officials are seeking to use the criminal prosecution to recover funds from the estate – or any funds at all – but rather to enforce the duly enacted criminal laws of the sovereign State of Connecticut. Thus, a criminal action brought against a former officer of the Debtor would have no impact on the debtor's process of liquidating in Chapter 11.

40.    Rather than expanding the powers of the Court, §105 limits the power of the Court to act unless it is acting in furtherance of a specific provision of the Bankruptcy Code. *New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In re Dairy Mart Convenience Stores, Inc), 351 F.3d 86 (2d Cir. 2003).* There is no provision of the Bankruptcy Code that authorizes the court to enjoin a state from instituting a criminal proceeding against a nondebtor. In fact, Bankruptcy Code § 362(b)(1) specifically excepts from the automatic stay "the commencement or continuation of a criminal action or proceeding against the debtor."

41.     Thus, on the facts of this case, and the lack of any impact on the estate, the Court should deny the Motion on the grounds that the court lacks jurisdiction to enter an injunction on behalf of a non-debtor.

**V.     The Bankruptcy Court Should Deny The Motion Because The Movant Has Failed To Identify With Any Particularity The Individual State Actors He Seeks To Enjoin.**

42.     In *Davis*, the Third Circuit also held that a bankruptcy court may not enjoin a "state *court* directly." *See Davis*, 691 F.2d at 178 n.5 (emphasis in original). It also held that bankruptcy courts may only "enjoin the *proceedings* before a state court under §2283 by enjoining the litigants." *Id.* (emphasis in original). In that case, the court held that the injunction requested was properly directed to *particular individuals*, including the Attorney General of Delaware.

43.     Here, the Movant has simply moved to enjoin the "State of Connecticut" from commencing criminal proceedings against him. The State of Connecticut includes, of course, all of its courts, as well as investigating agencies and individuals, such as DOL, prosecutors within the State's Attorneys Office, and Assistant Attorneys General within the Office of the Attorney General. Under Connecticut law, a criminal prosecution may not be commenced for wage violations unless and until a superior court judge issues an arrest warrant. The present Motion, which seeks an order enjoining the State *from commencing* a criminal prosecution, would therefore require this Court to enjoin a state court from issuing an arrest warrant. Because, contrary to the requirements identified by the Third Circuit in *Davis*, the Movant has failed to identify with particularity any of the individuals he seeks to enjoin, merely naming the State of Connecticut, this Court lacks jurisdiction to enter the relief requested.

17

WHEREFORE, for all of the above reasons, the Motion to Enjoin the State of Connecticut From Criminal Prosecution Pursuant to 11 U.S.C. §105 should be denied.

> DEFENDANT,
> STATE OF CONNECTICUT
>
> RICHARD BLUMENTHAL
> ATTORNEY GENERAL
>
> BY: _____
> Joan E. Pilver, CT #08604
> Robert W. Clark CT #18681
> Assistant Attorney General
> 55 Elm Street, 4th Fl., P.O. Box 120
> Hartford, Connecticut 06141-0120
> Tel:  (860) 808-5150
> Fax:  (860) 808-5383
> Email:  Joan.Pilver@PO.STATE.CT.US

Case 1:07-cv-00266-SMS    Document 13-4    Filed 10/12/2007    Page 4 of 13

**Sec. 31-71b.   Weekly payment of wages. Exemptions.** (a) Each employer, by himself, his agent or representative, shall pay weekly all moneys due each employee on a regular pay day, designated in advance by the employer, in cash, by negotiable checks or, upon an employee's written request, by credit to such employee's account in any bank which has agreed with the employer to accept such wage deposits.

(b)   The end of the pay period for which payment is made on a regular pay day shall be not more than eight days before such regular pay day, provided, if such regular pay day falls on a nonwork day, payment shall be made on the preceding work day.

(c)   This section shall not be construed to prohibit a local or regional board of education and a recognized or certified exclusive bargaining representative of its certified or noncertified employees from including within their collective bargaining agreement a schedule for the payment of wages to certified employees or noncertified employees that differs from the requirements of subsections (a) and (b) of this section.

(d)   Nothing in this section shall be construed to apply to employees swapping workdays or shifts as permitted under a collective bargaining agreement.

(1967, P.A. 714, S. 2; 1969, P.A. 251, S. 1; P.A. 00-65, S. 1, 2; May 9 Sp. Sess. 02-7, S. 91; P.A. 03-11, S. 1; 03-107, S. 10; P.A. 04-13, S. 1.)

History: 1969 act authorized payment of wages by credit to employee's bank account upon employee's written request in Subsec. (a); P.A. 00-65 added new Subsec. (c) re payment of wages to certified employees of local and regional boards of education, effective May 16, 2000; May 9 Sp. Sess. P.A. 02-7 added new Subsec. (d) to exempt from weekly payment of wages requirement employees who swap workdays or shifts as permitted under a collective bargaining agreement, effective August 15, 2002; P.A. 03-11 amended Subsec. (c) by adding provisions re paraprofessionals, effective July 1, 2003; P.A. 03-107 made a technical change, effective June 18, 2003; P.A. 04-13 amended Subsec. (c) to extend authorization for different payment schedule to all noncertified board of education employees, replacing references to "paraprofessionals" with references to "noncertified employees", and deleting definition of "paraprofessional", effective July 1, 2004.

Cited. 212 C. 294. Cited. 228 C. 106.

Cited. 36 CA 29. Constitutional requirement of due process not violated merely because mens rea is not required element of a proscribed crime. 37 CA 379. Crime of failure to pay wages is a strict liability crime and does not require a mens rea of at least criminal negligence. 83 CA 67.

**Sec. 31-71c.   Payment of wages on termination of employment.** (a) Whenever an employee voluntarily terminates his employment, the employer shall pay the employee's wages in full not later than the next regular pay day, as designated under section 31-71b, either through the regular payment channels or by mail.

(b)   Whenever an employer discharges an employee, the employer shall pay the employee's wages in full not later than the business day next succeeding the date of such discharge.

(c)   When work of any employee is suspended as a result of a labor dispute, or when an employee for any reason is laid off, the employer shall pay in full to such employee the wages earned by him not later than the next regular pay day, as designated under section 31-71b.

(1967, P.A. 714, S. 3.)

Cited. 212 C. 294.
Subsec. (b):
Cited. 40 CS 246.

**Sec. 31-71d.   Payment where wages disputed.** (a) In case of a dispute over the amount of wages, the employer shall pay, without condition and within the time set by sections 31-71a to 31-71i, inclusive, all wages, or parts thereof, conceded by him to be due, and the employee shall have all remedies provided by law, including those under said sections as to recovery of any balance claimed.

(b)   The acceptance by any employee of a payment under this section shall not constitute a release as to the balance of his claim and any release required by an employer as a condition to payment shall be void.

(1967, P.A. 714, S. 4.)

Cited. 212 C. 294.

### Sec. 31-71e.   Withholding of part of wages.

No employer may withhold or divert any portion of an employee's wages unless (1) the employer is required or empowered to do so by state or federal law, or (2) the employer has written authorization from the employee for deductions on a form approved by the commissioner, or (3) the deductions are authorized by the employee, in writing, for medical, surgical or hospital care or service, without financial benefit to the employer and recorded in the employer's wage record book.

(1967, P.A. 714, S. 5.)

Cited. 212 C. 294. Formula for calculating salesperson's commissions did not violate prohibition against employer deducting money from employees' wages. 260 C. 152.

Plaintiff, an at-will employee, failed to provide any law or legal analysis to support claim that trial court improperly concluded that, in implementing furlough program affecting all salaried and hourly employees, employer did not violate statute prohibiting withholding of any portion of an employee's salary. 52 CA 724.

Cited. 40 CS 246.

### Sec. 31-71f.   Employer to furnish employee certain information.

Each employer shall: (1) Advise his employees in writing, at the time of hiring, of the rate of remuneration, hours of employment and wage payment schedules, and (2) make available to his employees, either in writing or through a posted notice maintained in a place accessible to his employees, any employment practices and policies or change therein with regard to wages, vacation pay, sick leave, health and welfare benefits and comparable matters.

(1967, P.A. 714, S. 6.)

Cited. 212 C. 294.

### Sec. 31-71g.   Penalty.

Any employer or any officer or agent of an employer or any other person authorized by an employer to pay wages who violates any provision of this part may be: (1) Fined not less than two thousand nor more than five thousand dollars or imprisoned not more than five years or both for each offense if the total amount of all unpaid wages owed to an employee is more than two thousand dollars; (2) fined not less than one thousand nor more than two thousand dollars or imprisoned not more than one year or both for each offense if the total amount of all unpaid wages owed to an employee is more than one thousand dollars but not more than two thousand dollars; (3) fined not less than five hundred nor more than one thousand dollars or imprisoned not more than six months or both for each offense if the total amount of all unpaid wages owed to an employee is more than five hundred but not more than one thousand dollars; or (4) fined not less than two hundred nor more than five hundred dollars or imprisoned not more than three months or both for each offense if the total amount of all unpaid wages owed to an employee is five hundred dollars or less.

(1967, P.A. 714, S. 7; P.A. 78-358, S. 1, 6; P.A. 93-392, S. 4.)

History: P.A. 78-358 made imposition of penalty optional rather than mandatory, substituting "may" for "shall", imposed minimum fine of two hundred dollars and raised maximum fine from two hundred to one thousand dollars; P.A. 93-392 increased the maximum penalty for violating the state's wage laws from one thousand dollars and thirty days to five thousand dollars and five years, and to allow for the imposition of varying fines and prison terms based on the amount of wages owed by an employer.

Cited. 212 C. 294. Structural relationship to Sec. 31-72 discussed. 243 C. 454.

Cited. 36 CA 29. Cited. 37 CA 379.

584                                    LABOR                                    Title 31

**Sec. 31-71h.  Regulations.** The commissioner is authorized to issue regulations for the establishment of procedures for carrying out the provisions of sections 31-71a to 31-71i, inclusive.

(1967, P.A. 714, S. 8.)

Cited. 212 C. 294.

**Sec. 31-71i.  Waiver of weekly payment requirement.** The commissioner may, upon application, waive the provisions of section 31-71b with respect to any particular week or weeks, and may also, upon application, permit any employer, subject to the provisions of this section, to establish regular pay days less frequently than weekly, provided each employee affected shall be paid in full at least once in each calendar month on a regularly established schedule.

(1967, P.A. 714, S. 9.)

Cited. 212 C. 294.

**Sec. 31-72.  Civil action to collect wage claim, fringe benefit claim or arbitration award.** When any employer fails to pay an employee wages in accordance with the provisions of sections 31-71a to 31-71i, inclusive, or fails to compensate an employee in accordance with section 31-76k or where an employee or a labor organization representing an employee institutes an action to enforce an arbitration award which requires an employer to make payments to an employee welfare fund or to make payments to an employee welfare fund, such employee or labor organization may recover, in a civil action, twice the full amount of such wages, with costs and such reasonable attorney's fees as may be allowed by the court, and any agreement between him and his employer for payment of wages other than as specified in said sections shall be no defense to such action. The Labor Commissioner may collect the full amount of any such unpaid wages, payments due to an employee welfare fund or such arbitration award, as well as interest calculated in accordance with the provisions of section 31-265 from the date the wages or payment should have been received, had payment been made in a timely manner. In addition, the Labor Commissioner may bring any legal action necessary to recover twice the full amount of unpaid wages, payments due to an employee welfare fund or arbitration award, and the employer shall be required to pay the costs and such reasonable attorney's fees as may be allowed by the court. The commissioner shall distribute any wages, arbitration awards or payments due to an employee welfare fund collected pursuant to this section to the appropriate person.

(1951, S. 1291b; 1955, S. 3015d; 1967, P.A. 641; P.A. 78-358, S. 2, 6; P.A. 89-157, S. 2; P.A. 90-55, S. 1, 3.)

History: 1967 act deleted reference to repealed Sec. 31-71, added reference to Secs. 31-71a to 31-37i, authorized recoveries by labor organizations and made provisions applicable to cases where employee or labor organization institutes action to enforce arbitration award; P.A. 78-358 authorized recovery of twice the amount of wages and costs where previously recovery was limited to the amount itself and substituted "recover the amount provided by this section" for "collect such claim" in provision re bringing of legal action; P.A. 89-157 deleted the provisions allowing the labor commissioner to take an assignment of an employee's wage claim and provided for the collection and distribution by the labor commissioner of unpaid wages, payments due an employee welfare fund and arbitration awards; P.A. 90-55 made provisions applicable to cases where employer has failed to compensate an employee in accordance with Sec. 31-76k.

See Sec. 31-89a re civil action to collect past due payments to employee welfare funds.

See Sec. 52-596 re statute of limitation for actions for payment of remuneration for employment.

Award of attorney's fees and costs does not apply to proceedings to confirm, modify or vacate arbitration awards, which are not civil actions within meaning of title 52, but only to civil actions later brought to enforce such orders. 176 C. 401. Cited. 209 C. 818. Cited. 211 C. 648. Cited. 212 C. 294. Cited. 217 C. 490. Cited. 219 C. 217. Legislature did not exempt real estate salespersons from section as was done in Unemployment and Workers' Compensation Acts. 231 C. 690. Award of double damages justified where employer requested employee to work additional hours, assured employee that she would be paid and then subsequently denied payment of overtime wages. 243 C. 454. Determination of whether an individual can be considered an employer where a corporate entity exists depends on the individual's authority to control hours and wages and responsibility for illegally withholding wages. Id. Analysis of legislative history. Wage statutes, as a whole, do not provide substantive rights regarding how a wage is earned, but provide remedial protections where employer-employee wage agreement is violated. 260 C. 152. It is well established that it is appropriate for plaintiff to recover attorney's fees

---

Ch. 558

and double damages und[...]
If a contingency fee agree[...]
unfairness to the party w[...]
section not equivalent t[...]
payment of wages betw[...]
from raising agreement [...]

Cited. 8 CA 254. Cit[...]
provisions are not preem[...]
27 CA 800. Cited. 35 CA[...]
to section. 69 CA 419. [...]
court's discretion. 69 CA[...]
of payment bond on beh[...]
Statute, together with Se[...]
statutory scheme to ensu[...]
Since grievance procedu[...]
tiff's claim, plaintiff did[...]
to do so would be futile.

**Sec. 31-73.  I**[...]
section, "refund o[...]
any agent of his e[...]
in return for serv[...]
employee of wage[...]
person or organiza[...]

(b)  No emplo[...]
of labor, acting by[...]
receive or exact [...]
person, or deduct [...]
understanding tha[...]
necessary to secu[...]
quire, request or d[...]
fee, contribution [...]
in employment. A[...]
set forth in any w[...]
received, if such [...]
instrument in writ[...]

(c)  The provi[...]
made in accordan[...]
by any governme[...]

(d)  Any pers[...]
than one hundred [...]
and, for each sub[...]
imprisoned not m[...]

(1949 Rev., S. 7363.)

Cited. 37 CA 85.
Subsec. (b):
Formula for calculati[...]
employees' wages. 260 [...]

**Sec. 31-74.  V**[...]
for him shall mak[...]
him, when the wa[...]
that at which suc[...]
provision of this s[...]

(1949 Rev., S. 7366.)

WAGES                                585

and double damages under this section only when defendant has acted with bad faith, arbitrariness or unreasonableness. If a contingency fee agreement is reasonable, trial court may depart from its terms only when necessary to prevent substantial unfairness to the party who bears ultimate responsibility for payment of the fee. 265 C. 210. Double damage award under section not equivalent to punitive or exemplary damages; provision prohibiting employer from raising agreement for payment of wages between employer and employee as defense against action for unpaid wages does not bar employer from raising agreement for other purposes, such as ground for vacating arbitration award. 275 C. 72.

Cited. 8 CA 254. Cited. 10 CA 22. Provisions govern collection of wages; employees' rights under these statutory provisions are not preempted by collective bargaining agreements. 16 CA 232. Cited. 18 CA 618. Cited. 26 CA 251. Cited. 27 CA 800. Cited. 35 CA 31. Cited. 36 CA 29. Plaintiff's pension and medical benefits do not qualify as "wages" pursuant to section. 57 CA 419. Award of double damages and attorney's fees in unpaid wage case was reasonable exercise of court's discretion. 69 CA 463. Statute construed to empower Labor Commissioner to initiate legal action for enforcement of payment bond on behalf of employees of subcontractor against general contractor and surety on public works project. Statute, together with Secs. 49-41 and 49-42 re public works and bond enforcement, intended by legislature as remedial statutory scheme to ensure that employees on public works projects are paid wages to which they are entitled. 73 CA 39. Since grievance procedures established in collective bargaining agreement were not capable of providing relief for plaintiff's claim, plaintiff did not have to exhaust her administrative remedies before bringing an action under this section since to do so would be futile. 78 CA 601.

**Sec. 31-73.   Refund of wages for furnishing employment.** (a) When used in this section, "refund of wages" means: (1) The return by an employee to his employer or to any agent of his employer of any sum of money actually paid or owed to the employee in return for services performed or (2) payment by the employer or his agent to an employee of wages at a rate less than that agreed to by the employee or by any authorized person or organization legally acting on his behalf.

(b) No employer, contractor, subcontractor, foreman, superintendent or supervisor of labor, acting by himself or by his agent, shall, directly or indirectly, demand, request, receive or exact any refund of wages, fee, sum of money or contribution from any person, or deduct any part of the wages agreed to be paid, upon the representation or the understanding that such refund of wages, fee, sum of money, contribution or deduction is necessary to secure employment or continue in employment. No such person shall require, request or demand that any person agree to make payment of any refund of wages, fee, contribution or deduction from wages in order to obtain employment or continue in employment. A payment to any person of a smaller amount of wages than the wage set forth in any written wage agreement or the repayment of any part of any wages received, if such repayment is not made in the payment of a debt evidenced by an instrument in writing, shall be prima facie evidence of a violation of this section.

(c) The provisions of this section shall not apply to any deductions from wages made in accordance with the provisions of any law, or of any rule or regulation made by any governmental agency.

(d) Any person who violates any provision of this section shall be fined not more than one hundred dollars or imprisoned not more than thirty days for the first offense and, for each subsequent offense, shall be fined not more than five hundred dollars or imprisoned not more than six months or both.

(1949 Rev., S. 7363.)

Cited. 37 CA 85.
Subsec. (b):
Formula for calculating salesperson's commissions did not violate prohibition against employer deducting money from employees' wages. 260 C. 152.

**Sec. 31-74.   Wages not to be scaled.** No employer of labor or any person acting for him shall make a discount or deduction from the wages of any person employed by him, when the wages of the employee or any part thereof are paid at an earlier time than that at which such wages would regularly have been paid. Any person violating any provision of this section shall be fined not more than one hundred dollars.

(1949 Rev., S. 7366.)

LABOR

**Sec. 31-74a.   Computation and payment of vacation pay.** Whenever an employee is eligible to receive both vacation pay and his regular wage payment on the same pay day, his employer shall compute federal social security and withholding taxes from the regular wage payment and the vacation pay separately.

(P.A. 84-303.)

**Sec. 31-75.   Discrimination in compensation on account of sex.** No employer shall discriminate in the amount of compensation paid to any employee solely on the basis of sex. Any difference in pay based on sex shall be deemed a discrimination within the meaning of this section, provided nothing herein shall be deemed to prevent the operation of employment practices which recognize length of service or merit rating as a factor in determining wage or salary rates.

(1949, 1953, S. 3016d.)

Cited. 38 CA 306.

**Sec. 31-76.   Enforcement.** The Labor Commissioner shall carry out the provisions of section 31-75 either upon complaint or upon his own motion. For this purpose, the commissioner, or his authorized representative, may enter places of employment, inspect payrolls, investigate work and operations on which employees are engaged, question employees and take such action as is reasonably necessary to determine compliance with section 31-75. Any employer who violates the provisions of section 31-75 shall be liable to the employee or the employees affected for the difference between the amount of wages paid and the maximum wage paid any other employee for equal work. Action to recover such difference may be maintained in any court of competent jurisdiction by any one or more employees. Any agreement to work for less than the wage to which such employee is entitled under section 31-75 shall not be a defense to such action. At the request of any employee who has received less than the wage to which he is entitled under section 31-75, the commissioner may take an assignment of such wage claim in trust and may bring any legal action necessary to collect such claim. If judgment is rendered against an employer in any civil action brought to collect wages under the provisions of this section, the employer shall be required to pay the taxable costs and such reasonable attorney's fees as may be allowed by the court. No action shall be brought or any prosecution instituted for any violation of section 31-75 unless within one year after the commission of the act complained of. Any person who violates section 31-75 or any employer who discriminates in any manner against any employee because such employee has filed a complaint or taken any other action as herein provided shall, upon conviction, be fined for each violation not more than two hundred dollars.

(1953, S. 3017d; P.A. 97-263, S. 20.)

History: P.A. 97-263 increased amount of fine from one hundred to two hundred dollars.

See Sec. 31-22 re commissioner's duties re enforcement of regulations and reporting of violations.

Cited. 165 C. 318.

**Sec. 31-76a.   Investigations on complaint of nonpayment of wages and certain misrepresentations re employees.** (a) On receipt of a complaint for nonpayment of wages or a violation of the provisions of subsection (g) of section 31-288, the Labor Commissioner, the director of minimum wage and wage enforcement agents of the Labor Department shall have power to enter, during usual business hours, the place of business or employment of any employer to determine compliance with the wage payment laws or subsection (g) of section 31-288, and for such purpose may examine payroll and other records and interview employees, call hearings, administer oaths, take testimony under oath and take depositions in the manner provided by sections 52-148a to 52-148e, inclusive.

---

(b)   The commissioner
the attendance of witnesses
any officer or agent of any e
to furnish time and wage re
of minimum wage or any
admit the commissioner, the
employer, corporation, firm
the director or such agent in
such agent's duties in the en
five dollars nor more than c
time and wage records to th
a separate offense, and eac
commissioner, the director

(1959, P.A. 369; P.A. 77-604, S. 3

History: P.A. 77-604 substituted ref
existing provisions into Subsecs. (a) an
in Subsec. (b).

**Sec. 31-76b.   Overtim**
inclusive:

(1)   The "regular rate" a
all remuneration for emplo
be deemed to include (A) s
Christmas time or on other
which are not measured by
(B) payments made for occa
holiday, illness, failure of
cause; reasonable payments
employee in the furtherance
the employer; and other simi
tion for the employee's hou
performed during a given p
and the amount of the paym
or near the end of the period
causing the employee to ex
pursuant to a bona fide pro
meeting the approval of th
other relevant factors, to th
determined with regard to
irrevocably made by an emp
for providing old-age, retire
employees; (E) extra comp
worked by the employee in
in excess of eight in a day
employee under section 31-
or regular working hours, a
premium rate paid for work
days of rest, or on the sixth
is not less than one and one
performed in nonovertime h
a premium rate paid to the e

(b)   The commissioner or the director, for such purpose, may issue subpoenas for the attendance of witnesses and the production of books and records. Any employer or any officer or agent of any employer, corporation, firm or partnership who wilfully fails to furnish time and wage records as required by law to the commissioner, the director of minimum wage or any wage enforcement agent upon request, or who refuses to admit the commissioner, the director or such agent to the place of employment of such employer, corporation, firm or partnership, or who hinders or delays the commissioner, the director or such agent in the performance of the commissioner's, the director's or such agent's duties in the enforcement of this section shall be fined not less than twenty-five dollars nor more than one hundred dollars. Each day of such failure to furnish the time and wage records to the commissioner, the director or such agent shall constitute a separate offense, and each day of refusal to admit, of hindering or of delaying the commissioner, the director or such agent shall constitute a separate offense.

(1959, P.A. 369; P.A. 77-604, S. 31, 84; P.A. 00-58, S. 2.)

History: P.A. 77-604 substituted reference to Secs. 52-148a to 52-148e for reference to Sec. 52-148; P.A. 00-58 divided existing provisions into Subsecs. (a) and (b), added references to Sec. 31-288(g) in Subsec. (a) and made technical changes in Subsec. (b).

**Sec. 31-76b.   Overtime pay: Definitions.** As used in sections 31-76b to 31-76j, inclusive:

(1)   The "regular rate" at which an employee is employed shall be deemed to include all remuneration for employment paid to, or on behalf of, the employee, but shall not be deemed to include (A) sums paid as gifts; payments in the nature of gifts made at Christmas time or on other special occasions, as a reward for service, the amounts of which are not measured by or dependent on hours worked, production or efficiency; (B) payments made for occasional periods when no work is performed due to vacation, holiday, illness, failure of the employer to provide sufficient work, or other similar cause; reasonable payments for traveling expenses, or other expenses, incurred by an employee in the furtherance of the employer's interests and properly reimbursable by the employer; and other similar payments to an employee that are not made as compensation for the employee's hours of employment; (C) sums paid in recognition of services performed during a given period if either, (i) both the fact that payment is to be made and the amount of the payment are determined at the sole discretion of the employer at or near the end of the period and not pursuant to any prior contract, agreement or promise causing the employee to expect such payments regularly; (ii) the payments are made pursuant to a bona fide profit-sharing plan or trust or bona fide thrift or savings plan, meeting the approval of the Labor Commissioner who shall give due regard, among other relevant factors, to the extent to which the amounts paid to the employee are determined with regard to hours of work, production or efficiency; (D) contributions irrevocably made by an employer to a trustee or third person pursuant to a bona fide plan for providing old-age, retirement, life, accident or health insurance or similar benefits for employees; (E) extra compensation provided by a premium rate paid for certain hours worked by the employee in any day or workweek because such hours are hours worked in excess of eight in a day or in excess of the maximum workweek applicable to such employee under section 31-76c, or in excess of the employee's normal working hours or regular working hours, as the case may be; (F) extra compensation provided by a premium rate paid for work by the employee on Saturdays, Sundays, holidays or regular days of rest, or on the sixth or seventh day of the workweek, where such premium rate is not less than one and one-half times the rate established in good faith for like work performed in nonovertime hours on other days; or (G) extra compensation provided by a premium rate paid to the employee, in pursuance of an applicable employment contract

to do so, and shall be obeyed by any and all persons and officers to whom the same is directed or whom it may concern.

(e) Whenever a warrant is issued under this section or section 53a-32, the court, judge or judge trial referee may cause such warrant to be entered into a central computer system. Existence of the warrant in the computer system shall constitute prima facie evidence of the issuance of the warrant. Any person named in the warrant may be arrested based on the existence of the warrant in the computer system and shall, upon any such arrest, be given a copy of the warrant.

(1959, P.A. 28, S. 27; February, 1965, P.A. 194, S. 1; 1967, P.A. 10, S. 1; 152, S. 44; 549, S. 10; P.A. 74-183, S. 126, 291; P.A. 76-436, S. 518, 681; P.A. 77-576, S. 38, 65; P.A. 79-216, S. 1; P.A. 80-313, S. 2; P.A. 84-123, S. 2; P.A. 00-209, S. 4; P.A. 01-72, S. 1; P.A. 04-127, S. 8.)

History: 1965 act added authority of judge to issue subpoenas and warrants; 1967 acts deleted language in last sentence qualifying power of judge as being "when the circuit court is not in session" and, effective October 1, 1968, added provisions for alternatives to bail; P.A. 74-183 replaced circuit court with court of common pleas, effective December 31, 1974; P.A. 76-436 replaced court of common pleas with superior court and deleted references to powers of other unspecified courts and judges, reflecting transfer of all trial jurisdiction to superior court, effective July 1, 1978; P.A. 77-576 added detailed provisions re procedure for issuance of bench warrants and clarified provisions with respect to crimes which are not bailable, effective July 1, 1978; P.A. 79-216 made minor wording changes; P.A. 80-313 divided section into Subsecs., restated power to issue bench warrants in Subsec. (a) and deleted detailed provisions re procedure re issuance of bench warrants and arrests made on bench warrant; P.A. 84-123 amended Subsec. (a) by authorizing the issuance of capias for defendants who violate a court order regarding any court appearance; added a new Subsec. (c) re the issuance of a capias in lieu of a rearrest warrant, and redesignated former Subsec. (c) as Subsec. (d); P.A. 00-209 made technical changes and added new Subsec. (e) authorizing the entry of a rearrest warrant into a central computer system, providing that the existence of the warrant in the computer system is prima facie evidence of its issuance and authorizing the arrest of a person based on the existence of the warrant in the computer system; P.A. 01-72 amended Subsec. (a) by adding "or any judge trial referee" specifically designated by the Chief Justice to exercise the authority conferred by this section" and amended Subsecs. (b) to (e) by adding references to judge trial referee; P.A. 04-127 amended Subsec. (e) by deleting reference to "rearrest" warrant and adding reference to Sec. 53a-32.

See Sec. 52-56(d) re execution or service of capias in any precinct by state marshal of any precinct.
See Sec. 54-64b re release following arrest on court warrant.

Annotations to former statute: At common law justice might take recognizance for appearance at adjourned sitting. 1 D. 98; 14 C. 209. In action on recognizance to town, claim against town cannot be set off. 45 C. 354. A bond to appear on adjournment and abide the order of court is not forfeited when principal appears but refuses to give bond on appeal. 51 C. 499. Taking recognizance after adjournment. 77 C. 38. When bond on adjournment should run to state. 85 C. 324; Cited. 110 C. 173. Cited. 224 C. 29. Cited. 229 C. 125.

Service on defendant by exhibiting warrant so he could read it was sufficient compliance with this section. 28 CS 19. Failure to produce witness who is within reach and who would naturally have been produced permits, but does not require, inference that evidence of witness would have been unfavorable. 5 Conn. Cir. Ct. 298. Issuance of warrant upon application of police officer, whose information concerning defendant's criminal act was based upon New Haven police reports, was issuance upon probable cause. "Probable cause" is a practical concept and may be based upon hearsay. Id., 529. Cited. Id., 685.

Annotations to present section:
Cited. 181 C. 562. Cited. 187 C. 292. Cited. 202 C. 443. Cited. 233 C. 403.
Cited. 38 CS 377.
Subsec. (a):
Subdiv. (1) cited. 193 C. 612; 205 C. 298.
Subdiv. (1) cited. 27 CA 307.

## Sec. 54-2b. Transferred to Chapter 960, Sec. 54-56a.

## Sec. 54-2c. Traffic violator need not appear in court, when. Schedule of fines established. Section 54-2c is repealed.

(1967, P.A. 429; 1969, P.A. 455; 1971, P.A. 436; P.A. 74-183, S. 128, 291; P.A. 75-577, S. 123, 126.)

## Sec. 54-2d. Notation in computer network of actions taken by law enforcement agency to execute certain warrants. Not later than thirty days after the entry of the issuance of any rearrest warrant or arrest warrant for a violation of probation into the paperless rearrest warrant network, the law enforcement agency for the municipality in which the accused person resides shall, if such network is available and accessible to

of the general statutes, revision of 1958, revised to January 1, 2003, or section 53a-129b, 53a-129c or 53a-129d may file a complaint reporting such alleged violation with the law enforcement agency for the town in which such person resides. Such law enforcement agency shall accept such complaint, prepare a police report on the matter, provide the complainant with a copy of such report and investigate such alleged violation and any other offenses allegedly committed as a result of such violation and shall, if necessary, coordinate such investigation with any other law enforcement agencies.

(P.A. 03-156, S. 7.)

**Secs. 54-1o and 54-1p.** Reserved for future use.

**Sec. 54-1q. Court to advise defendant that guilty or nolo contendere plea may have consequence of suspension of driver's license.** The court shall not accept a plea of guilty or nolo contendere from a person in a proceeding with respect to a violation of section 14-110, subsection (b) or (c) of section 14-147, section 14-215, subsection (a) of section 14-222, subsection (a) or (b) of section 14-224 or section 53a-119b unless the court advises such person that conviction of the offense for which such person has been charged may have the consequence of the Commissioner of Motor Vehicles suspending such person's motor vehicle operator's license.

(P.A. 03-233, S. 3.)

**Sec. 54-2. Conviction and binding over by trial justice.** Section 54-2 is repealed.

(1949 Rev., S. 8725; 1957, P.A. 522, S. 2; 1959, P.A. 28, S. 204.)

**Sec. 54-2a. Issuance of bench warrants of arrest, subpoenas, capias and other criminal process. Release conditions. Service of court process. Entry of warrants into computer system.** (a) In all criminal cases the Superior Court, or any judge thereof, or any judge trial referee specifically designated by the Chief Justice to exercise the authority conferred by this section may issue (1) bench warrants of arrest upon application by a prosecutorial official if the court or judge determines that the affidavit accompanying the application shows that there is probable cause to believe that an offense has been committed and that the person complained against committed it, (2) subpoenas for witnesses, (3) capias for witnesses and for defendants who violate an order of the court regarding any court appearance, and (4) all other criminal process; and may administer justice in all criminal matters.

(b) The court, judge or judge trial referee issuing a bench warrant for the arrest of the person or persons complained against shall, in cases punishable by death or life imprisonment, set the conditions of release or indicate that the person or persons named in the warrant shall not be entitled to bail and may, in all other cases, set the conditions of release. The conditions of release, if included in the warrant, shall fix the first of the following conditions which the court, judge or judge trial referee finds necessary to assure such person's appearance in court: (1) Written promise to appear; (2) execution of a bond without surety in no greater amount than necessary; or (3) execution of a bond with surety in no greater amount than necessary.

(c) In lieu of a warrant for the rearrest of any defendant who fails to appear for trial at the place and time specified or on any court date thereafter the court, judge or judge trial referee may issue a capias.

(d) All process issued by said court or any judge thereof, or any judge trial referee shall be served by any proper officer, or an indifferent person when specially directed

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| MORTGAGE LENDERS NETWORK USA, INC. | : | Case No. 07-10146(PJW) |
| | : | |
| Debtor. | : | Related Docket No. 367 |

## AFFIDAVIT OF SENIOR ASSISTANT STATE'S ATTORNEY MAUREEN PLATT TEMCHIN

I, Maureen Platt Temchin, having been duly sworn, depose and say that:

1.    I am over the age of eighteen (18) years and I understand and respect the obligations of an oath.

2.    I am a Senior Assistant State's Attorney of the State of Connecticut in the Judicial District of Middletown, Connecticut. In that capacity, I am generally responsible for prosecuting crimes within the State of Connecticut and have been assigned primary responsibility over the Connecticut Department of Labor's application for an arrest warrant against Mitchell Heffernan. I am submitting this Affidavit in opposition to Mr. Heffernan's Motion to Enjoin The State of Connecticut From Criminal Prosecution Pursuant to 11 U.S.C. § 105.

3.    Section 31-71b(a) of the Connecticut General Statutes provides that "[each employer, by himself, his agent or representative, shall pay weekly all moneys due each employee on a regular pay day, designated in advance by the employer, in cash, by negotiable checks or, upon an employee's written request, by credit to such employee's account in any bank which has agreed with the employer to accept such wage deposits." Conn. Gen. Stat. § 31-71b(a).

4.    Section 31-71g(1) of the Connecticut General Statutes provides that "[a]ny employer or any officer or agent of an employer or any other person authorized by an employer

(179)

to pay wages who any provision of this part may be: (1) Fined not less than two thousand dollars nor more than five thousand dollars or imprisoned not more than five years or both for each offense if the total amount of all unpaid wages owed to an employee is more than two thousands dollars." Conn. Gen. Stat. § 31-71g(1). The remaining subsections of that statute provide for lesser penalties for each instance in which any of the persons described therein violate the wage provisions by failing to pay employees wages owed in lesser amounts.

5.    The State of Connecticut Department of Labor has no authority to impose any of the criminal penalties described in Conn. Gen. Stat. § 31-71g. The Department of Labor's sole authority with respect to the imposition of those criminal penalties is to investigate alleged crimes pursuant to Conn. Gen. Stat. § 31-76a and to ask a prosecuting authority within the Connecticut State's Attorney's Office to seek an arrest warrant. In order to make such a request, a member of the Department of Labor must provide the State's Attorneys Office with an application containing a sworn affidavit attesting to facts that the affiant believes constitute probable cause that one of the persons or entities described in Section 31-71g has violated a provision of the wage statutes. See Conn. Gen. Stat. § 54-2.

6.    Once the State's Attorney's Office receives an application from the Department of Labor or some other investigating agency, such as the local or state police, one or more prosecutors review the application to make an independent determination of whether probable cause exists to arrest the suspect for committing a crime.

7.    Generally speaking, and particularly under Section 31-76a, if a prosecutor determines that no probable cause exists, no arrest warrant may issue. If, on the other hand, a prosecutor determines that probable cause does exist, he or she may apply to a superior court judge for an arrest warrant. The judge, in turn, makes his or her own independent determination

of whether there is probable cause to issue an arrest warrant. Specifically, Connecticut law provides that a superior court judge may issue "bench warrants of arrest upon application by a prosecutorial official if the court or judge determines that the affidavit accompanying the application shows that there is probable cause to believe that an offense has been committed and that the person complained against committed it." Conn. Gen. Stat. § 54-2a(a)(1). If, and only if, a superior court judge issues a bench warrant for a person's arrest, the person named in the warrant may be arrested by a proper officer to face the charges against him or her. Conn. Gen. Stat. § 54-2a(d)-(e).

8.    On or about March 8, 2007, a Wage Enforcement Agent for the Department of Labor provided the State's Attorney's Office in Middletown, Connecticut with an application for an arrest warrant for Mitchell Heffernan. That application included an affidavit from the Wage Enforcement Agent attesting to facts that the he believed constituted probable cause to arrest Mr. Heffernan for violations of Conn. Gen. Stat. § 31-71b. Among other things, the agent swore that he had, pursuant to his authority under Conn. Gen. Stat. § 31-76a, conducted an investigation in response to numerous claims for unpaid wages that had been filed with the Department of Labor.

9.    As a result of that investigation and audit, the Wage Enforcement Agent requested that an arrest warrant issue for Mr. Heffernan, who he alleged had been the President and Chief Executive Officer of Mortgage Lenders Network USA, Inc. ("MLN") during the relevant period, for failure to pay weekly all monies due as required by section 31-71b of the Connecticut General Statutes. Specifically, the agent sought an arrest warrant for Mr. Heffernan for 61 separate counts of wage violations. The agent alleged that the 61 separate wage violations amounted to approximately $2.5 million in unpaid wages, with claims for unpaid wages ranging

(201)

from $178.00 to $310,380.29. The application did not seek a warrant for MLN or, for that matter, any other individual or entity.

10.    As of the date of this Affidavit, the State's Attorneys Office has not signed the arrest warrant application or presented it to a superior court judge. I presently retain independent discretion to either pursue or not pursue an arrest. No arrest warrant can issue, moreover, until I, or, in the event another prosecutor is eventually assigned to the case, another prosecuting officer within the State's Attorneys Office, presents an application to a Superior Court judge, who makes yet another independent judgment about whether probable cause exists. See Conn. Gen. Stat. § 54-2a(a)(1).


Under penalty of perjury, the above statements, to the best of my knowledge and belief, are true, correct and complete.

Maureen Platt Temchin
Assistant State's Attorney


SUBSCRIBED AND SWORN to me on
this 5ᵗʰ day of April, 2007,

Notary Public   CHERYL A. TURNER
My Commission Expires on 11/30/2009.

4

